**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BUILDING MANAGEMENT ASSOCIATES, INC., | Civil Case No. |
| Plaintiff, | **COMPLAINT** |
| -against- | **JURY TRIAL DEMANDED** |
| SALVATORE GIGANTE and LATOYA ALLEN | |
| Defendants. | |

Plaintiff Building Management Associates Inc. ("BMA" or "Plaintiff"), by and through the undersigned attorneys, brings this Complaint against defendant Salvatore Gigante ("Sal") and Latoya Allen ("Latoya") (each individually a "Defendant" and, collectively, the "Defendants") and respectfully alleges as follows:

## NATURE OF ACTION

1.      Established in 1980 to manage a portfolio of low and moderate-income multi-family and senior citizen housing, Plaintiff BMA has been providing property management services to numerous Housing Development Fund Corporation ("HDFC") cooperatives for approximately 40 years.

2.      Defendant Sal has engaged in a massive corporate theft from the Plaintiff, BMA, amounting to hundreds of thousands of dollars. When terminated from his employment at BMA, he undertook a series of actions, literally stealing BMA's business established over decades.

3.      That business is an integral part of the legacy of the late Rev. Louis R. Gigante ("Father G"), an iconic figure and Roman Catholic priest, who was instrumental in rebuilding the South Bronx and Hunts Point. As The New York Times recently characterized it, Father G "was

instrumental in rebuilding one of America's most notorious slums, in the South Bronx, into a thriving and safer neighborhood with thousands of new homes."[1]

4.     Upon Father G's passing in 2022, his son, Luigino M. Gigante ("Gino") has become the *sole* residuary beneficiary of his entire $7 million Estate, which includes BMA.

5.      Sal is Father G's grandnephew and worked for BMA for 18 years.

6.     Having been "cut-off", Sal, along with Latoya, have been stonewalling and not providing information about BMA's business and its books and records to Gino.

7.     Sal,  therefore, was terminated from his employment at BMA.  And since then, it has become evident that Sal had been misappropriating corporate funds for his personal benefit in an amount no less than $278,502.96 and failed to repay a loan evidenced by a promissory note to BMA by him in 2017 for which the amount currently due is $70,640.63.

8.     After he was fired, Sal has taken active steps to tortiously interfere with BMA's business relationships with the purpose of wrongfully appropriating BMA's business by transferring the entirety of its portfolio of managed properties to an entity owned, controlled and/or managed by him and/or Latoya.

9.     He has done so with the help of Latoya by: (i) encouraging BMA employees to join him at the new business and causing 9 of them to precipitously resign from BMA; (ii) attempting to transfer the data base which houses information on the managed properties; and (iii) causing all

---

[1] https://www.nytimes.com/2022/10/23/obituaries/louis-gigante-dead.html (last accessed 1-24-2023).

15 of the property owners to simultaneously issue notices purportedly terminating the management arrangement with BMA *which has been in place for decades.*

10. Such a blatant attempt to usurp BMA's business – the cornerstone of Father G's 50- year legacy of providing affordable housing in the South Bronx – must be stopped. And Sal's corporate theft, accounted for.

## PARTIES, JURISDICTION AND VENUE

11. Plaintiff BMA is a domestic corporation with a principal place of business located at 885 Bruckner Boulevard, Bronx, New York 10459. 80% of the company is owned by the Estate of Father G and the remaining 20% is owned by Gino. Gino is the President of BMA.

12. Upon information and belief, Sal is an individual who resides in Greenwich, Connecticut and was the Chief Operating Officer ("COO") of BMA.

13. Upon information and belief, Latoya is an individual who resides in Montvale, Bergen County, New Jersey and was until recently, Vice-President of BMA.

14. This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because this action is between a New York corporation, a citizen of the State of Connecticut and a citizen of the State of New Jersey, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

15. This Court has personal jurisdiction over the Defendants and venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part or all of the events or omissions giving rise to the claims herein occurred in this judicial district.

## RELEVANT FACTS

### The Revitalization of South Bronx and Father G's Companies

16. In an attempt to fight the blight and deterioration that had plagued the Hunts Point community of the Bronx, the group known as (South East Bronx Community Organization, Inc.)

was formed in the fall of 1969 under the visionary leadership of Father G as a cornerstone to resurrect the Bronx and as a first step in rebuilding the Hunts Point section of the South Bronx.

17.　　Thirteen organizations, among them churches, business institutions and local civic associations, banded together in an effort to redevelop one of the worst neighborhoods in the United States and its poorest Congressional District.　Assisted by the "Model Cities Program", SEBCO worked with urban planners and elected officials to develop schools, recreational facilities and the local infrastructure as a prelude to the redevelopment of the neighborhood's housing stock.

18.　　In 1975, after lengthy negotiations, the United States Development of Housing and Urban Development ("HUD") approved SEBCO's first subsidized rehabilitation project for 360 apartments in nine buildings.　In 1977, HUD approved the next project　for an additional 200 housing units and by late 1978, many more proposals for HUD Section 8 projects were approved.

19.　　In April of 1978, SEBCO was formally incorporated under the laws of the State of New York as SEBCO Development, Inc. ("SEBCO").

20.　　The organization grew rapidly and, in anticipation of a need for its own management and security systems, in 1980, Father G created SEBCO Management, now known as BMA, to enable SEBCO to self-manage its portfolio of low and moderate-income multi-family and senior citizen housing and through Sentry Security Co., Inc., its wholly owned subsidary, to prevent their deterioration.　That mission has been accomplished.

21.　　BMA is part of a portfolio of entities, wholly owned by Father G, that were created to fulfill Father G's overarching mission -- the revitalization of the South Bronx.

22.　　Father G's various for-profit entities, which became involved in real estate development, management and/or maintenance, which include BMA as well as, among others, Fox River Properties, Inc. ("Fox River"), Bruckner Property Management Inc. ("Bruckner") and Tiffany Maintenance Co., Inc. ("Tiffany") (collectively, the "Companies").　And, together with

SEBCO Father G's Companies continued to grow through the years providing local jobs, housing, and assistance to the South Bronx Community as well as future sustenance to SEBCO. SEBCO and the Companies are collectively referred to as the "Business".

23.     By 1981, Father G had orchestrated the construction and rehabilitation of 1,100 federally subsidized apartments in the South Bronx. And by 2004, SEBCO had developed 2,000 housing units.

24.     BMA has since grown substantially with more than 125 employees that manage the 3,100 residential units and 40 commercial locations.

25.     The offices for BMA, Bruckner, Tiffany and SEBCO are all located in the same building at 885 Bruckner Boulevard, Bronx, New York 10459 (the "Building"). The Building itself is owned by Fox River.

26.     On October 19, 2022, Father G passed away at the age of 89.

27.     Under Father G's last will and testament (the "Will"), Gino is the ultimate beneficiary of his residuary Estate, which includes Father G's ownership in the Companies.

28.     By order of the Surrogate's Court of Columbia County, New York, non-party Irwin Siegel (" Mr. Siegel"), Father G's long-time trusted attorney, advisor and friend of almost 50 years was appointed Executor of the Father G's Estate.

29.     Mr. Siegel was *the* Honoree at SEBCO's 50th Anniversary Gala in 2018. As Father G put it, "[t]onight we celebrate the work of someone who was by my side since the beginning of SEBCO, Mr. Irwin Siegel." His guidance, business acumen, honesty and loyalty have been unwavering" and "he is one of the main foundation blocks that has built this [Business]".

30.      The Estate is the current owner of Father G's shares in the Companies, which includes 80% of BMA.

**Sal 's Theft and Breach of Fiduciary Duty to BMA**

31.     Out of the goodness of his heart, Father G hired his grandnephew, Sal -- not his nephew as Sal tells everyone  -- to work at BMA and at certain of the other Companies.  Sal had no real estate knowledge whatsoever at the time.  His college career focused on hammer throwing.

32.     Sal worked for 18 years at BMA.  He was the Executive Vice-President since 2018, and recently, taking advantage of Father G's failing health, appointed himself as COO.

33.     Sal had an Option Agreement upon Father G's passing to purchase his shares in BMA and Tiffany on favorable terms. The Option required periodic payments to be made by Sal. For four years, however, he made no payments at all and was in default.

34.     After Father G's passing in 2022, Sal issued a check for all of missed payments and sent it to Mr. Siegel.  As Father G's appointee under a durable power of attorney, had Mr. Siegel accepted the payments, the Option could have been exercised.  But if, in fact, the Option had lapsed because of Sal's failure to make the required payments and  Mr. Siegel, nevertheless, permitted Sal to take advantage of the Option, then, as the residuary beneficiary of Father G's Estate, Gino, could have sued Mr. Siegel and the Estate or sought to reverse the transfer to Sal.

35.     Mr. Siegel, therefore, sought a legal opinion from the well-known law firm of K&L Gates on the validity of the Option.  They concluded that, under New York law, the Option was no longer valid.  That being the case, Mr. Siegel told Sal that the Option was no longer valid. While Sal did not dispute that the Option was no longer in effect, he was livid.

36.     The fact that he no longer had an ownership interest in any of the Companies and that Gino, "the illegitimate son" --  as he called him --  inherited it all, has fueled Sal's attempted takeover of the Business, including BMA.  Father G was not even cold in his grave when Sal started plotting and scheming to do so.

37.     Latoya has been instrumental in helping Sal doing so.  Latoya's wrongdoing is motivated by her misplaced loyalty and complicity with Sal, working as his "second in command" for the past 10 years, as well as the expectation that she will reap a financial benefit by following Sal and assisting him in his plan.  Both Sal and she were extremely well compensated while at BMA[2].

38.     Following father's passing in 2022, Irwin became Executor of the Estate, and Gino became the ultimate owner of the Companies.

39.     In undertaking their responsibilities to the Companies, they began taking a close look at the financial condition and operations of each of the Companies, including BMA.

40.     While attempting to obtain information about BMA from employees, they encountered a lot of "stonewalling" from several BMA employees, including Latoya and Sonal Shah, the controller, as well as employees of the other Companies.  This included disregarding their requests for information when asked, as well as withholding important information and records they requested.

41.     The general attitude toward them was to provide the bare minimum, if anything.

42.     In short, they encountered considerable push-back.  Along with Sal and Latoya, Sonal created roadblocks so they could not get access to the books and records of BMA.

43.     On January 9, 2023, Sal therefore, was formally terminated from his employment with each of the Companies, including BMA.

44.     And, Gino finally obtained access to the books and records.  The reason why the Defendants were not willing to work with Gino and Mr. Siegel and provide them with the necessary information became evident.

---

[2] Based on SEBCO's latest tax filing, its Form 990, Sal received more than $680,000 altogether from organizations related to SEBCO i.e., from the Companies, which include BMA.

45. Upon review of BMA's financial records, it was discovered that Sal violated his fiduciary duties to BMA through, *inter alia*, the misappropriation of corporate funds and by paying himself excessive and unauthorized compensation.

46. In the review of BMA's records, it has come to light, that for at least 13 years, Sal has used BMA's funds, without authorization, to lease luxury vehicles for his personal use on the company's "dime" (the "Car Payments").

47. Starting on or about 2010, Sal used BMA's funds to make monthly payments for luxury automobile leases, maintenance, and insurance, totaling approximately $183,108.96.

48. Specifically, BMA's records have revealed that Sal misappropriated: (1) approximately $13,956.14 in Car Payments in 2010; (2) approximately $17,439.13 in Car Payments in 2011; (3) approximately $15,719.88 in Car Payments in 2012; (4) approximately $13,511.73 in Car Payments in 2013; (5) approximately $7,290.13 in Car Payments in 2014; (6) approximately $7,453.27 in Car Payments in 2015; (7) approximately $9,601.93 in Car Payments in 2016; (8) approximately $11,079.15 in Car Payments in 2017; (9) approximately $11,625.66 in Car Payments in 2018; (10) approximately $14,388.00 in Car Payments in 2019; (11) approximately $14,388.00 in Car Payments in 2020; (12) approximately $22,110.23 in Car Payments in 2021; and (13) approximately $24,545.71 in Car Payments in 2022.

49. Notably, Father G, who owned the Companies, never paid for any automobile expenses for himself from any of Father G's Companies, SEBCO or any other entity.

50. Sal had no right to use those funds belonging to BMA.

51. Sal 's payment of personal car expenses of at least $183,108.96 for the past 13 years was never authorized by BMA and is an improper conversion of BMA's corporate funds.

52. Furthermore, without BMA's authorization, beginning in or about 2017, Sal took numerous sums of money totaling approximately $95,394 from BMA's corporate accounts and

instructed auditors of BMA, who wrongfully acquiesced in order to keep the client, to classify the pilfered $95,394.00 as "advances/loans & exchanges" which was then buried with "Accounts Receivable" on the financial statement which totaled $1,711,871.

53. Upon information and belief, these payments consisted of: (1) $45,000 in May 2017; (2) $30,000 in February 2019; (3) $15,000 in May 2019; and (5) $5,394 in June 2021.

54. Not surprisingly, there are no documents substantiating such "accounts receivable" or even loans from BMA to Sal, for which he has never paid any interest.

55. BMA never authorized such loans and Sal never had the authority to make such loans to himself while he was employed by BMA.

56. Upon discovering the missing $95,394 from BMA -- the phony accounts receivable– BMA demanded the return of the funds from Sal.

57. BMA has also demanded return of the Car Payments wrongfully taken from BMA's corporate accounts.

58. To date, Sal has not returned any of the funds to BMA.

59. As such, Sal's taking these funds from BMA's accounts without authorization, and his refusal to return the funds, constitutes a conversion of BMA's corporate funds and a breach of his fiduciary duties to BMA.

**Sal 's Breach of Promissory Note**

60. In addition to the sums above, upon information and belief, BMA has a record of one actual loan made to Sal in September 2017 for a total of $55,000.

61. The loan is evidenced by a Demand Promissory Note signed by Sal dated September 1, 2017 (the "Promissory Note").

62. The Promissory Note is for the principal sum of $55,000 with an interest rate to be calculated at 5.25% per annum.

63.     The Promissory Note specifically provides that "[t]he outstanding Principal and any accrued or unpaid Interest shall be due and payable upon demand of the Payee (the "Maturity Date")."

64.     There is no record that Sal ever repaid the amount borrowed pursuant to the Promissory Note.

65.     Plaintiff has demanded payment of the money due on the Promissory Note.

66.     To date, Sal has not paid any amount due under the Promissory Note to BMA.

67.     As such, Sal 's failure to pay the amount due constitutes a breach of the Promissory Note.

**Sal 's Retaliatory Campaign**

68.     Since his termination at BMA on January 9, 2023, Sal has engaged in a retaliatory campaign with the aim of dismantling the very foundation on which SEBCO and Father G's Companies were built, thereby destroying more than 60 years of Father G's life's work of providing affordable housing in the South Bronx.

69.     Immediately following his termination as an employee of BMA on January 9, 2023, Sal sought to bar Mr. Siegel and Gino from accessing BMA's offices, going so far as to allege that Gino and Mr. Siegel have no right to enter the Building and falsely alleging that they were "breaking and entering" and "trespassing".

70.     On January 9, 2023, the New York City Police received upon information and belief a complaint from SEBCO's lawyer, David Samuels ("Samuels") that Mr. Siegel and Gino had "broken and entered into the Building", causing at least eight police officers to come to the Building. The matter was ameliorated by the head of Sentry Security Co., Inc., the unarmed security company founded by Father G to protect the buildings developed by SEBCO and managed by BMA.

71. In response, on January 10, 2023, Sal himself was at the Building and called 911 accusing Mr. Siegel and Gino of "trespassing". Such an allegation was made knowing that the Building is owed by Father G's Estate, where one of the alleged trespassers was the Estate's Executor and an attorney, and where the other is the President of BMA, a tenant in the Building. Again, the police came and again the complaint was determined to be unfounded.

72. The following day, Wednesday, January 11, 2023, Mr. Siegel and Gino returned to the Building to work on BMA business matters accompanied by one security officer. While stating that Gino could enter, Sal refused Mr. Siegel entry. As Executor of Father G's Estate which owns Father G's Companies, including Fox River (which owns the Building) and 80% of BMA (whose offices are located there), Mr. Siegel has the absolute right to enter Building.

73. On January 11, 2023, Sal had his attorneys transmit two documents they asserted granted SEBCO an extended lease in a portion of the Building.

74. The first was a lease agreement dated October 1, 1993, which grants SEBCO a lease for 1,500 square feet on the second floor for ten years (the "1993 Lease") which expires on September 30, 2003. The second document, entitled "Lease Modification and Extension Agreement" dated January 1, 2021 ("Lease Extension") is a lease for one half of the building (i.e., 5,000 square feet) but without a definition of the premises leased.

75. The Lease Extension is an obvious forgery.

76. First, the document was allegedly executed as an "Extension" nearly *two decades after* the alleged 1993 Lease expired, without explanation.

77. The document also was purportedly signed by Sal as "President" of SEBCO in January 2021. This is impossible, however, in light of the fact that Father G, *not Sal*, was the President of SEBCO at that time and health-wise, fine.

78.     Moreover, the notarization for the two signatures -- one of which was for the signature of Sal -- were undated.

79.     And, ***critically***, the notary public's commission, per the notary stamp, is set to expire on December 20, 2025.  Given that the term of commission for a notary in New York is four years, the notary ***could not have notarized*** the document in January 2021 -- almost five years earlier.  The document is obviously a fake.

### *Defendants' Tortious Interference*

80.     Following the encounters with the police and the run-in between Sal and Mr. Siegel and Gino, things have only further deteriorated, culminating in what now clearly has become a scheme to steal the Business, spearheaded by Sal and Latoya.

81.     The Defendants have become bolder and more obvious in their tortious interference with BMA's business relationships.

82.     For ***several decades***, BMA has been managing numerous HDFC and other affordable government housing projects (collectively referred herein as the "BMA Managed Properties") which are owned by fifteen separate entities.

83.     While there were agreements in place when these entities (collectively, the "Property Owners")[3] were set up in the 1980s, those agreements have since lapsed and BMA has been managing the properties as part of its course of conduct for decades without any objection.

84.     The Property Owners are HDFC's which were organized by Father G and sponsored by SEBCO during the 1980s and incorporated pursuant to Article XI of the Private Housing Finance Law of the State of New York.

---

[3] A list of the Property Owners and the respective properties owned by them and managed by BMA (the "BMA Managed Properties") is annexed hereto.

85. BMA has been the property manager and authorized payment for the services it rendered "As agent for" the Property Owner(s).

86. Neither SEBCO nor the Property Owners have any involvement in the BMA Managed Properties since they were constructed.

87. The original sponsor for the Property Owners was SEBCO and, therefore, SEBCO controls these entities. Sal, who, unilaterally declared himself as the COO of SEBCO in 2019, now controls SEBCO. He has also since placed the majority of the members on the SEBCO Board, many of whom are riddled with conflicts of interest.

88. On January 23, 2023, Sal caused each of the 15 Property Owners to deliver termination notices to BMA at the same time, purporting to terminate BMA's property management services, effective February 22, 2023 (the "Termination Notices") as part of his efforts to take over BMA's business.

89. The Termination Notices purport to terminate the arrangement with BMA after more than 40 years. The sole purpose of the purported sudden termination *after decades* is for the wrongful purpose of transferring the management of the current BMA Managed Properties to a new entity owned, controlled and/or managed by Sal and/or Latoya.

90. And, upon information and belief, none of the required permissions by, among others, the New York City Department of Housing and Urban Development, the United States Department of Housing and Urban Development, institutional lenders and limited partners, were ever obtained to terminate these management arrangements with BMA.

91. More importantly, much like the falsified lease documents Sal had created to assert SEBCO's right to be in the Building, the Termination Notices attempt to dissolve the property management arrangements based on purported written agreements between the Property Owners and BMA are fake.

92.     Upon demand, Sal had Samuels, the attorney, send copies of the purported management agreements by email dated January 23, 2023.

93.     Each of the 15 agreements is dated January 1, 2020.

94.     That itself is telling.  At the time, Father G was very much alive.  And, Mr. Siegel had his durable power of attorney and managed his affairs.  Mr. Siegel nor Farther G knew of or authorized any such agreements between the Property Owners and BMA.

95.     Even more obvious that the agreements are a fake is the fact that of the 15 agreements,  14 of them contain *no countersignature* for the Property Owners.  The only signature is by defendant Latoya as Vice-President of BMA.  Indeed, not only is there no countersignature by the Property Owner, there is not, in fact, even a line for a countersignature.  In other words, the agreements purportedly between two entities are a nullity.  Indeed, when counterparts were requested from SEBCO's attorney Samuels, none were delivered.

96.     The only agreement countersigned is by Crotona Partners L.P.  And, lo and behold, it is countersigned by Sal on its behalf as the Vice-President.  In other words, the co-defendants themselves signed the agreement -- Sal , on behalf of the Property Owner, and Latoya on behalf of BMA.

97.     After producing these fake management agreements on January 23, 2023, Latoya has been busy poaching BMA employees by enticing them with the prospect of working for Sal and herself at his "new company just down the block".

98.     Indeed, several BMA employees have confirmed to Gino that they were approached by Latoya, and that she has falsely asserted that he intends to cut staff or otherwise decrease their compensation or benefits. She made these representations to encourage them to leave BMA and join Sal and her at a new company they are currently forming with offices to be located at 429 Bruckner Boulevard in the Bronx.

99.     Latoya was so bold as to hold these conversations with BMA employees in the basement of the Building from which BMA continues to operate.

100.    As a result, several employees have  resigned precipitously and given their two-weeks' notice, imperiling BMA's ability to operate.  These include:

- Yesenia Velez, head of building maintenance for BMA.

-  Celina Santa, the longtime leader of the account payable department as well as the payroll clerk responsible for paying close to 400 employees.

- Agueda Olivo, the Bookkeeper.

- Brian Velez, the Property Manager

- Jolanda Kendricks, Accounts Payable Clerk

- Laura Hilton, Payroll Manager

- Gloria Allen, HUD property Manager

- Celina Santana, Accounts Payable Manager and

- Jaime Diaz

101.    Latoya herself tendered her resignation with two-weeks' notice on February 2, 2023.

102.    Gino was also told by some of the remaining employees that Latoya -- who resigned but still is in BMA's employ and in the Building --  is now telling staff to "just leave without notice".

103.    And Gino heard that Latoya told staff this Friday, February 17, 2023, should be your last day.

104.    Defendants have also been trying to get MRI Security LLC (the database platform on which BMA as well as all the other Companies information is housed) to move the data to a new account they control.

105.     Latoya, in fact, on February 1, 2023, **one day before she resigned** – executed a written request  **on behalf of BMA** requesting data deactivation and transfer to a new entity.

106.     Defendants were one day away from accomplishing this goal -- which would have been fatal to BMA's continued management-- when the transfer process was stopped.  If not, all would have been lost.

107.     But there is no way to know what else Sal is up to and the steps he may take next

108.     Gino just obtained an email exchange with a BMA vendor, Heat Inc., where Sal and Latoya had notified them of a "management change for a few of the current BMA properties effective 2/24/23"

109.     As a result of the Defendants' tortious interference, BMA's business is in serious jeopardy.

110.     On February 3, 2023, SEBCO also gave notice of early termination effective June 9, 2023 under its purported Lease Extension and the two SEBCO signs outside the Building have bene removed as well.

111.     Clearly, Defendants are in the process of  attempting to complete their move out of the Building and move BMA files, data and employees to the new entity with its office location at 429 Bruckner Boulevard in the Bronx.

112.     **Time is of the essence**!

113.     Defendants' orchestrated efforts to interfere with BMA's current business relations that have been in place for 40 years, and transfer its business to a new entity owned, controlled and/or managed  by Sal and Latoya is not just illegal but a direct affront to Father G and the legacy he built.

114.     Father G literally "took in" Sal  to give him a job as he had no relevant skills or experience.

115.    In return, Sal has engaged in theft, fraud and the attempted destruction of Father G's life's work – work, that has had a real and meaningful impact in the lives of thousands of people in the South Bronx.

116.    That legacy must be preserved and continue for the sake of the community.

117.    And, Defendants must be held accountable for their actions.

## FIRST CLAIM

**(Conversion/ Misappropriation of Corporate Funds)**
**(the "Purported Loans")**

1.    Plaintiff repeats and realleges the allegations set forth in the paragraphs above as if fully set forth herein.

2.    The funds at issue, totaling approximately $95,394, were in a corporate account belonging to BMA bearing account number ending in 1070-0000.

3.    Starting in or about 2017 and through the course of several years, Defendant took approximately $95,394 from BMA's corporate account without authority and without permission from BMA.

4.    Upon information and belief, these payments consisted of: (1) $45,000 in May 2017; (2) $30,000 in February 2019; (3) $15,000 in May 2019; and (5) $5,394 in June 2021.

5.    Upon information and belief, in a failed attempt to conceal his unauthorized removal of BMA's funds, Defendant instructed BMA's auditors to bury the pilfered $95,394 as "advances/loans & exchanges" which was then buried with "Accounts Receivable" on the financial statement which account totaled $1,711,871.

6.    BMA never authorized the withdrawal of said funds and BMA never entered into a loan agreement with Defendant for these sums and no documents exist to substantiate any such purported loans to Defendant.

7. Furthermore, Defendant had no authority to make such loans from BMA to himself or anyone else.

8. Upon information and belief, to date, Defendant has made no interest or principal payments on the $95,394 in purported loans from BMA.

9. Upon discovering Defendant's misappropriation of the funds, Plaintiff has demanded immediate return of the monies taken from its corporate account.

10. To date, Defendant has refused to return any of the misappropriated funds to Plaintiff.

11. As a direct and proximate result of Defendant's tortious conversion, Plaintiff has been damaged in an amount to be determined at trial but not less than $95,394, plus costs and interest.

**SECOND CLAIM**
**(Conversion/ Misappropriation of Corporate Funds)**
**(Car Payments)**

12. Plaintiff repeats and realleges the allegations in the paragraphs set forth above as if fully set forth herein.

13. The funds at issue, totaling approximately $183,108.96 were in a corporate account belonging to BMA bearing account number 6538-0000, titled "Equipment Rental".

14. Starting on or about 2010, Defendant used BMA's funds to make monthly payments for luxury automobile leases, maintenance, and insurance (the "Car Payments").

15. Specifically, Defendant misappropriated: (1) approximately $13,956.14 in Car Payments in 2010; (2) approximately $17,439.13 in Car Payments in 2011; (3) approximately $15,719.88 in Car Payments in 2012; (4) approximately $13,511.73 in Car Payments in 2013; (5) approximately $7,290.13 in Car Payments in 2014; (6) approximately $7,453.27 in Car Payments in 2015; (7) approximately $9,601.93 in Car Payments in 2016; (8) approximately $11,079.15 in

Car Payments in 2017; (9) approximately $11,625.66 in Car Payments in 2018; (10) approximately $14,388.00 in Car Payments in 2019; (11) approximately $14,388.00 in Car Payments in 2020; (12) approximately $22,110.23 in Car Payments in 2021; and (13) approximately $24,545.71 in Car Payments in 2022.

16.     Upon information and belief, BMA never authorized the Car Payments to be paid from its corporate account on Defendant's behalf.

17.     Furthermore, Defendant had no authority to issue the Car Payments from BMA for his personal benefit.

18.     Upon discovering Defendant's misappropriation of the funds, Plaintiff demanded that Defendant immediately return the monies taken from its corporate account for all past Car Payments.

19.     To date, Defendant has not returned any of the misappropriated funds to Plaintiff.

20.     As a direct and proximate result of Defendant's tortious conversion, Plaintiff has been damaged in an amount to be determined at trial but not less than $183,108.96, plus costs and interest.

### THIRD CLAIM
**(Breach of Fiduciary Duty)**

21.     Plaintiff repeats and realleges all the allegations set forth in the Paragraphs above as if fully set forth herein.

22.     As Executive Vice-President and Chief Operating Officer of Plaintiff, Defendant owed a fiduciary duty to BMA.

23.     In a bad faith attempt to wrest power, control, and money belonging to BMA away from BMA and its rightful owner, Gino, Defendant breached his fiduciary duties to BMA by, among other things: (i) using Plaintiff's funds and resources for his personal use and benefit,

including to make his Car Payments in from 2010 through 2022; (ii) intentionally misappropriating Plaintiff's funds over the course of several years under the guise of purported "loans" without authorization or repayment of such funds to Plaintiff, with or without interest; (iii) intentionally withholding, and/or causing other employees of BMA to withhold, information concerning BMA's books and records from its owners.

24.     Defendant's breaches of his fiduciary duties have damaged Plaintiff in an amount to be determined at trial, but believed to be no less than $ 278,502.96.

### FOURTH CLAIM
**(Breach of Promissory Note)**

25.     Plaintiff repeats and realleges all the allegations set forth in the Paragraphs above as if fully set forth herein.

26.     On or about September 1, 2017, Defendant executed and delivered to the Plaintiff a Promissory Note, in consideration for BMA's loan to Defendant in the amount of $55,000.

27.     By the terms of the Promissory Note, the principal balance of the Note bore interest at the rate of seven percent (5.25%) per annum with all outstanding principal and accrued interest due and payable upon the demand of the payee, BMA (the "Maturity Date").

28.     As of the Maturity Date, the outstanding principal balance of the Promissory Note was $55,000.

29.     The current balance of the outstanding principal balance and accrued interest on the Promissory Note is $70,640.63.

30.     Defendant breached the terms of the Promissory Note by failing to repay the outstanding principal balance and all accrued interest due under the Promissory Note on the Maturity Date.

31.     Under the terms of the Promissory Note, if the Indebtedness is not paid when due, Defendant "shall pay all costs and expenses of collection, including, without limitation, attorneys' fees.

32.     As a result of the Defendant's breach, the Plaintiff has been damaged in the sum of $55,000, plus interest at the rate of 5.25% per annum, in an amount to be determined at trial, but believed to be no less than $ 70,640.63 plus any attorneys' fees and costs incurred in BMA's attempt to collect this debt from Defendant.

### FIFTH CLAIM
**(Tortious Interference with Business Relations Against Sal)**

33.     Plaintiff repeats and realleges all the allegations set forth in the Paragraphs above as if fully set forth herein.

34.     Plaintiff, BMA has ongoing business relationships with each of the Property Owners and been managing the BMA Managed Properties for decades.

35.     Defendant Sal  has interfered with BMA's business relationships with the Property Owners by, among other things (1) stonewalling and not providing the owners of BMA with information about the business and with the books and records; (2) exercising his control over SEBCO and causing the Property Owners to issue purported Termination Notices to BMA; (3) encouraging and causing supervisory and other employees of BMA to resign; and (iv) communicating with BMA vendors to transfer data and business to the new entity  All of this imperils BMA's survival.

36.     Upon information and belief, Sal  acted for a wrongful purpose and used dishonest, unfair, or improper means to interfere with BMA's business relationships.

37.     Upon information and belief, Sal's nefarious purposes include, *inter alia*, transferring the business currently handled by BMA for the Property Owners to an entity owned

controlled and or managed by him and/or Latoya; extracting all value from BMA's management portfolio in retaliation for BMA having terminated Sal; and retaliating against Gino and Mr. Siegel by maligning their reputations and dismantling Father G's legacy of providing affordable housing to the South Bronx Community.

38.     As a result of Sal's tortious interference, BMA's relationship with the Property Owners has been seriously jeopardized.

39.     Plaintiff has no adequate remedy at law and is entitled to a temporary restraining order and preliminary injunction maintaining the *status quo* pending trial on Plaintiff's tortious interference claims and its entitlement to a permanent injunction prohibiting Sal's further tortious interference with Plaintiff's business relationships with the Property Owners and BMA's employees.

40.     Plaintiff will suffer irreparable injury absent the grant of an injunction because Defendants' conduct and continued interference prevent BMA from continuing to provide building management services to the HDFC properties owned by the Property Owners.

41.     In addition, Defendant's misconduct also threatens irreparable harm to BMA's reputation as an effective management company for the Property Owners.

42.     The balance of the equities overwhelmingly favors the grant of an injunction because Plaintiff will incur substantial and irreparable harm whereas Sal will suffer no prejudice in immediately ceasing his interference with Plaintiff's longstanding business relationships.

43.     By reason of the foregoing, Plaintiff is entitled to a preliminary injunction enjoining and restraining Sal, his employees, agents, servants, representatives and any person acting on his behalf from interfering with BMA's business relationships: (i) as the provider of property management services for the BMA Managed Properties; and (ii) with its employees and vendors.

## SIXTH CLAIM

**(Tortious Interference With Business Relations Against Latoya)**

44.     Plaintiff repeats and realleges all the allegations set forth in the Paragraphs above as if fully set forth herein.

45.     Plaintiff, BMA has ongoing business relationships with the Property Owners and been managing the BMA Managed Properties for decades.

46.     Defendant Sal has interfered with BMA's business relationships with the Property Owners by, among other things (1) stonewalling and not proving the owners of BMA with information about the business and with the books and records; (2) exercising his control over SEBCO and causing the Property Owners to issue purported Termination Notices to BMA; (3) encouraging and causing supervisory and other employees of BMA to resign; and (iv) communicating with BMA vendors to transfer data and business to the new entity  All of this imperils BMA's survival.

47.     Upon information and belief, Latoya acted for a wrongful purpose and used dishonest, unfair, or improper means to interfere with BMA's business relationships.

48.     Upon information and belief, Latoya's wrongful acts include, *inter alia*, (i) not providing information and access to the books and records of BMA to its owners; (ii) assisting Sal to retain complete control of SEBCO and the Property Owners so that he can  transfer the business currently handled by BMA for the Property Owners to an entity owned and or controlled by them for which she intends to work; and (iii) lying to and encouraging BMA employees, including Yesenia Velez, former head of building maintenance at BMA to resign and join her and Sal at this entity; and (iv) communicating with BMA vendors to transfer the business, including requesting MRIS security LLC to transfer of the data on the managed properties to a new entity.

49.     As a result of the Latoya's tortious interference, Plaintiff's relationship with the Property Owners has been seriously jeopardized.

50.     Plaintiff has no adequate remedy at law and is entitled to a temporary restraining order and preliminary injunction maintaining the *status quo* pending trial on Plaintiff's tortious interference claim and its entitlement to a permanent injunction prohibiting Defendants' further tortious interference with Plaintiff's business relationships with the Property Owners and with BMA's employees and vendors.

51.     Plaintiff will suffer irreparable injury absent the grant of a restraining order and injunction because Sal's conduct and continued interference prevent BMA from continuing to provide property management services to the BMA Managed Properties and smoothly operate its business with its employees and vendors.

52.     In addition, Defendant's misconduct also threatens irreparable harm to BMA's reputation as an effective management company for the Property Owners.

53.     A balance of the equities overwhelmingly favors the grant of an injunction because Plaintiff will incur substantial and irreparable harm, whereas Defendants will suffer no prejudice in immediately ceasing her interference with Plaintiff's longstanding business relationships.

54.     By reason of the foregoing, Plaintiff is entitled to a temporary restraining order and preliminary injunction enjoining and restraining Defendant's, their fellow employees, agents, servants, representatives and any person acting in concert or on their behalf from interfering with BMA business relations: (i) as the provider of property management services for the BMA Managed Properties; and (ii) with its employees and vendors.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter an order and judgment in favor of Plaintiff against Defendant, containing the following relief:

1.     On its First Claim for Conversion/ Misappropriation of Corporate Funds (Purported Loans) awarding Plaintiff damages in an amount to be established at trial but no less than $95,394, to compensate Plaintiff for all monetary losses it has suffered;

2.     On its Second Claim for Conversion/ Misappropriation of Corporate Funds (Car Payments) awarding Plaintiff damages in an amount to be established at trial but no less than $183,108.96, to compensate Plaintiff for all monetary losses it has suffered;

3.     On its Third Claim for Breach of Fiduciary Duty awarding Plaintiff damages in an amount to be established at trial but no less than $278,502.96 to compensate Plaintiff for all monetary losses it has suffered;

4.     On its Fourth Claim for Breach of Promissory Note awarding Plaintiff damages in an amount to be established at trial but no less than $70,640.63 to compensate Plaintiff for all monetary losses it has suffered;

5.     On its Fifth Claim for Tortious Interference against Sal awarding Plaintiff a temporary restraining order and preliminary injunction preliminarily enjoining Salvatore Gigante and Latoya Allen and those in active concert or participation with them, from:

(i)     Interfering with BMA's management of the fifteen properties identified at the end of this Order (the "Properties");

(ii)    Transferring, or seeking to transfer, management of any of the Properties away from BMA to any other individual or entity owned, controlled and/or managed by them;

(iii)   Hiring any present or former BMA employees;

(iv)    Communicating with current BMA employees for purposes of persuading them to resign from BMA and/or seek employment with Defendants or any entity under ownership, control and/or management of Defendants; and

(v)     Communicating with any vendors engaged in servicing BMA and/or the Properties, including but not limited to MRI Securities LLC and Heat Inc.

6.      On its Fifth Claim for Tortious Interference against Sal awarding Plaintiff a permanent injunction enjoining Salvatore Gigante and Latoya Allen and those in active concert or participation with them, from:

(i)     Interfering with BMA's management of the fifteen properties identified at the end of this Order (the "Properties");

(ii)    Transferring, or seeking to transfer, management of any of the Properties away from BMA to any other individual or entity owned, controlled and/or managed by them;

(iii)   Hiring any present or former BMA employees;

(iv)    Communicating with current BMA employees for purposes of persuading them to resign from BMA and/or seek employment with Defendants or any entity under ownership, control and/or management of Defendants; and

(v)     Communicating with any vendors engaged in servicing BMA and/or the Properties, including but not limited to MRI Securities LLC and Heat Inc.


7.      On its Sixth Claim for Tortious Interference against Latoya awarding Plaintiff a temporary restraining order and preliminary injunction enjoining Salvatore Gigante and Latoya Allen and those in active concert or participation with them, from:

(i)     Interfering with BMA's management of the fifteen properties identified at the end of this Order (the "Properties");

(ii)    Transferring, or seeking to transfer, management of any of the Properties away from BMA to any other individual or entity owned, controlled and/or managed by them;

(iii)   Hiring any present or former BMA employees;

(iv)  Communicating with current BMA employees for purposes of persuading them to resign from BMA and/or seek employment with Defendants or any entity under ownership, control and/or management of Defendants; and

(v)  Communicating with any vendors engaged in servicing BMA and/or the Properties, including but not limited to MRI Securities LLC and Heat Inc.

8.  On its Sixth Claim for Tortious Interference against Latoya awarding Plaintiff a permanent injunction enjoining Salvatore Gigante and Latoya Allen and those in active concert or participation with them, from:

(i)  Interfering with BMA's management of the fifteen properties identified at the end of this Order (the "Properties");

(ii)  Transferring, or seeking to transfer, management of any of the Properties away from BMA to any other individual or entity owned, controlled and/or managed by them;

(iii)  Hiring any present or former BMA employees;

(iv)  Communicating with current BMA employees for purposes of persuading them to resign from BMA and/or seek employment with Defendants or any entity under ownership, control and/or management of Defendants; and

(v)  Communicating with any vendors engaged in servicing BMA and/or the Properties, including but not limited to MRI Securities LLC and Heat Inc.

9.  Awarding BMA 9% interest on its damages pursuant to CPLR §§ 5001-5004; and

10.  Granting BMA such other and further relief as the Court deems just and proper.

**JURY TRIAL DEMAND**

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury.

Dated: New York, New York
 February 16, 2023

Respectfully submitted,

**PRYOR CASHMAN LLP**

By: _s/ Shveta Kakar_
Shveta Kakar
Daniel L. Kurtz
Stephanie Chery
7 Times Square
New York, New York 10036
(212) 421-4100
dkurtz@pryorcashman.com
skakar@pryorcashman.com
schery@pryorcashman.com
*Attorneys for Plaintiff*
*Building Management Associates, Inc.*

## Property Owners and BMA Managed Properties

(1)    Crotona Partners L.P., a New York limited partnership which owns the property located at 1883 Crotona Avenue, Bronx New York; Block 2946, Lots 42 and 47 in construction.

(2)    479 Courtlandt Avenue Housing Development Fund Corporation, a New York not-for-profit corporation which owns the properties located at 479 Courtlandt Avenue, Bronx, New York; Block 2329, Lot 83; 485 Courtlandt Avenue, Bronx, New York; Block 2329, Lot 83; 515 Courtlandt Avenue, Bronx, New York; Block 2329, Lot 72; and 357 East 146th Street, Bronx, New York; Block 2329, Lot 83.

(3)    (3) E. C. Housing Development Fund Company, Inc., a New York not-for profit corporation which owns the property located at 887 Southern Boulevard, Bronx, New York, Block 2722, Lot 40.

(4)    (4)Erma Cava Housing Development Fund Company, Inc., a New York not-for-profit corporation which owns the property located at 923 Barretto Street, Bronx, New York, Block 2722 Lot 52.

(5)    (5)Filomena Gardens Housing Development Fund Company, Inc., a New York not-for-profit corporation which owns the property located at 641 East 225th Street, Bronx, New York, Block 4827, Lot 29.

(6)    Fox Street Housing Development Fund Corporation, a New York not-for-profit corporation which owns the properties located at 575 East 161st Street, Bronx, New York; Block 2620, Lot 1, 800 Fox Street, Bronx, New York; Block 2721, Lot 1.

(7)    Hunts Point Housing Development Fund Corporation, a New York not-for-profit corporation which owns the properties located at 1150 Garrison Avenue, Bronx, New York; Block 2761, Lot 24, 1200 Seneca Avenue, Bronx, New York; Block 2762, Lot 45, 1212 Seneca Avenue, Bronx, New York; Block 2762, Lot 47, 1216 Seneca Avenue, Bronx, New York; Block 2762, Lot 49, 1220 Seneca Avenue, Bronx, New York; Block 2762, Lot 51, 854 Hunts Point Avenue, Bronx, New York; Block 2762, Lot 37, 850 Hunts Point Avenue, Bronx, New York; Block 2762, Lot 149, 866 Hunts Point Avenue, Bronx, New York; Block 2762, Lot 44, 721 Faile Street, Bronx, New York; Block 2763, Lot 158, 737 Faile Street, Bronx, New York; Block 2763, Lot 155, 817 Faile Street, Bronx, New York; Block 2762, Lot 23, 1274-76 Lafayette Avenue, Bronx, New York; Block 2763, Lot 80, and 663-67 Casanova Street, Bronx, New York; Block 2765, Lot 79.

(8)     178th Street Housing Development Fund Company, Inc., a New York not-for-profit corporation which owns the property located at 2000 Washington Avenue, Bronx, New York; Block 3044, Lot 17.

(9)     PIO/VIP L.P., a New York limited partnership which owns the properties located at 1876 Belmont Avenue, Bronx, New York; Block 2946, Lot 1, and 1291 Lafayette Avenue, Bronx, New York; Block 2762, Lot 1.

(10)    Rosina Associates L.P., a New York limited partnership which owns the property located at 567 Southern Boulevard Bronx, New York; Block 2683, Lot 43, 852 East 163rd Street, Bronx, New York; Block 2690, Lot 73, 934 Barretto Street, Bronx, New York; Block 2723, Lot 25, 985 Intervale Avenue, Bronx, New York; Block 2699, Lot 52, and 994 Intervale Avenue, Bronx, New York; Block 2704, Lot 12.

(11)     SEBCO Housing Development Fund Company, Inc., a New York not-for-profit corporation which owns the property located at 980 Aldus Street, Bronx, New York; Block 2746, Lot 30.

(12)    St. Barnabas Housing Development Fund Company Inc., a New York not-for-profit corporation which owns the property located at 535-551 East 182nd Street, Bronx, New York; Block 3051, Lot 1.

(13)    Tiffany Gardens, L.P., a New York limited partnership which owns the property located at 870 Southern Boulevard, Bronx, New York; Block 2733, Lot 1.

(14)    Timpson Housing Development Fund Corporation, a New York not-for-profit corporation which owns the property located at 581 Timpson Place, Bronx, New York; Block 2603, Lot 35, 390 Jackson Avenue, Bronx, New York; Block 2573, Lot 71, 720 St. Mary's Street, Bronx, New York; Block 2573, Lot 49, and 1070 Rev. James Polite Ave., Bronx, New York; Block 2691, Lot 67

(15)    Willis Avenue Associates, L.P., a New York limited partnership which owns the properties located at 288-290 Willis Avenue, Bronx, New York; Block 2284, Lot 4, 292 Willis Avenue, Bronx, New York; Block 2284, Lot 6, 495 Courtlandt Avenue, Bronx, New York; Block 2329, Lot 82, 580 Courtlandt Avenue, Bronx, New York; Block 2397, Lot 5, and 512 Jackson Avenue, Bronx, New York; Block 2579, Lot 10.