UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BUILDING MANAGEMENT ASSOCIATES, INC., <br><br> Plaintiff, <br><br> -against- <br><br> SALVATORE GIGANTE and LATOYA ALLEN <br><br> Defendants. | Civil Case No. |

# DECLARATION OF LUIGINO GIGANTE

The following declaration is made pursuant to 28 U.S.C. § 1746:

 1. I am the President of Building Management Associates Inc. ("BMA") and also the son of the late Reverend Louis R. Gigante.

 2. My father was a Roman Catholic priest and an iconic figure, who, as The New York Times recently characterized it, "was instrumental in rebuilding one of America's most notorious slums, in the South Bronx, into a thriving and safer neighborhood with thousands of new homes."[1]

 3. In April of 1978, he created SEBCO Development, Inc. ("SEBCO"), a New York not-for-profit corporation as the cornerstone of the resurrection effort of the South Bronx.

 4. The organization grew rapidly and, in anticipation of a need for its own management and security systems, in 1980 my father created SEBCO Management, now known as BMA, to self-manage its portfolio of low and moderate-income multi-family and senior citizen housing.

---

[1] https://www.nytimes.com/2022/10/23/obituaries/louis-gigante-dead.html (last accessed 1-24-2023).

5. BMA is just part of a portfolio of entities to fulfill my father's overarching mission -- the revitalization of the South Bronx. Along with SEBCO, my father created a network of for-profit organizations (collectively, the "Business") to build, manage and provide security to properties located in the Bronx (collectively, the for-profit entities are referred herein as the "Companies").

6. By 1981, my father had orchestrated the construction and rehabilitation of 1,100 federally subsidized apartments in the South Bronx. And by 2004 SEBCO had developed 2,000 housing units.

7. Following my father's passing on October 19, 2022 at the age of 89, and by order of the Surrogate's Court of Columbia County, New York, Irwin Siegel ("Irwin"), his long-time attorney for 50 years and trusted friend and advisor, was appointed as the Executor of my father's Estate.

8. 80% of BMA is owned by my father's Estate. The remaining 20% is owned by me, and I also am the ultimate beneficiary of his residuary Estate.

9. I have personal knowledge of the facts stated in this declaration, except as may be otherwise indicated. If called as a witness, I could and would competently testify to these facts.

10. I submit this Declaration in support of BMA's application for a Temporary Restraining Order and Preliminary Injunction pending the Court's resolution of its claim for a permanent injunction seeking to enjoin defendants Salvatore Gigante ("Sal") and Latoya Allen ("Latoya") from any further interference with: (i) BMA's business relationships with various entities that own the properties managed by BMA; and (ii) interfering with the relationship with BMA's employees and vendors.

11. As my father's son, I have a clear understanding of how SEBCO and the Companies operate. Indeed, as a young adult, father and I would sit down every weekend and he would apprise me of the latest developments concerning the Business. He taught me everything I needed to know about the Business so that when he passed, I would be ready to assume the responsibility of running the Business.

12. For me, it is not just a 'business'. It is my father's legacy and everything he devoted his entire life to -- improving the lives of hundreds of thousands of people living in the South Bronx and fighting the blight and deterioration that had plagued the Hunts Point community of the Bronx during the 1960s. His vision -- which I share -- was to build a better and safer community. I am so proud of what he achieved and humbled to be a "Gigante".

13. Unfortunately, following my father's passing, I have come to learn of and witnessed how his grandnephew, Sal -- my cousin -- to whom my father provided employment at certain of his Companies and an opportunity for personal growth, has betrayed his trust and the trust the Companies placed in him.

14. Based on the recent discovery of Sal's wrongdoing over the course of his employment with the Companies; his recent actions attempting to usurp BMA's business after his employment was terminated, the discovery of his theft; and, statements directed at me following my father's death, Sal's actions are motivated by greed as well as animosity and hatred towards me because I am the sole heir and owner of the Companies under my father's last will and testament (the "Will").

15. Sal has worked for BMA for 18 years and had an Option Agreement upon my father's passing, to purchase his shares in BMA and Tiffany Maintenance Co. Inc. (an affiliated company providing maintenance services to the properties) on favorable terms. The Option

required periodic payments to be made by Sal. For four years, however, he made no such payments at all and was in default.

16. After father's passing in 2022, Sal issued a check for the missed payments and sent it to Irwin, father's attorney. As my father's appointee under a power of attorney, had Irwin accepted the payments, the Option would have been exercised. But *if*, in fact, the Option lapsed because of Sal's failure to make the required payments and Irwin, nevertheless, permitted Sal to take advantage of the Option, then as the residuary beneficiary of father's Estate, I could have sued Irwin and the Estate or sought to reverse the transfer to Sal.

17. Irwin, therefore, sought a legal opinion from the well-known law firm of K&L Gates on the validity of the Option. They concluded that, under New York law, the Option was no longer valid. That being the case, Irwin told Sal that the Option was no longer valid. While Sal did not dispute that the Option was no longer in effect, he was livid.

18. The fact that he no longer had an ownership interest in any of the Companies and that I, "the illegitimate son" as he has called me in public, inherited it all has fueled his attempted takeover of the Business, including BMA. My father was not even cold in his grave when Sal started plotting and scheming to do so.

19. I believe Latoya's wrongdoing is motivated by her misplaced loyalty and complicity with Sal, working as his "second in command" for the past 10 years, as well as the expectation that she will reap a financial benefit by following Sal and assisting him in his plan. Both Sal and she were *extremely* well compensated while at BMA[2].

---

[2] Based on SEBCO's latest tax filing, its Form 990 for year-ended 2021, Sal received more than $680,000 altogether from organizations related to SEBCO i.e., father's Companies, which include BMA.

**Factual Background**

20. Sal was the Executive Vice-President of BMA since 2018, and recently, taking advantage of Father G's failing health, appointed himself as COO.

21. Following father's passing in 2022, Irwin assumed his role as Executor to the Estate, and I became the ultimate owner of the Companies.

22. In undertaking our responsibilities to the Companies, Irwin and I, along with business consultants, began taking a close look at the financial condition and operations of each of the Companies, including BMA.

23. While attempting to obtain information about BMA from employees, we encountered a lot of stonewalling from several BMA employees, including Latoya and Sonal Shah, the controller, as well as employees of the other Companies. This included disregarding our requests for information when asked, as well as withholding important information and records we requested.

24. The general attitude toward us was to provide the bare minimum and sometimes even that was under protest.

25. We encountered considerable push-back from Sal, Latoya and Sonal. Sonal does not lift a pencil without Sal's say-so and has repeatedly stonewalled me and Irwin when we have asked for information. Along with Sal and Latoya, she created roadblocks so Irwin and I could not get access to the books and records of BMA.

26. On January 9, 2023, Sal was formally terminated from his employment with each of the Companies, including BMA.

27. And I finally obtained access to the books and records. The reason why they were not willing to work with us and provide us with the necessary information became evident.

28. We discovered that Sal had breached his fiduciary duties to BMA by misappropriating corporate funds for his personal benefit in an amount no less than $ 278,502.96.

29. Specifically, it has come to light, that for at least 13 years, Sal has used BMA's funds, without authorization, to lease luxury vehicles for personal use on the company's "dime".

30. It bears noting that my father, who owned the Companies, *never* paid for any automobile expenses for himself or any family members from any of his Companies or SEBCO.

31. Starting on or about 2010, Sal, however, used BMA's funds to make monthly payments for luxury automobile leases, maintenance, and insurance, totaling approximately $183,108.96.

32. In addition to this, Sal engaged in even more flagrant misappropriation. Specifically, without BMA's authorization beginning in or about 2017, Sal took numerous sums of money totaling approximately $ 95,394 from BMA's corporate accounts and instructed auditors of BMA, who wrongfully acquiesced in order to keep the client, to classify the pilfered $ 95,394.00 as "advances/loans & exchanges" which was then buried with "Accounts Receivable" on the financial statement which totaled $1,711,871.

33. Not surprisingly, no documents substantiate such accounts receivables or even "loans" from BMA to Sal, and he has never paid any principal or interest on these "receivables".

34. BMA never authorized such amounts and Sal never had the authority to take the money for himself while he was employed by BMA.

35. It was also discovered that Sal had failed to pay one actual loan, evidenced by a promissory note, issued to BMA by him in 2017 accruing interest in the amount of 5.25% annually for which the amount currently due is $70,640.63.

36. Although Sal has always been transparent in his dislike for me, his animosity toward me and Irwin is now worse.

37. Immediately following his termination as an employee of BMA on January 9, 2023, Sal sought to bar me and Irwin from accessing BMA's offices, going so far as to allege that we had no right to enter the Building (885 Bruckner Boulevard, Bronx, New York 10459) and falsely alleging that we were "breaking and entering" and "trespassing".

38. That same day, the New York City Police received a complaint from SEBCO"s lawyer, David Samuels ("Samuels") that we had allegedly "broken and entered into the Building". Sal, of course, knows that both me, as the 20% owner and President of BMA as well as sole heir to father's Companies (many of which were operating out of the Building, including BMA), and Irwin, as the Executor to the Estate which owns the Companies (including Fox River Properties, Inc. *which owns* the Building) have the absolute legal right and authority, not only to enter the Building, but to have unrestricted access to the entire space.

39. This false report caused at least eight police officers to come to the Building. The matter was ameliorated by the head of Sentry Security Co., Inc., an unarmed security company founded by father to protect the buildings managed by BMA.

40. On January 10, 2023, Sal was at the Building himself and attempted to discredit us in front of the BMA and SEBCO staff (SEBCO is also housed in the same Building) and called 911, once again knowingly and falsely accusing us of "trespassing".

41. The following day, on Wednesday, January 11, 2023, we returned to the Building to work on BMA business matters accompanied by one off-duty New York City Police Officer. While stating that I could enter, Sal refused to let Irwin enter the offices.

7

42. That same day, Sal had his attorneys transmit two documents that he asserted granted SEBCO an extended lease in the Building.

43. The first was a lease entered into on October 1, 1993, which grants SEBCO a 10-year lease for 1,500 square feet on the second floor (the "1993 Lease") which expired on September 30, 2003. The second document, a true and correct copy of which is annexed hereto as **Exhibit A**, is entitled "Lease Modification and Extension Agreement" dated January 1, 2021 (the "Extended Lease") and purportedly leases one-half of the Building (i.e., 5,000 square feet) to SEBCO, but without a definition of the premises. That is just the tip of the iceberg.

44. To put it bluntly, it is an obvious forgery.

45. First, the document was allegedly executed as an "Extension" nearly *two decades* after the alleged 1993 Lease expired, without explanation.

46. The document also was purportedly signed by Sal as "President" of SEBCO in January 2021. This is impossible, however, in light of the fact that my father, not Sal, was the President of SEBCO at that time and health-wise, fine.

47. Moreover, the notarization for the two signatures -- one of which was for the signature of Sal -- are undated.

48. And, *critically*, the notary public's commission, per the notary stamp, is set to expire on December 20, 2025.

49. This is critical because the term of commission for a notary in New York is four years. Therefore, the notary could not have notarized the document in January 2021 -- almost five years earlier. The so-called "Lease Modification and Extension Agreement " is obviously a fake.

50. Since the run-in between Sal and Irwin and me on January 11, 2023, things have only further deteriorated, culminating in what now clearly has become a scheme by the Defendants to steal the Business.

51. The Defendants have become bolder and more obvious in their tortious interference with BMA's business relationships with the property owners for the properties it manages, BMA's employees and vendors.

*The Attempted Take-Over of BMA*

52. For *several decades*, BMA has been managing numerous Housing Development Fund Corporations ("HDFC") cooperative properties which are owned by 15 entities (collectively, the "Property Owners")[3].

53. While there were agreements in place when these Property Owner entities were set up in the 1980s, those agreements have since lapsed and BMA has simply been managing the properties (the "BMA Managed Properties") without objection as part of its course of conduct for decades.

54. Because the Property Owners are HDFCs they needed a sponsor at the time when they were established in the 1980s and incorporated pursuant to Article XI of the Private Housing Finance Law of the State of New York.

55. The sponsor for the Property Owners was SEBCO and, therefore, SEBCO controls these entities. Sal, who since 2019 has unilaterally appoint himself as COO of SEBCO, controls SEBCO. He has also since placed the majority of the members on its Board, a number of whom are riddled with conflicts of interest.

---

[3] A list of the Property Owners and the respective properties is attached hereto.

56.     On January 23, 2023, Sal caused each of the Property Owners to issue termination notices to BMA purporting to terminate BMA's property management services, effective February 22, 2023 (the "Termination Notices") as part of his efforts to steal BMA's business.

57.     The Termination Notices purport to terminate the arrangement with BMA. The sole purpose of the sudden purported termination -- ***after decades*** -- is for the wrongful purpose of transferring the management of the current BMA Managed Properties to a new entity owned, controlled and/or managed by Sal and/or Latoya.

58.     And, none of the ***required*** permissions by, among others, the New York City Department of Housing and Urban Development, the United States Department of Housing and Urban Development, institutional and governmental lenders and limited partners, were ever obtained to terminate these management arrangements with BMA. Based upon a conversation with the limited partners' agent who said, "I know what going on", Sal has told people of his taking over of BMA's business.

59.     More importantly, much like the falsified lease documents Sal had created to assert SEBCO's right to be in the Building, the Termination Notices attempt to dissolve the property management arrangements based on purported written agreements between the Property Owners and BMA which are fake.

60.     In fact, Sal's attempted deception was discovered when, upon demand, Sal had Samuels, SEBCO's attorney, by email dated January 23, 2023, send copies of the purported management agreements that the Termination Notices allegedly terminated. A true and correct copy of one of the falsified written agreements sent by Samuels is annexed hereto as **Exhibit B**.

61.     Each of the 15 agreements is dated January 1, 2020.

62. That itself is telling because father was still very much alive and healthy at that time, and Irwin had his durable power of attorney and managed all his affairs, including those related to BMA's operations.

63. Irwin was never informed of, nor did he ever authorize, any such written agreements between the Property Owners and BMA. Nor did my father when he was alive.

64. Furthermore, the agreements are obviously a fake because of the 15 agreements, 14 of them contain **no countersignature** for the Property Owners.

65. The only signature on the documents is by defendant Latoya, as Vice-President of BMA. Indeed, not only is there no countersignature by the Property Owner, there is not even a line for a countersignature.

66. These purported agreements are merely pieces of paper, not contracts at all.

67. The only agreement countersigned is by Crotona Partners L.P. And, lo and behold, it is countersigned by Sal on its behalf as the Vice-President. How convenient that it is the co-defendants who signed the agreement -- Sal, on behalf of the Property Owner, and Latoya on behalf of BMA.

68. After producing these fake management agreements on January 23, 2023, Latoya has been busy poaching BMA employees by enticing them with the prospect of working for Sal and herself at his "new company just down the block".

69. Such location is important to my employees who have to walk to work or be able to be home for their children when they come home from school. To accommodate their needs working hours are from eight AM to four PM.

70. Indeed, several BMA employees have confirmed to me that they were approached by Latoya, and that she has falsely asserted that I intent to cut staff or otherwise decrease their

compensation or benefits. She made these representations to encourage them to leave BMA and join Sal and her at a new company they are currently forming with offices to be located at 429 Bruckner Boulevard in the Bronx.

71. Latoya was so bold as to hold these conversations with BMA employees in the basement of the Building from which BMA continues to operate.

72. As a result, several employees have resigned precipitously and given their two-weeks' notice, imperiling BMA's ability to operate. These include:

- Yesenia Velez, head of building maintenance for BMA.
- Celina Santa, the longtime leader of the account payable department as well as the payroll clerk responsible for paying close to 400 employees.
- Agueda Olivo, the Bookeeper.
- Brian Velez, the Property Manager
- Jolanda Kendricks, Accounts Payable Clerk
- Laura Hilton, Payroll Manager
- Gloria Allen, HUD property Manager
- Celina Santana, Accounts Payable Manager and
- Jaime Diaz

73. Latoya herself tendered her resignation with two-weeks' notice on February 2, 2023.

74. I have recently been told by some of the remaining employees that Latoya -- who resigned but still is in BMA's employ and in the Building -- is now telling staff to "just leave without notice".

75. And I just heard that Latoya told staff that this Friday, February 17, 2023, will be their last day.

76. Defendants have also been trying to get MRI Security LLC (the database platform on which BMA as well as all the other Companies information is housed) to move the data to a new account they control.

77. Latoya, in fact, on February 1, 2023, **one day before she resigned** – executed a written request (I have a copy) **on behalf of BMA** requesting data deactivation and transfer to a new entity. Unbelievable!

78. Defendants were one day away from accomplishing this goal -- *which would have been fatal to BMA's continued management*-- when the transfer process was stopped. If not, all would have been lost.

79. But there is no way to know what else Sal is up to and the steps he may take next.

80. Just yesterday I obtained an email exchange with a BMA vendor, Heat Inc., where Sal and Latoya had notified them of a "management change for a few of the current BMA properties effective 2/24/23"

81. As a result of the Defendants' tortious interference, BMA's business is in serious jeopardy.

82. On February 3, 2023, SEBCO also gave notice of early termination effective June 9, 2023 under its purported Lease Extension and the two SEBCO signs outside the Building have been removed as well.

83. Clearly, Defendants are in the process of attempting to complete their move out of the Building and move BMA files, data and employees to the new entity with its office location at 429 Bruckner Boulevard in the Bronx.

84. **Time is of the essence**.

85. Sal, with Latoya is attempting to demolish BMA's place in the network of entities created and established by father, with the dual purpose of taking the entirety of BMA's management portfolio, and the very substantial value that comes with that for their benefit, and simultaneously retaliating for his Option (through his own fault) not being in effect and the termination of his employment from the Companies, including BMA. He is doing this with the aim of destroying BMA and dismantling father's life's work as revenge for not being given -- what he believes, according to what he told a cousin, -- he is "entitled to".

86. Defendants' orchestrated efforts to interfere with BMA's current business relations and transfer its business to a new entity they own, control and/or managed is, therefore, not just illegal but a direct affront to Father Gigante and the efficient, well-ordered organization he built over the last 50+ years.

87. Father literally "took in" Sal to help him and give him a job, even though he had no relevant skills or experience.

88. In return, Sal has engaged in theft, fraud and the attempted destruction my father's life's work -- work that has had a real and meaningful impact in the lives of thousands of people who live in the South Bronx and those who have worked for and are working for Companies and buildings for 50 years.

89. That legacy spearheaded by me as his son and hopefully by my offspring must be preserved and continue for the sake of the community and the buildings. My father put the buildings and their occupants and the community, ahead of making money. As the property manager, BMA's mission was first and foremost to maintain and preserve the buildings and secure the neighborhood even if it and the other Companies made less. Knowing Sal's dire financial straits as evidenced by his continuous borrowings and failings to repay, he will put himself and

whatever promises he made to Latoya ahead of the buildings, its resident and the Hunts Point community.

90. The charitable bequests under my father's Will could also be impacted by BMA's value devolution if Salvatore and Latoya succeed in stealing BMA.

91. The facts are so egregious and satisfy all of the required elements warranting a temporary restraining order and preliminary injunction.

92. First, as noted above, all of the elements of a tortious interference claim against Sal and Latoya are satisfied, and so there is a likelihood of success on the merits of those claims.

93. Second, BMA is likely to suffer irreparable injury absent the injunction, specifically, the complete ruin of BMA caused by *inter alia* (i) Defendants' extraction of its portfolio of managed properties to another entity; (ii) Defendants' poaching of BMA's valued employees; (iii) communicating with vendors to move data and business; and (iv) the ultimate destruction of my father's decades-long work for the betterment of the South Bronx community.

94. Third, the balance of the equities tips decidedly in BMA's favor as there is no harm to Defendants if the temporary restraining order and preliminary injunction are issued, whereas there would be significant harm to BMA if this Court fails to issue a temporary restraining order and preliminary injunction pending resolution of the claims at trial. Indeed, to allow Defendants to continue to act without restraint would render moot any award at the conclusion of trial on the issue.

95. Finally, the public interest would not be disserved by the issuance of the temporary restraining order and preliminary injunction. To the contrary, the public would benefit from such orders where, as here, Defendants' have repeatedly demonstrated their malign intentions and greed,

and are likely to extract all of the value from the business, ultimately affecting the quality of the management of and living conditions in these HDFC affordable housing units.

96. That would be a blight on and a wanton destruction of my father's legacy and all that has been accomplished over the last 50 years.

97. This Court should not allow that to happen.

98. For these reasons, I respectfully submit that this Court should issue a temporary restraining order pending a hearing on BMA's application for a preliminary injunction, prohibiting Defendants' continued interference with BMA's business relationships with the Property Owners, and BMA's employees and vendors.

99. I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 16th day of February 2023.

*[signature]*

LUIGINO GIGANTE

Property Owners of BMA Managed Properties

(1) Crotona Partners L.P., a New York limited partnership which owns the property located at 1883 Crotona Avenue, Bronx New York; Block 2946, Lots 42 and 47;

(2) 479 Courtlandt Avenue Housing Development Fund Corporation, a New York not-for-profit corporation which owns the properties located at 479 Courtlandt Avenue, Bronx, New York; Block 2329, Lot 83; 485 Courtlandt Avenue, Bronx, New York; Block 2329, Lot 83; 515 Courtlandt Avenue, Bronx, New York; Block 2329, Lot 72; and 357 East 146th Street, Bronx, New York; Block 2329, Lot 83;

(3) E. C. Housing Development Fund Company, Inc., a New York not-for profit corporation which owns the property located at 887 Southern Boulevard, Bronx, New York, Block 2722, Lot 40;

(4) Erma Cava Housing Development Fund Company, Inc., a New York not-for-profit corporation which owns the property located at 923 Barretto Street, Bronx, New York, Block 2722 Lot 52;

(5) Filomena Gardens Housing Development Fund Company, Inc., a New York not-for-profit corporation which owns the property located at 641 East 225th Street, Bronx, New York, Block 4827, Lot 29;

(6) Fox Street Housing Development Fund Corporation, a New York not-for-profit corporation which owns the properties located at 575 East 161st Street, Bronx, New York; Block 2620, Lot 1, 800 Fox Street, Bronx, New York; Block 2721, Lot 1;

(7) Hunts Point Housing Development Fund Corporation, a New York not-for-profit corporation which owns the properties located at 1150 Garrison Avenue, Bronx, New York; Block 2761, Lot 24, 1200 Seneca Avenue, Bronx, New York; Block 2762, Lot 45, 1212 Seneca Avenue, Bronx, New York; Block 2762, Lot 47, 1216 Seneca Avenue, Bronx, New York; Block 2762, Lot 49, 1220 Seneca Avenue, Bronx, New York; Block 2762, Lot 51, 854 Hunts Point Avenue, Bronx, New York; Block 2762, Lot 37, 850 Hunts Point Avenue, Bronx, New York; Block 2762, Lot 149, 866 Hunts Point Avenue, Bronx, New York; Block 2762, Lot 44, 721 Faile Street, Bronx, New York; Block 2763, Lot 158, 737 Faile Street, Bronx, New York; Block 2763, Lot 155, 817 Faile Street, Bronx, New York; Block 2762, Lot 23, 1274-76 Lafayette Avenue, Bronx, New York; Block 2763, Lot 80, and 663-67 Casanova Street, Bronx, New York; Block 2765, Lot 79;

(8) 178th Street Housing Development Fund Company, Inc., a New York not-for-profit corporation which owns the property located at 2000 Washington Avenue, Bronx, New York; Block 3044, Lot 17;

(9) PIO/VIP L.P., a New York limited partnership which owns the properties located at 1876 Belmont Avenue, Bronx, New York; Block 2946, Lot 1, and 1291 Lafayette Avenue, Bronx, New York; Block 2762, Lot 1;

(10) Rosina Associates L.P., a New York limited partnership which owns the property located at 567 Southern Boulevard Bronx, New York; Block 2683, Lot 43, 852 East 163rd Street, Bronx, New York; Block 2690, Lot 73, 934 Barretto Street, Bronx, New York; Block 2723, Lot 25, 985 Intervale Avenue, Bronx, New York; Block 2699, Lot 52, and 994 Intervale Avenue, Bronx, New York; Block 2704, Lot 12;

(11) SEBCO Housing Development Fund Company, Inc., a New York not-for-profit corporation which owns the property located at 980 Aldus Street, Bronx, New York; Block 2746, Lot 30;

(12) St. Barnabas Housing Development Fund Company Inc., a New York not-for-profit corporation which owns the property located at 535-551 East 182nd Street, Bronx, New York; Block 3051, Lot 1;

(13) Tiffany Gardens, L.P., a New York limited partnership which owns the property located at 870 Southern Boulevard, Bronx, New York; Block 2733, Lot 1;

(14) Timpson Housing Development Fund Corporation, a New York not-for-profit corporation which owns the property located at 581 Timpson Place, Bronx, New York; Block 2603, Lot 35, 390 Jackson Avenue, Bronx, New York; Block 2573, Lot 71, 720 St. Mary's Street, Bronx, New York; Block 2573, Lot 49, and 1070 Rev. James Polite Ave., Bronx, New York; Block 2691, Lot 67 (Collectively, the "Property"); and

(15) Willis Avenue Associates, L.P., a New York limited partnership which owns the properties located at 288-290 Willis Avenue, Bronx, New York; Block 2284, Lot 4, 292 Willis Avenue, Bronx, New York; Block 2284, Lot 6, 495 Courtlandt Avenue, Bronx, New York; Block 2329, Lot 82, 580 Courtlandt Avenue, Bronx, New York; Block 2397, Lot 5, and 512 Jackson Avenue, Bronx, New York; Block 2579, Lot 10.