# EXHIBIT B

## PROPERTY MANAGEMENT AGREEMENT

THIS MANAGEMENT AGREEMENT (the "Agreement") dated, as of the **FIRST** day of **January, 2020**, by and between **BUILDING MANAGEMENT ASSOCIATES, INC.**, a New York Corporation, having its principal place of business at 885 Bruckner Boulevard, Bronx, New York 10459 (hereinafter referred to as "BMA"), and **ST. BARNABAS HDFC**, having as its principal place of business at **885 Bruckner Boulevard, Bronx, NY 10459** (the "Owner").

RECITALS:

A.  The Owner owns the real property located at **SEE EXHIBIT** (the "Property") which is described on Exhibit A (legal description of property) attached hereto and incorporated herein by this reference;

B.  It is the intention of the Owner that the Property is leased for residential and/or retail purposes;

C.  The Owner desires that the property be managed efficiently; and

D.  The Owner desires to employ BMA to manage the Property and BMA desires to accept said employment, all in accordance with the terms and conditions of this Agreement as hereinafter set forth.

NOW, THEREFORE, in consideration for the mutual covenants herein contained, the parties hereto hereby agree as follows:

1.  Employment

    (a)  Owner hereby employs BMA and BMA hereby accepts such employment as manager of the Property upon the terms and conditions hereinafter set forth.

    (b)  Owner acknowledges that the principles of BMA are in the business of managing real property for others and on its own account. It is hereby expressly agreed that the principles of BMA and their affiliates may continue to engage in such activities, may manage facilities other than those presently managed by it (whether or not such other facilities may be in direct or indirect competition with the Owner) and may in the future engage in other business which may compete directly or indirectly with the activities of the Owner.

    (c)  In the performance of its duties under this Agreement, BMA shall occupy the position of an independent contractor with respect to the Owner. Nothing contained herein shall be constructed as making the parties' hereto partners or joint ventures, nor, except as expressly otherwise provided for herein, constructed as making BMA an agent or employee of Owner.

2.  Duties and Authority of BMA

    (a)  General Duties of Authority. Subject only to the restrictions and limitations. provided in paragraphs (o) and (p) of this Section 2, BMA shall have the sole and exclusive authority to fully and completely supervise the Property and supervise

1

and direct the business and affairs associated or related to the daily operation thereof, and to that end to cause or direct Owner to execute such documents or instruments as in the sole judgment of BMA, may be deemed necessary or advisable. Such duties and authority shall include those set forth as follows, which are not in limitation of the foregoing.

(b) Renting of Property. BMA shall establish policies and procedures for the marketing activities for the Property. BMA shall have the sole discretion, which discretion shall be exercised in good faith, to establish the terms and conditions of occupancy by the tenants and licensees of the Property and BMA is hereby authorized to enter into rental and license agreements on behalf, in the name and for the account of the Owner with such tenants and to collect rent and fees form such tenants.

(c) Repairs, Maintenance and Improvements. BMA shall make and execute, or supervise and have control over the making and executing of all decisions concerning the acquisition of furniture, fixtures and supplies for the Property, and the purchase, lease or other acquisition of the same on behalf of Owner. BMA shall maintain, repair and landscape the Property. All costs incurred in connection therewith shall be on behalf of the Owner.

(d) Personnel. BMA shall select all vendors, suppliers, real estate brokers, contractors, subcontractors, and employees required for the operation and maintenance of the Property and shall hire, discharge and supervise all labor and employees required for the operation and maintenance of the Property; all such acts shall be on behalf of the Owner. Employees performing work on Owner's behalf may do so on a full-time or part-time basis. Employees may include, but will not be limited to, on-site resident managers, on-site assistant managers, relief managers, area managers, maintenance personnel and other individuals located, rendering services, or performing activities on the Property in connection with its operation and management. The cost of employing such persons shall not exceed prevailing rates for comparable persons performing the same or similar services with respect to real estate similar to the Property located within a five-mile radius. It is understood and acknowledged that some of such persons may be simultaneously engaged for the account of Owner and by or for the account of the owners of other facilities managed by BMA, some of whom may (i) be affiliates of BMA or (ii) compete with Owner. BMA will allocate the cost of these personnel among such owners on an equitable basis. BMA shall be responsible for the disbursement of funds in payment of all expenses incurred in connection with the operation of the Property and the Owner shall be required to employ personnel to assist in such disbursement. BMA shall not be separately reimbursed for the time of its executive officers and managers devoted to Owner's affairs or for the other overhead expenses of BMA.

(e) Agreements. BMA shall negotiate and execute on behalf of the Owner such agreements which BMA deems necessary or advisable for the furnishing of

agreements which BMA deems necessary or advisable for the furnishing of utilities, services, concessions and supplies, for the maintenance, repair and operation of the Property and such other agreements which may benefit the Property or be incidental to the matters for which BMA is responsible hereunder.

(f) Other Decisions. BMA shall make all decisions in connection with the operation of the Property.

(g) Regulations and Permits. BMA shall use its best efforts to cause all things to be done, on behalf of the Owner, on the Property necessary to comply with any statute, ordinance, law, rule, regulation or order of any government or regulatory body having jurisdiction over the Property, respecting the use of the Property or the maintenance or operation thereof BMA shall apply for and attempt to obtain and maintain, on behalf of the Owner, all licenses and permits required or advisable (in BMA's sole judgment) in connection with the management and operation of the Property.

(h) Records and Reports of Disbursements and Corrections. BMA shall establish, supervise, and direct the operation of a system of record keeping and bookkeeping with respect to all receipts and disbursements in connection with the management and operation of the Property. On or before thirty (30) days after the close of each calendar quarter, BMA shall cause to be prepared and delivered to Owner at Owner's expense, a monthly statement of receipts, expenses and charges (including management fees).

(i) Owner Reimbursement of BMA. In the event the disbursements required or permitted to be made by BMA under this agreement shall be in excess of the rents collected by BMA, Owner hereby agrees to pay such excess promptly upon demand of BMA, but in any event not later than ten (10) days after written notice from BMA.

(j) Deposits. BMA shall deposit all receipts and monies collected for Owner in an agency account in the name of the *BMA as agent for Owner* in a national or state institution qualified to engage in the banking or trust business separate from BMA's own accounts. It is agreed that BMA shall not be held liable in the event of bankruptcy or failure of a depository. BMA shall disburse Owner's funds from said account on behalf of the Owner in such amounts and at such times as disbursements of such revenues for payment of expenses is required in accordance with this Agreement. BMA may pay for any such expenses itself and obtain reimbursement from Owner.

(k) Collection. BMA shall direct the collection and billing of all accounts receivable due to the Owner with respect to the Property and shall be responsible for establishing policies and procedures to minimize the amount of bad debts.

(l) Legal Actions. BMA shall cause to be instituted, on behalf and in the name of the

3

advisable to collect charges, rent, or other income due to the Owner with respect to the Property or to oust or dispossess tenants or other persons unlawfully in possession under any lease, license, concession, agreement or otherwise, and to collect damages for breach thereof or default thereunder by such tenant, licensee, concessionaire or occupant. The cost of all such legal actions or proceedings shall be borne by the Owner. BMA shall keep Owner advised of on going litigation.

(m) Insurance. BMA shall use its best efforts to assure that there is obtained and kept in force, at the expense of the Owner, fire, comprehensive liability and other insurance policies in amounts generally carried with respect to similar facilities.

(n) Taxes. During the term of this Agreement, at Owner's request BMA shall: pay from Owner's funds, prior to delinquency, all real estate taxes, personal property taxes, and all other taxes assessed to or levied upon the Property. If required by the holder of any mortgage secured by the Property, BMA will set aside, from Owner's funds a reserve from each month's rent and other income collected, in an amount required by said holder. If the amount set aside and reserved to cover the payment of taxes are insufficient to pay said taxes, Owner shall provide BMA funds sufficient to cover the amount of the deficiency. If said holder does not require a reserve as described or if BMA believes the reserve is insufficient, BMA shall reserve the amount BMA believes is necessary and shall deposit any such amount reserved which is not required to be deposited with a said holder in an interest-bearing trust account for the benefit of the Owner. BMA shall use its best efforts to maintain and implement a procedure for review of all amounts assessed on the Property.

(o) Restrictions. Notwithstanding anything to the contrary set forth in this Section 2, BMA shall not be required to do, or cause to be done, anything for the account of the Owner (i) which may make BMA liable to third parties; (ii) which may not be commenced, undertaken or completed because of insufficient funds of Owner; or (iii) which may not be commenced, undertaken or completed because of acts of God, strikes, governmental regulations or laws, acts of war or other types of events beyond BMA's control whether similar or dissimilar to the foregoing.

(p) Shared Expenses. Certain economies may be achieved with respect to certain expenses to be incurred on behalf of Owner hereunder if material, supplies, insurance or services purchased by BMA in quantity for use not only in connection with the Property but in connection with other properties managed by BMA or its affiliates or entities affiliated with the principles of BMA. BMA shall have the right to purchase such materials, supplies, insurance or services in its own name and charge Owner a pro rata share of the cost; provided, however, that the pro rata cost of such purchase to Owner shall not result in expenses greater than would otherwise be incurred at competitive prices and terms available in the area where the Property is located; and, provided further, BMA shall give Owner access to records so Owner may review any such expenses incurred.

(q) Notices. BMA shall promptly notify Owner as to any substantial loss, accident or substantial destruction of property.

*Governmental Requirements.* The Property is subject to the LIHTC Extended Use and Restriction Periods, as well as being subject to the HPD Regulatory Agreement referenced herein and throughout, which obligates Owner to rent the properties in accordance with specific income requirements. Owner will furnish Manager with copies of any Regulatory Agreements and/or other related agreements. In performing its duties under this Management Agreement, Managing Agent will comply with all pertinent requirements of the Regulatory Agreements and, if applicable, agreements with other agencies. In the event of any instruction from Owner which is in contravention of such requirements, the latter will prevail but only after Managing Agent informs Owner of a possible conflict.

(a) *HUD Requirements.* In furtherance of Owner's business purposes, Manager shall rent units in the Project only to individuals or families who, at a minimum, qualify under the guidelines established for the State of New York by the Secretary of the United States Department of Housing and Urban Development as 'low or moderate income' families. Manager shall, in renting housing units, obtain such references and perform such background checks as are customary in residential real estate management.

(b) *Low Income Housing Tax Credit Requirements.* Manager acknowledges that, Owner is required to use its best efforts to lease the necessary percentage of the Units to Tenants at rent levels that qualify such apartments for inclusion in determining federal low-income housing tax credits (the "***Credits***") for the Project pursuant to Section 42 of the Code. For this particular agreement, the total number of eligible Units are set forth as part of Exhibit B to the Regulatory Agreement, which Manager acknowledges and will seek to comply with as part of this paragraph. Manager and Owner will use their best efforts to lease any units at the subject property in a manner that would qualify any such units for inclusion in determining the federal low-income housing tax credits, in accordance with Section 42 of the Code, and Manager acknowledges there must be compliance with the following requirements:

(i) As set forth above, a certain number of the Units must be occupied by individuals with income less than or equal to sixty percent (60%) of area median gross income; and

(ii) The gross rent (including all utilities) for each Unit may not exceed thirty percent (30%) of the qualifying income level for the Tenant under Subparagraph (i) above as determined pursuant to Section 42(g)(2)(C) of the Code.

(c) Manager will familiarize itself with the low-income housing tax credit requirements as they relate to Manager's leasing and management duties hereunder and shall use its best efforts to comply with such requirements and to the extent Manager is unable to do so, Manager shall promptly notify Owner of such fact and the reasons therefor. Incident thereto, the following provisions shall apply:

(i)     Manager shall require each prospective Tenant to certify, on the Lease application or Lease, the amount of such Tenant's annual family income, family size, and any other information required to enable Owner to obtain the Credits or otherwise reasonably requested by Owner, including conformity with the requirements of Regulatory Agreement section 3.07. Manager shall require Tenants to certify in writing as to such matters on an annual basis, prior to such time as the information is required for reporting purposes.

(ii)    Manager shall from time to time furnish Owner with a written schedule of maximum rents for the apartments that complies with the Requirements, for Owner's (and any lenders, if required) approval. Without Owner's (or any lenders, if required) express prior written consent, Manager shall not enter any lease on behalf of Owner at a rental amount exceeding the applicable maximum.

(iii)   Manager shall maintain and preserve all written records of Tenant family income and size, and any other information necessary to comply with the Requirements or otherwise reasonably requested by Owner throughout the term of this Agreement, and shall turn all such records over to Owner upon the termination or expiration of this Agreement; and

(iv)    If requested by Owner, Manager shall prepare reports of low-income leasing and occupancy and other matters related to Manager's obligations hereunder and to the operation of the Project in form suitable for submission in connection with the Credits and in compliance with the Requirements.

3.  Duties of the Owner

The Owner hereby agrees to cooperate with BMA in the performance of its duties under this Agreement and to that end, upon the request of BMA to provide reasonable office space for BMA employees on the premises of the Property, give BMA access to all files, books and records of the Owner relevant to the operation of the Property, and to execute all documents or instruments as BMA in its sole judgment deems necessary or advisable to enable it to fulfill its duties under this Agreement.

4.  Compensation of BMA

The Owner shall pay to BMA as the full amount due for the services herein a monthly Management Fee as set forth on Exhibit A. If applicable to the calculation of such Management Fee, the term "Gross Revenue" shall mean all receipts arising from the operation of the Property, as well as rental payments of lessees of space in the Property, vending machine or concessionaire revenue, billboard revenue, maintenance charges, if any, paid by the tenants of the Property in addition to parking fees, if any, and all monies whether or not otherwise described herein paid for the use or sale of the Property. "Gross Revenue" shall be determined on a cash basis and shall include all receipts for rent, and services less returned checks and proceeds of the sale and refinance of the Property (in excess of the then outstanding mortgage at the time of such sale or refinance). The Management Fee for each month shall be paid promptly at the end of such month and shall be calculated on the basis of the "Gross Revenue" of such month. It is understood and agreed that such compensation will not be reduced by the cost to

Owner of those employees and independent contractors engaged by or for Owner, including but not limited to the categories of personnel specifically referred to in Section 2(d). Except as provided in this Section 4, it is further understood and agreed that BMA shall not be entitled to additional compensation of any kind in connection with the performance by it of its duties under this Agreement. It is understood and agreed that the monthly payments to be made hereunder may in some months be inaccurate to the extent of net deposits and that said inaccuracies will be corrected not less often than annually.

5. Uses of Trademarks, Service Marks and Related Items

It is understood and agreed that the name, trademark and service mark, "BMA" or "Building Management Associates" and related marks, slogans, caricatures, designs and other trade or service items may be utilized for the non-exclusive benefit of the Owner in the rental operation of the Property, and in comparable operations elsewhere. It is further understood and agreed that this name and all such marks, slogans, caricatures, designs and other trade or service items shall remain and be at all times the property of BMA and its affiliates, and that except during the term hereof, the Owner shall have no right whatsoever therein. Upon termination of this Agreement at any time for any reason, all such use by and for the benefit of the Owner of any such name, mark, slogan, caricature, design or other, trade or service items in connection with the Property shall, in any event, be terminated and any signs bearing any of the foregoing shall be removed from view and no longer used by the Owner. It is understood and agreed that BMA will, use and shall be unrestricted in its use of such name, mark slogan, caricature, design or other trade or service item in the management and operation of other facilities both during and after the expiration or termination of the term of this Agreement.

6. Term

This Agreement shall commence on the date hereof and shall terminate on **December 31, 2020** and shall be automatically renewed unless terminated by Owner or Manager, upon no less than thirty (30) days' notice.

7. Indemnification

The owner hereby agrees to indemnify and hold BMA, all persons and companies affiliated with BMA, and all officers, shareholders, directors, employees and agents of BMA and of any affiliated companies or persons (collectively the "Indemnified Persons") harmless from any and all costs, expenses, attorneys' fees, suits, liabilities, judgments, damages, and claims in connection with the management of the Property (including the loss of use thereof following any damage, injury, or destruction), arising from any cause except for willful misconduct or gross negligence on the part of the indemnified Persons provided that BMA notifies Owner within a reasonable time. In addition, no Indemnified Person shall be liable for any error in judgment or for any mistake of fact or law, made in the normal course of operation of Property, except in cases of willful misconduct or gross negligence.

7

8. Assignment

Neither this Agreement nor any right hereunder shall be assignable by the Owner and any attempt to do so shall be void *ab. initio*. BMA shall have the right to assign the Agreement to an affiliate or a wholly or majority owned subsidiary; provided, however, any such assignee must assume all obligation of BMA hereunder. The Owner's rights hereunder will be enforceable against any such assignee.

9. Headings

The headings herein are for convenience or reference only and are not intended to define, limit or describe the scope or intent of any provision of the Agreement.

10. Governing Law

The validity of the Agreement, the construction of its terms and the interpretation of the rights and duties of the parties shall be governed by the internal laws of State of New York.

11. Notices

Any notice required or permitted herein is to be given in writing and shall be personally delivered or sent by certified mail, return receipt requested, or delivered by a reputable overnight delivery service to the respective addresses of the parties set forth in the preamble of this Agreement, or to such other address as any party may give to the other in writing. Any notice required by this Agreement will be deemed to have been given when personally served or one day after delivery to an overnight delivery service or five days after mailing.

12. Severability

Should any term or provision hereof be deemed invalid, void, or unenforceable either in its entirety or in a particular application, the remainder of the Agreement shall nonetheless remain in full force and effect and, if the subject term or provision is deemed to be invalid, void, or unenforceable only with respect to a particular application, such term or provision shall remain in full force and effect with respect to all other applications.

13. Successors

This Agreement shall be binding upon and inure to the benefit of the respective parties hereto and their permitted Assigns and successors in interest.

14. Attorneys' Fees

If it shall become necessary for either party to hereto engage attorneys to institute legal action for the purpose of enforcing its rights hereunder or for the purpose of defending legal action brought by the other party hereto, the party or parties prevailing in such litigation shall be

8

entitled to receive all costs, expenses and fees (including reasonable attorneys' fees) incurred by it in such litigation (including appeals).

15.     Counterparts

This Agreement may be executed in one or more counterparts, each of which shall be deemed on original, but all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

Building Management Associates, Inc.

By: *[signature]*
Latoya Allen, Vice President

9

# EXHIBIT A

**ST. BARNABAS HDFC**
**535-551 EAST 182ND STREET, BRONX, N.Y.**