**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BUILDING MANAGEMENT ASSOCIATES, INC., | Civil Case No. |
| Plaintiff, | |
| -against- | |
| SALVATORE GIGANTE and LATOYA ALLEN Defendants. | |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF APPLICATION**
**FOR A TEMPORARY RESTRAINING ORDER**
**AND PRELIMINARY INJUNCTION**

PRYOR CASHMAN LLP
7 Times Square
New York, NY 10036
(212) 421-4100
*Attorneys for Plaintiff*

Plaintiff Building Management Associates, Inc. ("BMA") respectfully submits this memorandum of law in support of its application for a temporary restraining order and preliminary injunction.

## PRELIMINARY STATEMENT

The Plaintiff, BMA, requires this Court's assistance in preventing Defendants from their attempted take-over of BMA's business.

Established in 1980 to self-manage a portfolio of low and moderate-income multi-family and senior citizen housing, BMA has been providing property management services to numerous Housing Development Fund Corporation ("HDFC") cooperatives for approximately 40 years. It has more than 125 employees that manage 3,100 residential units.

Along with SEBCO Development Inc. ("SEBCO"), a not-for-profit corporation, BMA is part of a network of for-profit entities[1] created by the Father Louis R. Gigante ("Father G") to build, manage and provide security to properties located in the Bronx. Father G was an iconic figure, who, as The New York Times recently characterized it, "was instrumental in rebuilding one of America's most notorious slums, in the South Bronx, into a thriving and safer neighborhood with thousands of new homes."[2]

Defendant Salvatore Gigante ("Sal"), Father G's grandnephew, has been working in the Business for several years and, until recently, was the Chief Operating Officer ("COO") of BMA. After Father G's passing in 2022, Sal has been "cut-off" from what he believes he is "entitled to" because Father G's son, Luigino Gigante ("Gino") is the *sole* beneficiary of Father G's residuary estate ("Estate"), which includes ownership of the Companies.

---

[1] The for-profit entities are collectively referred to as the "Companies" or "Father G's Companies".

[2] https://www.nytimes.com/2022/10/23/obituaries/louis-gigante-dead.html (last accessed 1-24-2023).

Gino, therefore, has been stonewalled repeatedly in his attempts to gather information and the books and records of the Companies.  On January 9, 2023, Sal, therefore, was terminated from his employment at the Companies, including BMA.  And, upon accessing the books and records, Gino discovered that Sal misappropriated $278,502.96 from BMA.

In retaliation for being terminated, Sal, working in concert with his second in command at BMA, defendant Latoya Allen ("Latoya") therefore, has, orchestrated a scheme to steal BMA's business.

He has done so, by taking the following actions:  (i) causing all the HDFC property owners to simultaneously issue notices terminating the management arrangements *that BMA has had in place for 40 years*; (ii) soliciting BMA employees to join Latoya and him at their "new company" across the street, culminating already in the precipitous resignations of 9 employees, in the last two weeks, including the head of building management, accounts payable and the bookkeeper; and (iii) contacting various BMA vendors to transfer the business to their new company, including, MRI Securities LLC, which houses the database for the BMA managed properties.

Gino has been told by some employees that Latoya has now told BMA staff to resign "without notice" and that this Friday, February 17, 2023 should be their last day after which, as of next week, they can start at the new company.

Given these egregious facts, BMA is likely to succeed on the merits.  And, BMA is likely to suffer irreparable injury in the absence of an injunction.  *Without a temporary restraining order there, therefore, may be no BMA business left to protect*.  **Time is of the essence**.

And, the balance of hardships and public interest both tip in favor of BMA.

There is no harm to Defendants during the pendency of the TRO and injunctive relief other than the fact that their takeover effort will be thwarted.  The harm to BMA's 40- year-old business

on the other hand would be irreparable – a business that is an integral part of the legacy of the late Father G, providing jobs and affordable housing to thousands in the Bronx.

BMA, therefore, respectfully requests that this Court grants its request for a temporary restraining order and request for a preliminary injunction pursuant to Federal Rule of Civil Procedure 65 which will preserve the status quo while the parties litigate their dispute before this Court.

**STATEMENT OF FACTS**[3]

*Father G's Companies*

Plaintiff, BMA, is just part of a portfolio of entities established by Father G to fulfill his overarching mission -- the revitalization of the South Bronx. (Gigante Decl. ¶¶1 and 5). By 1981, Father G had orchestrated the construction and rehabilitation of 1,100 federally subsidized apartments in the South Bronx. (*Id.* ¶6). By 2004, SEBCO had developed 2,000 housing units and was the centerpiece of what became a network of nonprofit and for-profit organizations (the "Business") to build, manage and provide security to the properties. (*Id.* ¶6).

Following Father G's death on October 19, 2022, and by order of the Surrogate's Court of Columbia County, New York, Irwin Siegel ("Irwin"), Father G's long-time attorney for 50 years and trusted friend and advisor was appointed as the Executor of Father G's Estate (*Id.* ¶7). 80% of BMA is owned by the Estate and the remaining 20% is owned by Gino who is also the ultimate beneficiary of the Estate. (*Id.* ¶8).

Growing up, Gino was taught about the Business by Father G who told him everything he needed to know so he could be prepared to take the reins when the time came. (*Id.* ¶11). Gino is

---

[3] The facts of this matter are set forth in detail in the accompanying declaration of Luigino Gigante dated February 16, 2023 ("Gigante Decl.") and Plaintiff's Complaint. For the Court's convenience, the salient facts are set forth herein.

determined to continue his father's work using the Business to build a better and safer community in the South Bronx, keeping true to Father G's mission and to preserve his legacy. (*Id*. ¶12).

### *Defendants' Animosity Toward Gino and Irwin*

Defendant Sal is Father G's grandnephew, who Father literally "took in" to help him and Sal joined the Business, even though he did not have any relevant experience or skills *(Id*. at ¶80.) Sal has worked for BMA for 18 years and was the Executive Vice-President of BMA since 2018. (*Id*. ¶22).

One of the issues that soon arose following Father G's death involved an Option Agreement. (*Id*. ¶15).  Sal had an Option Agreement upon Father G's passing, to purchase his shares in BMA and Tiffany Maintenance Co. Inc. (an affiliated company providing maintenance services to the properties) on favorable terms. (*Id*. ¶15).  The Option required periodic payments to be made by Sal.  For four years, however, he made no such payments and was in default. (*Id*. ¶15).

After Father G. passed in 2022, Sal issued a check for all the missed payments and sent it to Irwin. (*Id*. ¶16).  As Father G's appointee under a power of attorney, had Irwin accepted the payments, the Option would have been exercised. (*Id*. ¶16).  However, as Executor of the Estate, Irwin rightly refused to accept Sal's attempted belated cure of his default.  (*Id*. ¶16).  Instead, Irwin sought a legal opinion from the well-known law firm of K&L Gates on the validity of the Option. The firm concluded that, under New York law, the Option no longer was valid. (*Id*. ¶17). Irwin informed Sal that the Option was no longer valid. (*Id*. ¶17). While Sal did not dispute this fact, this earned Irwin Sal's ire. (*Id*. ¶17).

With no ownership interest in any of the Companies and Gino being the sole heir, Sal started plotting and scheming to take over the Business, including BMA, to get what he believes

he is "entitled" to.  (*Id*. at 18 and ¶79).  Soon after Father G's death, Sal started his plotting and scheming to do so. (*Id*. ¶18).

Following Father G's passing in 2022, Irwin assumed his role as Executor to the Estate, and Gino became the ultimate owner of the Companies. (*Id.* ¶23).  In undertaking their responsibilities to the Companies, Irwin and Gino, along with business consultants, began taking a close look at the financial condition and operations of each of the Companies, including BMA. (*Id*. ¶24).  While attempting to obtain information about BMA from employees, Irwin and Gino encountered "stonewalling" from BMA employees, including BMA's former Vice-President and defendant in this action, Latoya and Sonal Shah, the controller. (*Id*. ¶25). This included disregarding requests for information made by Gino and Irwin, as well as withholding important information and records requested. (*Id*. ¶25).

Latoya's wrongdoing is motivated by her misplaced loyalty and complicity with Sal, working as his "second in command" for the past ten years, as well as the expectation that she will reap a financial benefit by following Sal and assisting him in his plan. (*Id*. ¶19).  Notably, during their time working for the Business, both Sal and she were extremely well compensated earning high six-figure salaries (*Id*. ¶19).[4]

Sonal does not lift a pencil without Sal's say-so and has repeatedly stonewalled Gino and Irwin when they sought information. (*Id*. at 20).  Along with Sal and Latoya, Sonal has created roadblocks so Irwin and Gino could not get access to the books and records of BMA. (*Id*. at 20).

In general, the attitude displayed toward Gino and Irwin following Father G's passing was one where employees, at Sal direction, provided Gino and Irwin with the bare minimum of

---

[4] According to SEBCO latest publicly available tax filing, the Form 990 for year-ended 2021, Sal earned more than $680,000 from the Companies and Latoya earned $400,000.

information, if any. (*Id*. ¶26).  Gino and Irwin encountered considerable resistance from Sal, Latoya and Sonal. (*Id*. ¶27).  Sal's employment at the Companies, including BMA, was therefore, terminated on January 9, 2023.

### *The Discovery of Sal's Breaches of Fiduciary Duty and Misappropriation*

Gino was now able to obtain access to the books and records. (*Id*. ¶29).  Once this occurred, the reason why Defendants were not willing to work with Gino and Irwin and provide them with the necessary information became abundantly clear. (*Id*. ¶29).  It was discovered that Sal had breached his fiduciary duties to BMA by misappropriating corporate funds for his personal benefit in an amount no less than $ 278,502.96. (*Id*. ¶30).  Specifically, it has come to light, that for at least 13 years, Sal used BMA's funds, without authorization, to lease luxury vehicles for personal use on the company's "dime". (*Id*. ¶31).  It bears noting that Father G, ***who founded and owned the Companies,*** never paid for any automobile expenses for himself or any family members from any of the Companies or SEBCO. (*Id*. ¶32).  Starting on or about 2010, Sal, however, used BMA's funds to make monthly payments for luxury automobile leases, maintenance, and insurance, totaling approximately $183,108.96. (*Id*. ¶33).

In addition to this, Sal engaged in even more flagrant misappropriation. (*Id*. ¶34). Specifically, without BMA's authorization beginning in or about 2017, Sal took numerous sums of money totaling approximately $95,394 from BMA's corporate accounts and instructed auditors of BMA, who wrongfully acquiesced in order to keep the client, to classify the pilfered $95,394.00 as "advances/loans & exchanges" which was then buried with "Accounts Receivable" on the financial statement which totaled $1,711,871. (*Id*. ¶34).  Not surprisingly, no documents substantiate such accounts receivables or even "loans" from BMA to Sal, and he has never paid any principal or interest on these "receivables". (*Id*. ¶35).  BMA never authorized such amounts

and Sal never had the authority to take the money for himself while he was employed by BMA. (*Id.* ¶36).

It has also been recently discovered that Sal failed to pay one actual loan, evidenced by a promissory note, issued by BMA to him in 2017 accruing interest in the amount of 5.25% annually for which the amount currently due is $70,640.63. (*Id.* ¶37).  Despite a demand for the monies, he has not made a payment to date.

### *Sal's Retaliatory Response*

Although Sal has always been transparent in his dislike for Gino, his animosity toward Gino and Irwin has worsened following his termination. (*Id.* ¶38).  Immediately following his termination as an employee of BMA on January 9, 2023, Sal sought to bar Gino and Irwin from accessing BMA's offices, going so far as to allege that they had no right to enter the Building (885 Bruckner Boulevard, Bronx, New York 10459) and falsely alleging that they were "breaking and entering" and "trespassing". (*Id.* ¶39).

That same day, the New York City Police received a complaint from SEBCO"s lawyer, David Samuels ("Samuels") that Gino and Irwin had allegedly "broken and entered into the Building".  Sal, of course, knows that both Gino, as the 20% owner and President of BMA as well as sole heir to Father G's Companies (many of which, including BMA, are operating out of the Building), and Irwin, as the Executor to the Estate which owns the Companies (including 80% of BMA and Fox River Properties, Inc. *which owns* the Building) have the absolute legal right and authority, not only to enter the Building, but to have unrestricted access to the entire space. (*Id.* ¶40).  Sal's false report caused at least eight police officers to come to the Building. (*Id.* ¶41).  The matter was ameliorated by the head of Sentry Security Co., Inc., an unarmed security company

8

founded by Father G to protect the buildings developed by SEBCO and managed by BMA. (*Id.* ¶41).

On January 10, 2023, Sal was at the Building himself and attempted to discredit Gino and Irwin in front of BMA and SEBCO staff (SEBCO is also housed in the same Building) and called 911, once again knowingly and falsely accusing them of "trespassing". (*Id.*¶42). The following day, on Wednesday, January 11, 2023, Gino and Irwin returned to the Building to work on BMA business matters accompanied by one security officer. (*Id.* ¶43). While stating that Gino could enter, Sal refused to let Irwin enter the offices. (*Id.* ¶43).

That same day, Sal had his attorneys transmit two documents that he asserted granted SEBCO an extended lease in the Building. (*Id.* ¶44).  The first was a lease entered into on October 1, 1993, which granted SEBCO a 10-year lease for 1,500 square feet on the second floor (the "1993 Lease") until September 30, 2003.  (*Id.* ¶45). The second document, entitled "Lease Modification and Extension Agreement" dated January 1, 2021 (the "Lease Extension") purportedly leases one-half of the Building (i.e., 5,000 square feet) to SEBCO, but without a definition of the premises. (*Id.* ¶45).  It is an obvious forgery. (*Id.* ¶46).

First, the document was allegedly executed as an "Extension" nearly two decades after the alleged 1993 Lease expired, without explanation. (*Id.* ¶47). The document also was purportedly signed by Sal as "President" of SEBCO in January 2021. (*Id.* ¶48).   This is impossible, however, in light of the fact that, Father G, not Sal, was the President of SEBCO at that time and health-wise, fine. (*Id.* ¶46).  Moreover, the notarization for the two signatures -- one of which was for the signature of Sal -- were undated.  (*Id.* ¶49). And, *critically*, the notary public's commission, per the notary stamp, is set to expire on December 20, 2025.  (*Id.* ¶48). This is critical because the term of commission for a notary in New York is four years. (*Id.* ¶49). Therefore, the notary could not

have notarized the document in January 2021 -- almost five years earlier. (*Id.*).  The so-called "Lease Modification and Extension Agreement" is obviously a fake. (*Id.* ¶51).

### *The Attempted Take-Over of BMA*

Since the run-in between Sal, Gino, and Irwin on January 11, 2023, things have only further deteriorated, culminating in what now clearly has become a brazen scheme to steal the Business, spearheaded by Sal and Latoya (*Id.* ¶52). The Defendants have become bolder and more obvious in their tortious interference with BMA's business relationships with the Property Owners and BMA's own employees.  (*Id.* ¶53).

For several decades, BMA has been managing numerous Housing Development Fund Corporations ("HDFC") properties which are owned by 15 entities (collectively, the "Property Owners") (*Id.* ¶54).  While there were agreements in place when these Property Owner entities were set up in the 1980s, those agreements have since lapsed and BMA has simply continued to manage the properties (the "BMA Managed Properties") without objection as part of its course of conduct for decades (*Id.* ¶54).

Because the Property Owners are HDFCs they needed a sponsor at the time when they were established in the 1980s and incorporated pursuant to Article XI of the Private Housing Finance Law of the State of New York. (*Id.* ¶54).  The sponsor for the Property Owners was SEBCO and, therefore, SEBCO controls these entities.  Neither SEBCO nor the Property Owners have any involvement in the BMA Managed Properties since they were constructed.  (*Id*. ¶55).

Sal, who has unilaterally appointed himself as SEBCO's COO currently controls SEBCO. (*Id.* ¶55).  Notably, Sal since 2019, has also placed the majority of the members on SEBCO's Board, a number of whom are riddled with conflicts of interest. (*Id.*)

On January 23, 2023, Sal, therefore, caused each of the Property Owners to issue notices to BMA purporting to terminate BMA's property management services, effective February 22,

2023 (the "Termination Notices") as part of his efforts to usurp BMA's business. (*Id.* ¶56).    The sole purpose of the sudden purported termination -- ***after several decades*** -- is for the wrongful purpose of transferring the management of the current BMA Managed Properties to a new entity owned, controlled and/or managed by Sal and/or Latoya. (*Id.* ¶57).

The Termination Notices, however, appear to be invalid.  None of the required permissions by, among others, the New York City Department of Housing Preservation and Development, the United States Department of Housing and Urban Development, institutional lenders and limited partners, were ever obtained to terminate these management arrangements with BMA. (*Id.* ¶58).

More importantly, much like the falsified Extended Lease document Sal had created to assert SEBCO's right to be in the Building, the Termination Notices attempt to dissolve the property management arrangements based on purported written agreements between the Property Owners and BMA which are fake. (*Id.* ¶59). In fact, Sal's attempted deception was discovered when, upon demand, Sal had Samuels, SEBCO's attorney, by email dated January 23, 2023, send copies of the purported management agreements that the Termination Notices allegedly terminated. (*Id.* ¶60).  Each of the 15 agreements is dated January 1, 2020. (*Id.* ¶61).  That itself is telling because Father G. was still very much alive at that time, and Irwin had his durable power of attorney and managed all of his affairs, including those related to BMA's operations.  (*Id.* ¶62).

Irwin was never informed of, nor did he ever authorize, any such written agreements between the Property Owners and BMA. (*Id.* ¶63).  Nor did Father G. when he was alive. (*Id.*). Furthermore, the agreements are obviously a fake because of the 15 agreements, 14 of them contain no countersignature for the Property Owners.  (*Id.* ¶64). The only signature on the documents is by defendant Latoya, as Vice-President of BMA.  Indeed, not only is there no countersignature by the Property Owner, there is not even a line for a countersignature.  (*Id.* ¶65).  These purported

11

agreements are merely pieces of paper, not contracts at all.  (*Id.* ¶66).  Indeed, when counterparts were requested from SEBCO's attorney Samuels, none were delivered.  The only agreement countersigned is by Crotona Partners L.P.  And, lo and behold, it is countersigned by Sal  on its behalf as the Vice-President.  In other words, the co-defendants themselves signed the agreement -- Sal, on behalf of the Property Owner, and Latoya on behalf of BMA.  (*Id.* at ¶¶66-69).

After producing these fake management agreements on January 23, 2023, Latoya has been busy poaching BMA employees by enticing them with the prospect of working for Sal and herself at his "new company just down the block".  (*Id.* at 68).

Indeed, several BMA employees have confirmed to Gino that they were approached by Latoya, and that she has falsely asserted that he intends to cut staff or otherwise decrease their compensation or benefits. She made these representations to encourage them to leave BMA and join Sal and her at a new company they are currently forming with offices to be located at 429 Bruckner Boulevard in the Bronx.  (*Id.* at ¶70).

As a result, 9 employees have already precipitously resigned and given their two-weeks' notice, imperiling BMA's ability to operate.  These include:

- Yesenia Velez, head of building maintenance for BMA.

-  Celina Santa, the longtime leader of the account payable department as well as the payroll clerk responsible for paying close to 400 employees.

- Agueda Olivo, the Bookeeper.

- Brian Velez, the Property Manager

- Jolanda Kendricks, Accounts Payable Clerk

- Laura Hilton, Payroll Manager

- Gloria Allen, HUD property Manager

- Celina Santana, Accounts Payable Manager and

- Jaime Diaz

Latoya herself tendered her resignation with two-weeks' notice on February 2, 2023.   (*Id*. at ¶72-75).  Gino was also told by some of the remaining employees that Latoya -- who  resigned but still in BMA's employ and in the Building -- is now telling staff to "just leave without notice". And Gino heard that Latoya is telling staff that this Friday, February 17, 2023, will the their last day. (*Id*. at ¶¶76-77).

Defendants have also been trying to get MRI Security LLC (the database platform on which BMA as well as all the other Companies information is housed) to move the data to a new account they control. (*Id*. ¶76). Latoya, in fact, on February 1, 2023, *one day before she resigned* – executed a written request  **on behalf of BMA** requesting data deactivation and transfer to a new entity.   Defendants were one day away from accomplishing this goal -- which would have been fatal to BMA's continued management-- when the transfer process was stopped.  If not, all would have been lost.  (*Id*. at ¶¶77-80).   Gino also obtained an email exchange with a BMA vendor, Heat Inc., where Sal and Latoya had notified them of a "management change for a few of the current BMA properties effective 2/24/23" (*Id*. at ¶80).   As a result of the Defendants' tortious interference, BMA's business is in serious jeopardy.

On February 3, 2023, SEBCO also gave notice of early termination effective June 9, 2023 under its purported Lease Extension and the two SEBCO signs outside the Building have bene removed as well. (*Id*. ¶82).  Clearly, Defendants are in the process of  attempting to complete their move out of the Building and move BMA files, data and employees to the new entity with its office location at 429 Bruckner Boulevard in the Bronx.  (*Id*. at ¶83).

Defendants are attempting to usurp BMA's place in the network of entities created and established by Father G., with the dual purpose of taking the entirety of BMA's management portfolio, and the value that comes with that for his benefit, and simultaneously retaliating for his Option not being validated and the termination of his employment from the Companies, including BMA. (*Id.* ¶¶83-85). He is doing this with the aim of destroying BMA and dismantling Father G's life's work as revenge for not being given -- what he believes to be -- his rightful share. (*Id.*).

Defendants' orchestrated efforts to interfere with BMA's current business relations and transfer its business to a new entity they own, control and/or manage is therefore, not just illegal but a direct affront to Father G and the legacy he built. (*Id.* ¶86). Father G literally "took in" Sal to help him and give him a professional footing. (*Id.* ¶87). In return, Sal has engaged in theft, fraud and the attempted destruction Father G's life's work-- work that has had a real and meaningful impact in the lives of thousands of people in the South Bronx. (*Id.* ¶88). That legacy must be preserved and continue for the sake of the community. (*Id.* ¶89).

As discussed in further detail below, BMA respectfully submits that it satisfies all of the required elements warranting a temporary restraining order and preliminary injunction.

## ARGUMENT

This Court should grant a temporary restraining order and preliminary injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure, in order to preserve the *status quo* between the parties and prevent irreparable harm to BMA.

## I. THE PERMANENT INJUNCTION WILL BE RENDERED INEFFECTUAL WITHOUT TEMPORARY INJUNCTIVE RELIEF

Without injunctive relief, any decision the Court reaches will be ineffectual to prevent the irreparable harm that will be caused by Defendants should they succeed in terminating the property

14

management arrangements between BMA and each of the Property Owners which **have been in place for the last 40 years**.

By the time the Court rules upon BMA's claims, Defendant will have entirely transferred BMA's management portfolio to effectuate the transfer to a business owned, controlled and/or managed by Sal and/or Latoya.  Additionally, if Defendants are permitted to continue poaching BMA's employees, they will make it impossible for BMA to be able to operate effectively. Likewise, any continued effort to transfer the database would be fatal to BMA's operations. BMA's very survival is at stake and time is of the essence.

The Second Circuit Court of Appeals has explained that "[a]n injunction should be granted when the intervention of a court of equity is essential to protect a party's property rights against injuries that would otherwise be irremediable." *Ticor Tit. Ins. Co. v. Cohen*, 173 F.3d 63, 68 (2d Cir. 1999) (citing *Cavanaugh v. Looney*, 248 U.S. 453, 456 (1919)). A preliminary injunction is particularly warranted, where, as here, absent an injunction, Sal will continue to use his influence and control to transfer BMA's business, employees, financial information and other data to his newly formed business. *See e.g. Beirne Wealth Consulting Servs., LLC v. Englebert*, 19 Civ.7936(ER), 2020 U.S. Dist. LEXIS 16165, at *14-14 (S.D.N.Y. Jan. 30, 2020) (holding that "injury would be irreparable" where absent an injunction, defendants "will continue to use their relationships with former clients and proprietary [] data to transfer clients to their new firm.").

As a result, this Court should enter an injunction that will preserve the *status quo* permitting BMA to continue operating its business managing the properties as it has been for 40 years while allowing the Court to eventually rule on the merits and award BMA the full measure of relief that it is entitled to.

## II.   BMA SATISFIES THE TRADITIONAL PRELIMINARY INJUNCTION STANDARD OF FEDERAL RULE OF CIVIL PROCEDURE 65

In the Second Circuit, a party is entitled to a preliminary injunction "where a plaintiff demonstrates irreparable harm and meets either of two standards: (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation, and a balance of hardships tipping decidedly in the movant's favor." *Beirne Wealth Consulting Servs., LLC*, 2020 U.S. Dist. LEXIS 16165, at * (citation omitted).

To obtain a preliminary injunction, in addition to a likelihood of success a party must also establish "by clear and convincing evidence" (1) "that the plaintiff is likely to suffer irreparable injury in the absence of an injunction"; (2) "that the balance of hardships tips in the plaintiff's favor"; and (3) "that the public interest would not be disserved by the issuance of the injunction." *Sound Around Inc. v. Shenzhen Keenray Innovations Ltd.*, No. 22-cv-6943(HG), 2022 U.S. Dist. LEXIS 227247, 2022 WL 17811475, at *2 (E.D.N.Y. Dec. 18, 2022) (citation omitted).

Furthermore, "[t]he purpose of such interim equitable relief is not to conclusively determine the rights of the parties but to balance the equities as the litigation moves forward." *Shenzhen Miracle Laptop Bags Co. v. Castillo*, No. 22-cv-7734 (HG), 2023 U.S. Dist. LEXIS 14405, at *7-8 (E.D.N.Y. Jan. 27, 2023) (citation omitted).  Moreover, "in deciding a motion for [a] preliminary injunction, a court may consider the entire record including affidavits and other hearsay evidence." *Helio Logistics, Inc. v. Mehta*, No. 22-cv-10047 (NSR), 2023 U.S. Dist. LEXIS 18787, at *6 (S.D.N.Y. Feb. 3, 2023) (citations omitted).

As explained in further detail below, BMA satisfies *all* requisites warranting the Court's granting a preliminary injunction. The purpose of the interim relief, in this case would not conclusively determine the parties' rights, rather, an injunction would serve only to maintain the

*status quo* until such time as the Court finally resolves BMA's claims of tortious interference against Defendants.  To do so otherwise, would render Sal's unlawful conduct irremediable.

### A.   BMA Is Likely To Succeed On The Merits Of Its Claims Against Defendants

In evaluating whether a moving party has satisfied the likelihood of success prong, under New York law, "[i]t is well settled that a likelihood of success on the merits may be sufficiently established even where the facts are in dispute and the evidence is inconclusive." *Four Times Sq. Assoc., L.L.C. v. Cigna Invs., Inc*., 306 A.D.2d 4, 5 (1st Dep't 2003) (citing *Ma v. Lien*, 198 A.D.2d 186 (1993); *Demartini v. Chatham Green*, 169 A.D.2d 689 (1991)); *See also 1234 Broadway LLC v. West Side SRO Law Project, Goddard Riverside Community Ctr.*, 86 A.D.3d 18, 23-24 (1st Dep't 2011) ("[T]he proponent of a preliminary injunction need not tender conclusive proof beyond any factual dispute establishing ultimate success in the underlying action.") (citations omitted).

Here, the facts are not is dispute – *they are egregious* -- and the evidence, in fact, is conclusive that Sal and Latoya are literally stealing BMA's business.  And, absent injunctive relief, they will have accomplished their goal, making a final judgment entirely superfluous.  New York courts have held that where, as here, "the denial of injunctive relief would render the final judgment ineffectual, the degree of proof required to establish the element of likelihood of success on the merits should be reduced." *State v. City of N.Y.*, 275 A.D.2d 740, 741 (2d Dep't 2000); *see also Gramercy Co. v. Benenson*, 223 A.D.2d 497, 498 (1st Dep't 1996).

As will be demonstrated at trial, BMA has a meritorious claim for tortious interference against Sal and Latoya. To assert a claim for tortious interference with business relations, the plaintiff must establish four elements: "(1) business relations with a third party; (2) defendants' interference with those relations; (3) defendants acted with the sole purpose of harming plaintiff

17

or used dishonest, unfair, or improper means; and (4) injury to the relationship." *World Wrestling Federation Ent. v. Bozell*, 142 F. Supp. 2d 514, 532 (S.D.N.Y. 2001) (citations omitted); *See also Purgess v. Sharrock*, 33 F.3d 134, 141 (2d Cir. 1994).

It is indisputable that BMA has had a longstanding business relationship with the Property Owners and has been managing their properties for several decades.

It is also undisputable that BMA has a business relationship with its employees and vendors. As former employees of BMA, it is also undisputed that Sal and Latoya knew about these relationships.

It is also undisputed that Defendants have interfered with these relationships by, among other things: (i) Sal causing the Property Owners to issue notices terminating the decades long relationship with BMA; (ii) encouraging BMA employees to leave and join them across the street at the new business owned by Sal and/or Latoya, as a result of which multiple resignations of key BMA staff have ensued; and (iii) communicating with vendors, including MRI Security LLC to transfer BMA's database to their new business.

As a result of Defendants' wrongful actions, BMA's business relationship as the property manager and its ability to continue its operations has been seriously jeopardized.

On the basis of these facts, BMA has established that it is likely to succeed on the merits of its tortious interference claims against Defendants. Accordingly, the first prong of the test for injunctive relief pursuant to Federal Rule of Civil Procedure 65 is satisfied.

**B.    BMA Will Suffer Irreparable Harm Absent Injunctive Relief Pending this Action**

Unless Defendants are enjoined by this Court from interfering with BMA's business relations with the Property Owners, BMA's employees, and its vendors, BMA will suffer irreparable injury, specifically, the complete ruin of BMA caused by *inter alia* (i) Defendants'

extraction of its portfolio of managed properties to another entity; (ii) Defendants' poaching of BMA's valued employees; (iii) the appropriation of its database; and (iv) the ultimate destruction of Father G's decades-long work for the betterment of the South Bronx community. (Gino Decl. at ¶¶85-93). Thus, the "irreparable harm" prong of the preliminary injunction inquiry clearly is satisfied.

Courts have held that "[t]he total loss of a business clearly constitutes irreparable injury." *Galvin v. New York Racing Ass'n*, 70 F. Supp. 2d 163, 170 (E.D.N.Y. 1998) (internal citations omitted).  However, the loss does not need to be total "so long as it is so great as to seriously compromise the company's ability to continue in its current form." *Id*. Indeed, "[t]he risk that a company's customers would turn to competitors … created the potential for injury which could not be rectified by money damages and thus constituted 'irreparable harm'." *Id*. (citing *Jacobson Company v. Armstrong Cork Co.,*548 F.2d 438, 444-45 (2d Cir. 1977)); *See e.g. QBE Ams., Inc. v. Allen*, No. 22-cv-756 (JSR), 2022 U.S. Dist. LEXIS 54398, at *45-46 (S.D.N.Y. Mar. 24, 2022) ("Even if QBE could reliably measure and obtain damages for poached customers at the end of this litigation, it would be very difficult to precisely quantify the harm caused by having its trade secrets misappropriated and used to jumpstart a new competitor.") (citation omitted)

Here, Defendants are not only creating a new company to compete directly with BMA and essentially take over BMA's portfolio of business, Defendants are also poaching BMA's employees to work for their competing business (Gino Decl. ¶¶52-84) and trying to obtain the vital data needed to manage the properties.  If Defendants are permitted to do so, there are no money damages that could rectify the situation.  Furthermore, and perhaps more concerning is the potential of Defendants' takeover resulting in a reduction in the value of the management services afforded to the Property Owners. (*Id*. ¶89-90).  Given Defendants' display of wrongdoing and

greed to date, including Sal's theft of BMA monies, and given Sal's expressed disdain for Gino and Irwin and blatant disrespect for Father G's memory (*see e.g.* Gino Decl. at ¶¶ 14, 18), it is likely that the very foundation of Father G's legacy will be destroyed if Defendants' are successful. It is, therefore, respectfully submitted, that Defendants should be enjoined from causing Plaintiff such irreparable injury.

C.      <u>The Balance Of The Hardships Favors Granting Injunctive Relief To BMA</u>

In determining whether to grant a preliminary injunction, "[w]hen assessing the balance of hardships between the parties, [t]he relevant harm is the harm that (a) occurs to the parties' legal interests and (b) cannot be remedied after a final adjudication, whether by damages or a permanent injunction." *Pearson Educ., Inc. v. Labos*, 19 Civ. 487 (CM), 2019 U.S. Dist. LEXIS 72342, at *17-18 (S.D.N.Y. Apr. 23, 2019) (internal citations omitted).

BMA's request for injunctive relief seeks nothing more than to prohibit Defendants from continuing their ongoing tortious interference with BMA's longstanding business relations in an effort steal all of BMA's management portfolio and its employees.  The balance of the hardships favors BMA because it merely seeks to continue operating its business as it has for the past few decades in the service of the Bronx community and keeping true to Father G's mission and legacy (Gino Decl. ¶¶86- 89).  Enjoining Defendants from interfering with BMA's business pending this Court's ultimate resolution of Plaintiff's claims will not prejudice Defendants in any way.  Defendants have nothing to lose if their wrongful conduct is put to a stop-- except that they would not have accomplished their goal of stealing BMA's business.

Plaintiff on the other hand has every legal right to be able to conduct its business without Defendants' constant interference and disruptions.  By contrast, BMA may lose the entirety of its business if Defendants' interference continues unchecked.

Thus, the balance of the hardships tips decisively in favor of providing BMA with provisional relief pending this Court's ultimate decision on the merits of its claims.

**D.**    **The Public Interest Favors BMA**

In determining whether to grant Plaintiff's request for a temporary restraining order and preliminary injunction, "[t]he consideration of the public interest is designed to 'ensure that the public interest would not be disserved' by the issuance of a preliminary injunction." *Sound Around Inc.*, 2022 U.S. Dist. LEXIS 227247, at *12 (citing *Hope Organics LLC v. Preggo Leggings LLC*, No. 21-cv-2416, 2021 WL 5919367, at *13 (S.D.N.Y. Dec. 15, 2021).

Here, not only would the public's interest "not be disserved", the public's interest would benefit from the issuance of a temporary restraining order and injunctive relief prohibiting Defendants from continuing to engage in their wrongdoing.  Specifically, in this case, Defendants' have repeatedly demonstrated their greed, dishonesty, and their intent to damage BMA and Father G' legacy. (*See* Gino Decl. at ¶¶30-38, 43-68).  Unlike Plaintiff, Defendants have acted only out of self-interest and an animosity directed at Gino and Irwin. They do not care if the Bronx community continues to be served in accordance with Father G's mission.  Defendants have not sought to continue the smooth operation of the BMA Managed Properties following Father G's passing.  Instead, while Father G's grave was not even cold, they took the opportunity to cause disruptions in BMA's operations, preventing Gino and Irwin's access to BMA's records, falsely asserting that Gino and Irwin could not enter the Building from which BMA operates, brought internal chaos, pitting employees against Gino and Irwin, and now are actively attempting to take the entirety of BMA's management portfolio to transfer it to a new company owned, controlled and/or managed by one them.  Defendants' greed knows no bounds. They are likely to extract all of the value from the business, ultimately affecting the quality of management of and living in

these HDFC affordable housing units.  It is the public interest that will ultimately be affected if this Court does not issue a temporary restraining order and injunctive relief.

**III.      THE COURT SHOULD NOT ISSUE A BOND**

There is no identifiable harm to Defendants that will result from the granting of a temporary restraining order and preliminary injunction in this matter.

Under Federal Rule of Civil Procedure 65(c), the district court has "wide discretion to set the amount of a bond, and even to dispense with the bond requirement where there has been no proof of likelihood of harm ...." *N.Y. State Telecomms. Ass'n v. James*, 544 F. Supp. 3d 269, 289 (E.D.N.Y. 2021) (citing *Doctor's Assocs., Inc. v. Distajo*, 107 F.3d 126, 136 (2d Cir. 1997)) (internal quotation marks omitted). In fact, courts will dispense with the bond requirement "in cases where the non-movant has not shown a likelihood of harm". *Masefield AG v. Colonial Oil Indus.,* 05 Civ.2231, 2005 U.S. Dist. LEXIS 6737, at *24 (S.D.N.Y. Apr. 18, 2005) (citations omitted); *See also Sound Around Inc.*, 2022 U.S. Dist. LEXIS 227247, at *13 ("The Court waives the bond requirement because neither the Court nor Defendants (who have so far failed to appear in the action) have identified any damages or costs that Defendants will suffer as a result of the injunction.")

Accordingly, where, as here, there is no likelihood of harm to Defendants whatsoever, no bond should be required.

**CONCLUSION**

For the foregoing reasons, BMA respectfully submits that it has satisfied each and every element for preliminary injunctive relief, and respectfully requests that this Court grant the preliminary injunction as sought in the Order to Show Cause and, in the interim, grant BMA's requested temporary restraining order to preserve the *status quo ante*.

22

Dated:   New York, New York
         February 16, 2023

PRYOR CASHMAN LLP
By: */s/ Shveta Kakar*
      Daniel L. Kurtz
      Shveta Kakar
      Stephanie Chery
7 Times Square
New York, NY 10036-6569
(212) 421-4100
*Attorneys for Plaintiff*
*Building Management Associates, Inc.*