UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------------- X
BUILDING MANAGEMENT ASSOCIATES, INC.　　　　　:
　　　　　　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　Plaintiff,　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　　　　　　:　　　　　Civil Action No.
　　　　　　　-against-　　　　　　　　　　　　　　:　　　　1:23-cv-1304-JLR
　　　　　　　　　　　　　　　　　　　　　　　　　　　:
SALVATORE GIGANTE and LATOYA ALLEN,　　　　:
　　　　　　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　Defendants.　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　　　　　　:
---------------------------------------------------------------------- X

**NON-PARTY SEBCO DEVELOPMENT, INC.**
**MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S**
**<u>REQUEST FOR TEMPORARY RESTRAINING ORDER</u>**

FRANKFURT KURNIT KLEIN & SELZ, P.C.
Nicole Hyland
28 Liberty Street, 35th Floor
New York, New York  10005
Tel.:  (212) 980-0120
Fax:  (347) 438-2140

*Attorneys for Non-Party SEBCO Development, Inc.*

## TABLE OF CONTENTS

RELEVANT FACTUAL BACKGROUND ................................................................................ 1

ARGUMENT ................................................................................................................... 5

    THE TRO SHOULD BE DENIED ................................................................. 5

    A.    Plaintiff is Not Likely to Succeed on its Claims for Tortious Interference ........... 6

        1.    Defendants Did Not Tortiously Interfere with the Management
             Agreements or the Business Relationship Between BMA and
             SEBCO ........................................................................................... 6

        2.    Defendants Did Not Tortiously Interfere with BMA's At-Will
             Employment Relationships ........................................................ 8

    B.    Plaintiff Fails to Establish it is Likely to Suffer Irreparable Harm ........................ 9

    C.    Plaintiff Fails to Establish that the Balance of Hardships Tips in its Favor ........ 10

    D.    The Public Interest is not Served by Issuing the TRO ......................................... 12

CONCLUSION ................................................................................................................ 12

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Albert v. Loksen*,
  239 F.3d 256 (2d Cir. 2001)..................................................................................9

*Cap. Access Servs. Inc. v. Direct Source Seafood, LLC*,
  No. 17-CV-1405 (VSB), 2018 WL 3093967 (S.D.N.Y. June 22, 2018), *aff'd*,
  767 F. App'x 157 (2d Cir. 2019) ....................................................................6, 7, 8

*Devash LLC v. German Am. Capital Corp.*,
  959 N.Y.S.2d 10 (1st Dep't 2013).........................................................................7

*Foster v. Churchill*,
  87 N.Y.2d 744 (1996) ............................................................................................6

*Free Country Ltd v. Drennen*,
  235 F. Supp. 3d 559 (S.D.N.Y. 2016)...................................................................5

*Kirch v. Liberty Media Corp.*,
  449 F.3d 388 (2d Cir. 2006)...............................................................................6, 8

*NBT Bancorp Inc. v. Fleet/Norstar Fin. Grp., Inc.*,
  664 N.E.2d 492 (N.Y. 1996) .................................................................................6

*Sharma v. Skaarup Ship Mgmt. Corp.*,
  916 F.2d 820 (2d Cir. 1990)...................................................................................7

This firm represents non-party SEBCO Development, Inc. ("SEBCO").  Pursuant to the Court's February 18, 2023 order (Dkt. No. 24), SEBCO submits this brief in opposition to Plaintiff Building Management Associates, Inc. ("BMA")'s motion for a temporary restraining order ("TRO") against Defendants Salvatore Gigante ("Salvatore")[1] and Latoya Allan ("Ms. Allen").  As discussed below, the requested TRO will substantially prejudice SEBCO's rights, disrupt its operations, and interfere with its freedom of contract.  In addition, the requested TRO will effectively prevent Defendants (two of SEBCO's most valuable employees) from being able to perform their jobs. This will not only cause damage to SEBCO, but will likely cause harm to the low-income residents of the buildings that SEBCO owns or controls, due to the inability to provide adequate management services.  Therefore, SEBCO respectfully requests that the TRO be denied.

## RELEVANT FACTUAL BACKGROUND

The relevant facts are set forth in the February 22, 2023 Declarations of David Samuels, Esq. ("Samuels Decl."), Salvatore ("Salvatore Decl."), and Ms. Allen ("Allen Decl.").  This memorandum provides a brief summary of the salient facts, but refers to the Declarations for further detail.

SEBCO is a non-profit entity controlled by a Board of Directors (the "SEBCO Board"), which is dedicated to making affordable housing available to residents of the Bronx, New York. Salvatore and Ms. Allen are long-time employees and high-level executives at SEBCO, with Salvatore also serving on the SEBCO Board.  SEBCO controls various entities (the "Property

---

[1] We refer to Mr. Salvatore Gigante by his first name in order to distinguish him from Mr. Luigino Gigante ("Gino"), who purports to control BMA. Gino is the son and heir of Father Louis Gigante, who founded SEBCO and owned a number of for-profit entities, including BMA, that worked with SEBCO to develop and manage affordable housing.

Owners"), which own low-income buildings in the Bronx, including the buildings referenced in BMA's Complaint (the "Properties"). BMA has been providing management services for the Properties pursuant to management agreements (the "Management Agreements" or "MAs"). A sample MA is attached as Ex. 1 to the Samuels Decl.[2]

Historically, SEBCO and BMA have had a close relationship, despite being separate and distinct corporate entities. For example, SEBCO and BMA are both tenants of the same office building and have a number of personnel in common. In fact, Salvatore served as the President of BMA until Gino terminated him on January 9, 2023. Ms. Allen also served as an executive of BMA, until she resigned on February 22, 2022. Other individuals have also provided services for both BMA and SEBCO at various times. The overlap between personnel means that individuals employed by SEBCO or dually employed by SEBCO and BMA have been performing many of the management functions that BMA was responsible for delivering to SEBCO and the Property Owners.

After Father Louis Gigante died in 2022, Gino assumed control of BMA and various other related for-profit entities, but he was unable to gain control of SEBCO. Although Gino terminated Salvatore from his employment at BMA, he did not succeed in removing Salvatore as SEBCO's Chief Operating Officer. Gino and his attorney, Irwin Siegel ("Siegel"), have done

---

[2] SEBCO is prepared to submit copies of all the relevant MAs if the Court requests. BMA claims that the MAs are fabrications because they are not signed by the Property Owners. The MAs are signed by BMA, however, and the Property Owners have affirmed the validity of the MAs by serving notices of termination pursuant to the 30-day termination provisions contained in the MAs. In any event, the MAs are either valid (as SEBCO and the Property Owners assert) and they have been properly terminated according to their terms or the MAs are not valid (as BMA asserts) and there are no written management contracts between SEBCO and BMA. If that is the case, then the 30-day notices are more than reasonable to terminate non-existent management contracts. Either way, BMA has no contractual or legal basis to oppose SEBCO's termination to BMA's management services.

everything they can to drive a wedge between Salvatore and the SEBCO Board, in the hopes of convincing the Board to terminate Salvatore.[3]  They have also attempted to drive Salvatore out of SEBCO by obstructing his ability to complete important SEBCO projects, causing substantial damage to SEBCO in the process.  This campaign of hostility reached its pinnacle on January 9 and 10, 2023, when Gino and Siegel entered SEBCO's offices accompanied by armed guards, as discussed in the Declarations.  Their presence in the office on those days was extremely disruptive and intimidating for the employees of SEBCO and BMA (which, as noted, shares portions of the office space with SEBCO).

As a result of this intimidating conduct, police were called to the office on both days.  In addition, one of the employees found a box containing what appeared to be a very realistic looking gun and police badge in the office stairwell, which had been left by one of the armed guards that Gino and Mr. Siegel brought to the office.  Although it was later learned that the gun was a fake, the employees did not know that at the time.  Many of them felt unsafe and concerned about returning to the office.  The guard who had left the items was subsequently arrested for impersonating a former police office.  On January 10, Gino and Mr. Siegel returned to the office, again with armed guards.  Both Salvatore and Ms. Allen were present that day.  As described in their Declarations, the presence of these individuals continued to create an intimidating environment in the office.

The incidents on January 9 and 10, along with the subsequent events, have severely undermined the morale of the office staff.  For example, the intruders attempted to break into Salvatore's locked office and, when they were given access, they rummaged through his office

---

[3] Mr. Siegel served for decades as SEBCO's attorney until SEBCO terminated him in 2022. Since then, Mr. Siegel has engaged in a personal vendetta against Salvatore and SEBCO, in direct violation of his ethical and fiduciary obligations to his former client.

contents and removed various items.  On several occasions, Mr. Siegel has threatened to terminate employees who did not comply with his demands.  The armed guards stood in the doorways of offices and stairwells barking questions and demands at employees who attempted to pass.  Salvatore became increasingly concerned that employees would refuse to return to the office and might even resign as a result of Gino and Mr. Siegel's behavior.

On January 11, 2023, the SEBCO Board met to discuss (among other things) the January 9 and 10 incidents and to determine what steps, if any, to take with respect to BMA.  At the end of the meeting, the Board resolved to terminate SEBCO's relationship with BMA and to begin the process of transitioning to self-management.  Salvatore abstained from voting on the resolution.  SEBCO was not only concerned about the January 9 and 10 incidents, but about Gino's decision to terminate Salvatore from BMA and install himself as President of the company.  The Board members were aware that Gino had never worked for BMA and had no knowledge or qualifications to run the business.  Before the termination notices were delivered, however, Gino did something that reinforced SEBCO's decision to terminate the Management Agreements.  On or around January 17, Gino cut off all access to the bank accounts relating to the Properties.  None of the BMA or SEBCO employees were able to access the accounts, which they needed to perform the necessary management functions for the Properties.  Significantly, as of today, access to those bank accounts has still not been restored.  Many of the employees expressed concern over why they were being cut off from the accounts, with some of them fearing that this meant they were being fired (as Mr. Siegel had previously threatened).  It is important to note that the funds in these accounts do not belong to BMA.  They belong to BMA's clients – the Property Owners that BMA is supposed to be servicing.

On or about January 20, 2023, each of the Property Owners served 30-day notices terminating the Management Agreements with BMA.  Although the notices were not based on the "for cause" provisions of the MAs, the notices pointed out that the Board members were "deeply disturbed" by BMA's recent conduct and the intimidating effect it had had on the employees.

Between January 19 and February 8, 2023, multiple BMA employees chose to resign from their jobs.  Copies of their resignation letters are attached to the Samuels Decl. at Ex. 3.  In many cases, the employees attribute their resignations to the actions described above, which caused them to lose confidence in BMA and to doubt the security of their employment.  As Ms. Allen discusses in her Declaration, multiple employees expressed anxiety about remaining with BMA under the new management.  As Ms. Allen and Salvatore state, they did not affirmatively approach any of the BMA employees to offer them employment on behalf of SEBCO.  On the contrary, the BMA employees chose to resign for the reasons stated in their resignation letters. They did not need any prompting from either Ms. Allen or Salvatore.

## ARGUMENT
### THE TRO SHOULD BE DENIED

A TRO is an "extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Free Country Ltd v. Drennen*, 235 F. Supp. 3d 559, 565 (S.D.N.Y. 2016) (denying TRO against former employees for allegedly misappropriating trade secrets from former employer in order to engage in competition).  To prevail on a TRO, Plaintiff must show: "(1) a likelihood of success on the ultimate merits of the lawsuit; (2) a likelihood that the moving party will suffer irreparable harm if a TRO is not granted; (3) that the balance of hardships tips in the moving party's favor; and (4) that the public

interest is not disserved by the relief granted." *Id.* at 565. As demonstrated below, Plaintiff fails to establish any of the requisite elements for a TRO.

**A.        Plaintiff is Not Likely to Succeed on its Claims for Tortious Interference**

BMA claims that Salvatore and Ms. Allan have tortiously interfered with BMA's business relationships in two respects. First, BMA claims Defendants interfered with BMA's business relationships with SEBCO and the Property Owners by inducing them to terminate the Management Agreements. Second, BMA claims that Defendants interfered with BMA's relationships with its employees by inducing them to resign from BMA and seek employment with SEBCO. BMA contends that a TRO is necessary to prevent Defendants from continuing to interfere with those relationships. BMA's claims of tortious interference are meritless. BMA offers no evidence in support of its claim that Defendants are responsible for the implosion of BMA's business and employment relationships. Rather, Gino and Siegel's conduct (as detailed above and in the Declarations) was solely responsible for undermining BMA's relationship with SEBCO and for alienating BMA's own employees.

**1.        *Defendants Did Not Tortiously Interfere with the Management Agreements or the Business Relationship Between BMA and SEBCO***

To prevail on a claim for tortious interference with contract, BMA must establish: (1) the existence of a valid contract between plaintiff and a third party; (2) the defendant's knowledge of that contract; (3) the defendant's intentional procuring of the breach, and (4) damages." *Cap. Access Servs. Inc. v. Direct Source Seafood, LLC*, No. 17-CV-1405 (VSB), 2018 WL 3093967, at *7 (S.D.N.Y. June 22, 2018), *aff'd*, 767 F. App'x 157 (2d Cir. 2019) (citing *Foster v. Churchill*, 87 N.Y.2d 744 (1996) and *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401 (2d Cir. 2006)). Importantly, "[a] tortious interference claim requires a breach of the contract between the plaintiff and the third party." *Id.* (citing *NBT Bancorp Inc. v. Fleet/Norstar Fin. Grp., Inc.*,

664 N.E.2d 492, 495 (N.Y. 1996)).  Furthermore, the "defendant's conduct must be a but-for cause of the breach."  *Id.* (citing *Sharma v. Skaarup Ship Mgmt. Corp.*, 916 F.2d 820, 828 (2d Cir. 1990)).  In addition, it is well established that "an agent cannot be held liable for inducing its principal to breach a contract with a third person, at least where it is acting on behalf of its principal and within the scope of its authority." *Id.* at \*7-8 (citing *Devash LLC v. German Am. Capital Corp.*, 959 N.Y.S.2d 10, 15 (1st Dep't 2013) (citation omitted)).

Here, SEBCO duly terminated the MAs on 30-days written notice, pursuant to the contract terms.  It had an absolute contractual right to do so.  Thus, there was no breach of the MAs and, indeed, BMA does not allege any breach of contract.  In addition, the Defendants are high-level executives of SEBCO who were acting within the scope of their authority.  It is axiomatic that a party cannot tortiously interfere with its own contract.  Thus, the Defendants' actions – all of which were done with the full knowledge and authority of the SEBCO Board – cannot, as a matter of law, give rise to individual liability for tortious interference.  Moreover, the evidence demonstrates that Defendants' alleged conduct was not the "but for" cause of SEBCO's decision to terminate the MAs.  On the contrary, the termination was motivated by SEBCO's business decision to transition the building management function in-house to SEBCO, rather than to continue using an outside management company such as BMA.

Furthermore, Gino's and Mr. Siegel's behavior in terminating Salvatore, installing Gino as President of BMA despite having no experience or qualifications, disrupting the company's operations, intimidating and threatening employees, and cutting off access to the Property Owners' bank accounts were critical factors in SEBCO's decision to terminate the MAs.  BMA's claim that Salvatore and Ms. Allen plotted to transfer BMA's business to a new entity that they

control is pure fantasy.  There never was any such plan.  The only plan is for SEBCO to self-manage its own Properties, which it is fully entitled to do.

Because BMA disputes the validity of the MAs, it appears to allege that Defendants tortiously interfered with BMA's *business relations* with SEBCO (as opposed to its *contracts*). This claim requires BMA to prove even *more* culpable misconduct than is required for a claim for tortious interference with contract.  To prevail, BMA must show that: "(1) it had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) *the defendant acted solely out of malice, or used dishonest, unfair, or improper means*; and (4) the defendant's interference caused injury to the relationship."  *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 400 (2d Cir. 2006) (emphasis added).  Here, BMA has not established that Defendants acted solely out of malice or used dishonest, unfair, or improper means.  Rather, as established above and in the Declarations, Defendants acted at SEBCO's direction and within the scope of their authority as SEBCO employees.  As such, they are immune from any liability for tortious interference with SEBCO's business relationships.  *See Cap. Access Servs. Inc.*, 2018 WL 3093967, at *8.

## 2.   *Defendants Did Not Tortiously Interfere with BMA's At-Will Employment Relationships*

All of BMA former employees were at-will employees.  None of them signed employment agreements nor were they subject to any restrictive covenants.  This includes Salvatore and Ms. Allen, as well as any of the employees who chose to resign from BMA after the January 9 and 10 incidents.  Accordingly, there has never been any legal or contractual restriction that would prevent any of the employees from leaving BMA and seeking employment with SEBCO.  Nor were there any restrictive covenants or other agreements that prohibited SEBCO or any individuals acting on SEBCO's behalf from offering employment to the former

8

BMA employees. A claim for tortious interference with an at-will employment relationship must establish that a "third party used wrongful means to effect the termination such as fraud, misrepresentation, or threats, that the means used violated a duty owed by the defendant to the plaintiff, or that the defendant acted with malice." *Albert v. Loksen*, 239 F.3d 256, 274 (2d Cir. 2001). Here, at most, the only thing that Defendants did was carry out SEBCO's instruction to hire certain former BMA employees who had voluntarily resigned from BMA. Contrary to BMA's claims, no wrongful means, threats or malice were involved in that decision. Rather, the decision to hire former BMA employees was made for purely economic and business reasons, and was consistent with SEBCO's decision to provide the building management services in-house. Indeed, many of these employees were already providing services to SEBCO through the employee sharing relationship between SEBCO and BMA. Thus, there was a history of relationships with these employees which made them natural hires for SEBCO, once the employees had severed their relationships with BMA.

As the Declarations and the resignation notices establish, each of the employees made their own decisions to resign from BMA in reaction to the conduct they had witnessed by Gino and Siegel and because of their concerns for their safety and security of their jobs.

**B.      Plaintiff Fails to Establish it is Likely to Suffer Irreparable Harm**

BMA has not established that it is likely to suffer irreparable harm unless Defendants are restrained from interfering (allegedly) with BMA's relationships with either SEBCO or BMA's at-will employment relationships. On the contrary, it is the Defendants and SEBCO that will suffer irreparable harm if the TRO is granted. Even if the TRO is granted as to Defendants, that will not revive SEBCO's and the Property Owners terminated Management Agreements with BMA, because those decisions were made by the Boards of Directors of SEBCO and the Property Owners, consistent with the terms of the MAs. The Boards will not be reversing those

decisions; rather, they intend to continue the process of transitioning to self-management.[4] Furthermore, unlike in the cases cited by BMA for "irreparable harm," this is not a situation where former employees are bringing client lists or trade secrets to a competitor in violation of restrictive covenants, making it difficult predict which customers might or might not decide to transfer their business to the competitor and, thus, to ascertain monetary damages.  Here, there are no restrictive covenants at issue and the only client involved is SEBCO (through its subsidiaries, the Property Owners).  Thus, even in the unlikely event that there is a determination that Defendants interfered with BMA's relationship with SEBCO, any damages are ascertainable because of the well-documented history of SEBCO's and BMA's economic relationship.

With respect to any alleged damage caused the resignations of BMA employees, a TRO will have little to no effect.  As to the employees that have already left, a TRO will not restore their employment status.  None of those employees have any desire to return to BMA.  In fact, several of them are still traumatized by the recent events and do not even wish to work in the shared SEBCO/BMA office space, due to the presence of Gino and/or Siegel.  A TRO could theoretically deter any remaining BMA employees from exercising their free choice to resign from the company, but BMA has cited no case to support the proposition that this would be a favorable result, particularly in the case of at-will employees.

## C.   Plaintiff Fails to Establish that the Balance of Hardships Tips in its Favor

Contrary to BMA's claims, the balance of hardships tips in favor of the Defendants and SEBCO.  As discussed above, the requested TRO will not alter SEBCO's decision to terminate

---

[4] Per my prior letter to the Court, SEBCO has temporarily placed the transition process on hold until Saturday, February 25.  However, even this short delay has caused considerable disruption at the company, given the adversarial situation caused by this litigation and the disruptive behavior of Gino and Seigel.  It is critical that SEBCO be allowed to finalize the termination process so that it can extract itself from its toxic relationship with BMA and move forward.

the Management Agreements, nor will it salvage the damaged relationships between BMA and its current or former employees.  By contrast, the TRO will severely damage SEBCO's ability to continue its operations and would effectively deprive SEBCO of the services of its two top executives.  Due to the breadth and vagueness of the requested TRO, it could be interpreted to prevent Defendants from engaging in many of the essential activities needed to manage the Properties.  These activities were a central aspect of Defendants' jobs even before BMA was terminated.  In addition, the requested TRO could prevent Defendants from communicating with current SEBCO employees who have performed services for BMA.  Such a result would essentially render SEBCO inoperable.  Moreover, the requested TRO could be interpreted as preventing the Defendants from executing SEBCO's plan to transition the management function in-house.  Defendants could also be prevented from communicating with regulators about the transition process, communicating with and paying vendors who provide services for the Properties, responding to complaints from residents, and performing a whole host of functions that BMA could claim as interference with its own management functions while this litigation is pending.

The only conceivable solution to this situation would be for SEBCO to terminate Salvatore and Ms. Allen and hire new employees to perform these functions.  Indeed, it is evident to SEBCO that this is precisely the outcome intended by BMA, Gino and Siegel.  Of course, any new employee who took over Defendants' functions would become a new target for BMA and would likely find themselves being accused of tortious interference.  More to the point, SEBCO should not be forced into the position of having to replace its most valuable and long-time executives simply because BMA resents being terminated from its management role. Of course, this assumes that both of the Defendants can be replaced without completely

undermining SEBCO's operations, which is extremely unlikely.  The cost of replacing such experienced and valuable employees is incalculable.

**D.     The Public Interest is not Served by Issuing the TRO**

The TRO that BMA seeks will severely threaten SEBCO's ongoing operations and existence, which will interfere with SEBCO's ability to carry out its charitable mission of providing affordable housing to the low-income residents of the Bronx.  As such, the public interest is not served by issuing a TRO in favor of BMA, a for-profit company, that would prevent SEBCO from continue to pursue its mission.  In the event that this Court is inclined to grant the TRO, SEBCO respectfully submits that BMA should be required to pay a bond that is sufficient go compensate SEBCO for the economic losses it will undoubtedly sustain.

## CONCLUSION

For the foregoing reasons, it is respectfully requested that the Court deny Plaintiff's Temporary Restraining Order.

Dated: New York, New York
         February 22, 2023

FRANKFURT KURNIT KLEIN & SELZ, P.C.


By:___ */s/ Nicole Hyland*_____
        Nicole Hyland

28 Liberty Street, 35th Floor
New York, New York  10005
Tel.:  (212) 980-0120
Fax:  (347) 438-2140
nhyland@fkks.com

*Attorneys for Non-Party SEBCO Development, Inc.*

12