# EXHIBIT 1

# PROPERTY MANAGEMENT AGREEMENT

THIS PROPERTY MANAGEMENT AGREEMENT (this "**Agreement**"), dated and effective as of the 14th day of December, 2022, is made by and between Crotona Partners L.P., a limited partnership formed under the laws of the state of New York ("**Owner**") and Building Management Associates of New York (the "**Manager**").

## Recitals

Owner is a New York limited partnership operating by a First Amended and Restated Agreement of Limited Partnership (the "**Partnership Agreement**"). Owner owns a low-income housing tax credit residential housing development located on certain real property located at 1883 Crotona Avenue, Bronx New York, and designated as Block 2946, Lots 42 and 47 on the tax map of Bronx County, New York, together with all improvements, appurtenances and equipment located thereon. A complete description of the Project is attached hereto as Exhibit F-I, and by this reference made a part hereof.

Owner wishes to obtain the services of Manager in connection with the management of the Project subject to the terms and provisions of this Agreement, and Manager wishes to perform such services in exchange for the management fee provided herein.

Accordingly, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

## ARTICLE 1

## Appointment and Acceptance; Supervision

1.1     **Appointment and Acceptance**.  Owner hereby appoints Manager to manage, operate, maintain, and otherwise be responsible for renting the residential units in the Project and Manager hereby accepts the appointment, subject to the terms and conditions set forth in this Agreement.

## ARTICLE 2

## Term

2.1     This Agreement shall become effective on the date hereof and shall continue in full force and effect until December 31, 2023 and shall be automatically renewed every year unless terminated by Owner or Manager, with not less than thirty (30) days' prior written notice.

## ARTICLE 3

## Services of Manager

3.1     **Standard of Conduct**.  Manager acknowledges that the Property will generate HUD subsidized  units as provided in compliance with the requirements of the Code and the rules and regulations thereunder is required in order to maintain the HUD.  Manager also acknowledges

that the Property is subject to regulation by the New York State Housing Finance Agency ("HFA") and the Department of Housing Preservation and Development of the City of New York ("HPD") pursuant to certain regulatory agreements recorded against the Property, including the Regulatory Agreement between Owner and HFA (the "HFA Regulatory Agreement") and the Regulatory Agreement between Owner and HPD (the "HPD Regulatory Agreement"). Manager represents that it has received a copy of each of the HPD Regulatory Agreement and the HFA Regulatory Agreement. Manager further represents that it is experienced in professional management of property of a character and nature similar to the Project and Manager agrees to manage the Project and perform its obligations under this Agreement in accordance with the highest professional standards for such property.

3.2     **Plans and Specifications**.  As soon as practicable, but not later than final completion of the construction of the Project or any phase thereof, Owner shall furnish Manager with a complete set of general plans and specifications for the Project and copies of all guarantees and warranties pertinent to construction and fixtures and equipment of the Project.  With the aid of this information and inspection by competent personnel, Manager shall thoroughly familiarize itself with the character, construction, layout and plans of the Project, including the electrical, heating, plumbing and ventilating system and all other mechanical equipment in the Project.

3.3     **Rentals**.  Manager shall offer for rent and shall rent the housing units in the Project in accordance with all Requirements (as defined below), a rent schedule approved in writing by Owner, and the leasing guidelines and form of lease referred to below.  Pursuant to its rental responsibilities, Manager shall:

(a)     Show housing units for rent in the Project to all prospective tenants ("***Tenants***");

(b)     Take and process applications for rentals, including prospective Tenant interviews and credit checks.  If an application is rejected, the applicant shall be advised of the reason for rejection.  The rejected application, together with the written notice of the rejection and any other related correspondence, shall be kept on file for three years following the rejection;

(c)     Comply with the leasing and other requirements contained in HUD requirements with respect to housing units eligible for the HUD  requirements contained in any documents executed by Owner in connection with the acquisition, financing and ownership of the Project (the "***Requirements***"), including, but not limited to, the Partnership Agreement, the Loan Documents, and the Project Documents;

(d)     Comply with the leasing guidelines attached hereto as Exhibit F-II and by this reference made a part hereof, and use for each lease a form of lease to be provided by Manager (a "***Lease***"), which Lease form shall be subject to the approval of Owner and shall be consistent with the Requirements, unless otherwise agreed by Owner and Manager in writing;

(e)     Execute all Leases in Manager's name, identified thereon as agent for Owner, subject to prior written approval by Owner of any deviation from Owner's approved rent schedule, Lease form, and leasing guidelines;

(f)     Collect, deposit, and disburse security deposits, if required, in accordance with the terms of each Lease and Sections 7.1 and 7.2 hereof.  The amount of each security deposit shall be held by Manager in an account, separate from all other accounts and funds.  Such account shall be in the name of the Manager and designated of record as "**Security Deposit Account.**" Interest on security deposits shall be paid according to law;

(g)     Maintain a current list of acceptable prospective Tenants and undertake all arrangements necessary and incidental to the acceptance of rental applications and the execution of Leases.  Manager shall exercise its best efforts (including, but not limited to, placement of advertising, interviewing of prospective Tenants, assistance and counseling in completion of rental applications and execution of Leases, processing of documents and credit and employment verifications, and explanation of the program and operations of Owner), to effect the leasing of dwelling units, renewal of Leases and, in accordance with the terms of each Lease and the Requirements, subleasing of dwelling units in the Project, so that the Project is occupied as fully as possible;

(h)     Perform such other acts and deeds requested by Owner as are reasonable, necessary and proper in the discharge of Manager's rental duties under this Agreement;

(i)     Prorate the first month's rent collected from the Tenant should the Lease term commence on any other day than the first day of the month; and

(j)     Participate in the inspection of each dwelling unit identified in the Lease together with the Tenant prior to move-in and upon move-out, and shall record in writing any damage to the unit at the time the Tenant moved in and any damage occurring during the Tenant's occupancy.

3.4     **Qualified Rental Use**.

(a)     *Agency Requirements*.  In furtherance of Owner's business purposes, Manager shall rent units in the Project only to individuals or families who, at a minimum, qualify under the guidelines established for the State of New York, by the Secretary of the United States Department of Housing and Urban Development as 'low or moderate income' families.  Manager shall, in renting housing units, obtain such references and perform such background checks as are customary in residential real estate management. Manager shall comply with the special LIHTC requirements concerning leasing and related matters, including implementing the marketing plan provided to Manager by Owner, as approved by HFA and HPD.

(b)     *Low Income Housing Tax Credit Requirements*.  Manager acknowledges that Owner is required to use its best efforts to lease one hundred percent (100%) of the Units to Tenants at rent levels that qualify such apartments for inclusion in determining federal low-income housing tax credits (the "**Credits**") for the Project pursuant to Section 42 of the Code, which entails compliance with the following requirements:

(i)     All of the Units must be occupied by individuals with income less than or equal to sixty percent (60%) of area median gross income; and

(ii)     The gross rent (including all utilities) for each Unit may not exceed thirty percent (30%) of the qualifying income level for the Tenant under Subparagraph (i) above as determined pursuant to Section 42(g)(2)(C) of the Code.

(c)     Manager further acknowledges that obtaining the Credits will have substantial economic value to Owner and its partners.  Manager will familiarize itself with the low-income housing tax credit requirements as they relate to Manager's leasing and management duties hereunder and shall use its best efforts to comply with such requirements and to the extent Manager is unable to do so, Manager shall promptly notify Owner of such fact and the reasons therefor. Incident thereto, the following provisions shall apply:

(i)     Manager shall require each prospective Tenant to certify, on the Lease application or Lease, the amount of such Tenant's annual family income, family size, and any other information required to enable Owner to obtain the Credits or otherwise reasonably requested by Owner.  Manager shall require Tenants to certify in writing as to such matters on an annual basis, prior to such time as the information is required for reporting purposes;

(ii)     Manager shall from time to time furnish Owner with a written schedule of maximum rents for the apartments that complies with the Requirements, for Owner's (and any lender's, if required) approval.  Without Owner's (or any lender's, if required) express prior written consent, Manager shall not enter into any lease on behalf of Owner at a rental amount exceeding the applicable maximum;

(iii)     Manager shall maintain and preserve all written records of Tenant family income and size, and any other information necessary to comply with the Requirements or otherwise reasonably requested by Owner throughout the term of this Agreement, and shall turn all such records over to Owner upon the termination or expiration of this Agreement; and

(iv)     If requested by Owner, Manager shall prepare reports of low-income leasing and occupancy and other matters related to Manager's obligations hereunder and to the operation of the Project in form suitable for submission in connection with the Credits and in compliance with the Requirements.

3.5     **Collection of Rents and Other Receipts**.  Manager shall collect, when due, all rents, charges and other amounts receivable on Owner's account in connection with the management and operation of the Project.  Such receipts shall not be commingled with other funds and shall be deposited and held in a separate account in accordance with the provisions of Section 7.1.

3.6     **Enforcement of Leases**.  Manager shall secure full compliance by each Tenant with the terms of such Tenant's Lease.  Voluntary compliance will be emphasized and Manager shall counsel Tenants and make referrals to community agencies in cases of financial hardship or under other circumstances deemed appropriate by Manager, to the end that involuntary termination of tenancies may be avoided to the maximum extent consistent with sound management of the Project. Nevertheless, Manager may, and shall if requested by Owner, take action to lawfully terminate any tenancy when, in Manager's judgment, sufficient cause for such termination occurs under the terms of Tenant's Lease, including, but not limited to, nonpayment of rent.  For this

purpose, Manager is authorized to consult with legal counsel to be designated by Owner and bring actions for eviction and execute notices to vacate and judicial pleadings incident to such actions; *provided, however*, that Manager shall keep Owner informed of such actions and shall follow such instructions as Owner may prescribe for the conduct of any such action. Reasonable attorneys' fees and other necessary costs incurred in connection with such actions, as determined by Owner, shall be paid out of the Operating Account. Manager shall properly assess and collect from each Tenant or the security deposit the cost of repairing any damages to the housing unit arising during the Tenant's occupancy.

3.7    **Maintenance and Repairs**.  Manager shall, at Owner's expense, maintain the Project in a decent, safe and sanitary condition and in a rentable state of repair, all in accordance with the Project rules, regulations, and local codes, and Manager shall otherwise maintain the Project at all times in a condition acceptable to Owner, including but not limited to cleaning, painting, decorating, plumbing, carpentry, grounds care, and such other maintenance and repair work as may be necessary.  Incident thereto, the following provisions shall apply:

(a)    Special attention shall be given to preventive maintenance and, to that end, the services of a regular superintendent shall be used, who, with the consent of Owner, may be the same person employed by Manager for maintenance at any other building managed by Manager;

(b)    Subject to Owner's prior approval, Manager shall contract with qualified independent contractors for the maintenance and repair of major mechanical systems, and for the performance of extraordinary repairs beyond the capability of regular maintenance personnel. Manager shall obtain prior to commencement of any work appropriate written evidence of such contractor's liability and worker's compensation insurance;

(c)    Manager shall systematically and promptly receive and investigate all service requests from Tenants, take such action thereon as may be justified, and shall keep records of the same. Emergency requests shall be serviced on a twenty-four (24) hour basis.  Complaints of a serious nature shall be reported to Owner after investigation.  At Owner's request, Owner shall receive all service requests and the reports of action thereon;

(d)    Manager shall take such action as may be necessary to comply with any and all orders and requirements of federal, state, county and municipal authorities having jurisdiction over the Project and orders of any board of fire underwriters, insurance companies and other similar bodies pertaining to the Project; and

(e)    Except as otherwise provided in this section, Manager is authorized to purchase, at Owner's expense, all materials, equipment, tools, appliances, supplies and services necessary for proper maintenance and repair of the Project. Manager shall obtain contracts, materials, supplies, utilities, and services on the bids on all contracts or purchases exceeding Five Thousand Dollars ($5,000) for those items which can be obtained from more than one source. Manager shall secure and credit to Owner all discounts, rebates, or commissions obtainable with respect to purchase, service contracts, and all other transactions on Owner's behalf.

Notwithstanding the foregoing, the prior approval of Owner will be required for any contract that exceeds one year in duration or expenditure that exceeds one thousand dollars

($1,000) in any one instance for labor, materials, or otherwise in connection with the maintenance and repair of the Project, except for emergency repairs involving manifest danger to persons or property, or required to avoid suspension of any necessary service to the Project.  In the event of emergency repairs, Manager shall notify Owner of the facts promptly, and in no event later than seventy-two (72) hours from the occurrence of the event.

3.8 **Utilities and Services**.  Manager shall make arrangements for water, electricity, gas, fuel, oil, sewage and trash disposal, vermin extermination, decoration of common areas, laundry facilities, telephone services, and other necessary services in connection with the Project. Subject to Owner's prior approval as required in Section 3.7, Manager shall make such contracts as may be necessary to secure such utilities and services.

3.9 **Personnel**.  Project Employees (defined below) shall be contracted service providers or employees of Manager, subject to approval of Owner.  Manager shall be compensated for direct costs of Project Employees out of the Operating Account.  The term "Project Employees" shall include (i) full time on-site personnel and (ii) Manager's employees or contracted service providers who work at the Project on a part-time or temporary or as needed basis, to the extent of the time they spend at the Project.  Owner shall not pay or reimburse Manager for all or any part of Manager's general, administrative and overhead expenses.

3.10 **Operating Account**.  Disbursements from the Operating Account shall be made in accordance with the Operating Budget prepared pursuant to Section 3.11.  In the event that the balance in the Operating Account is at any time insufficient to pay disbursements due and payable under this Section 3.10, Manager shall promptly inform Owner of the fact and Owner may then remit to Manager sufficient funds to cover the deficiency. In no event shall Manager be required to use its own funds to pay such disbursements or be liable for any losses, costs or damages arising out of Owner's failure to cover the deficiency.

3.11 **Operating Budget**.  Manager shall prepare a recommended annual operating budget and projected rental rates for the Project for each fiscal year during the term of this Agreement, and shall submit the same to Owner at least ninety (90) days before the beginning of such fiscal year.  The annual operating budget shall include a schedule of recommended rents to be charged for each housing unit, including recommended rent increases with respect to Lease renewals and new Leases.  In preparing each proposed annual operating budget, Manager shall use its best efforts to take account of anticipated increases in real estate taxes, utility charges and other operating costs.  To the extent feasible, Manager shall support anticipated increases in real estate taxes and utility charges with written evidence or documentation. Proposed annual operating budgets for the Project shall be subject to approval by Owner.  Owner shall inform Manager of any changes incorporated in the approved operating budget and Manager shall make no expenditures in excess of the amounts set forth in such approved operating budget, for each line item of operation expense itemized, without the prior approval of Owner, except as permitted pursuant to Section 3.7 hereof for emergency repairs involving manifest danger to persons or property, or required to avoid suspension of any necessary services to the Project.

3.12 **Escrow and Tax Payments**.  From the funds collected and deposited by Manager in the Operating Account, Manager shall make any monthly escrow payments required under the Loans, if any, for the purpose of funding insurance, tax and such other reserve or escrow accounts

for the Project as are necessary to conform to the Requirements.  Manager promptly shall present tax bills and insurance premium notices to the escrow agent for payment and shall furnish Owner with evidence of timely payment of such taxes and insurance premiums, and of timely payment of Mortgage and escrow payments, if any.

3.13    **Licenses and Permits**.  Manager shall acquire and keep in force at Owner's expense all licenses and permits required for the operation of the Project as rental housing and commercial space, if applicable.

3.14    **Records and Reports**.  In addition to any requirements specified in this Agreement, Manager shall have the following responsibilities with respect to records and reports:

(a)    Manager shall establish and maintain a system of records, books, and accounts in a manner satisfactory to Owner which is consistent with and for the durations mandated by the Requirements.  All records, books, and accounts shall be subject to examination at reasonable hours upon reasonable notice by any authorized representative of Owner;

(b)    Manager shall prepare a monthly report in accordance with the Requirements and in form satisfactory to Owner, and any other reports which are necessary to conform to the Requirements and are consistent with Manager's duties hereunder, containing and including at least the following:  (i) a statement of income and expenses and accounts receivable and payable for the preceding month, including an itemized list of all delinquent rents as of the tenth (10th) day of the current month, as well as a report on action taken thereof by Manager; (ii) a rent roll/cash receipts form for the previous month; (iii) a disbursements summary for the previous month; (iv) current bank statements with reconciliation of the Operating and Security Deposit Accounts; and (v) a narrative of any unusual actions taken or emergencies responded to, and a full report of any accidents, claims and potential claims, for the previous month and any other information required by the Requirements.  Manager shall submit each such report to Owner on or before the fifteenth (15th) day of each month and shall send all reports that are required to be sent to any lenders to Owner for Owner's prior approval, which approval shall not be unreasonably withheld or delayed; *provided, however*, that Owner shall have two weeks to review such reports prior to submission to any lender;

(c)    Manager shall prepare, execute and file all forms, reports and returns required by law in connection with the employment of personnel, unemployment insurance, workman's compensation insurance, disability benefits, Social Security, and other similar insurance, and all other benefits or taxes now in effect or hereafter imposed;

(d)    All bookkeeping, data processing services, and management overhead expenses shall be paid for by Manager;

(e)    Manager shall promptly furnish such additional information (including monthly occupancy reports) as may be requested from time to time by Owner with respect to the renting and financial, physical, or operational condition of the Project; and

(f)    Manager shall establish Tenant files containing copies of Leases, certification forms, notices, and other documentation required by Owner as necessary to conform to the Requirements.

3.15    **Supporting Documentation**.   As additional support to the monthly financial statement required pursuant to Section 3.14(b) above, Manager shall provide, upon Owner's request, copies of the following:

(a)    All bank statements, bank deposit slips and bank reconciliations;

(b)    Detailed cash receipts and disbursements records;

(c)    Detailed trial balances;

(d)    Paid invoices; and

(e)    Summaries of adjusting journal entries.

3.16    **Tenant-Management Relations**.  Manager shall encourage and assist Tenants of the Project to participate in a residents' organization to promote the Tenants' common interests and to increase their ability and incentive to protect and maintain the Project and to contribute to its efficient management.

3.17    **Owner Communications**.  Manager shall be available for communications with Owner and shall keep Owner advised of items materially affecting the Project.

ARTICLE 4

**Management Authority**

4.1    **Authority**.  Manager's authority is expressly limited to the provisions contained herein as they may be amended in writing from time to time in accordance with the provisions of this Agreement.  Owner expressly withholds from Manager any power or authority to make any structural change in the Project or to make any other major alterations or additions in or to the Project or fixtures or equipment therein, or to incur any expense chargeable to Owner other than expenses related to exercising the express powers granted to Manager by the terms of this Agreement without the prior written consent of Owner.

4.2    **Delegation of Duties**.  Manager shall have the right to engage independent contractors for performance of such of its duties hereunder as Manager deems necessary, but Manager shall have the responsibility for supervision of the performance of such duties.  All contracts with independent contractors shall be subject to the approval of Owner.

4.3    **Compliance with Law**.  Manager shall comply fully with all federal, state, county, municipal and special district laws, ordinances, rules, regulations and orders relative to the leasing, use, operation, repair and maintenance of the Project. Manager shall remedy promptly any violation of any such law, ordinance, rule, regulation or order that comes to its attention and shall notify Owner by the end of the next business day after Manager becomes aware of any violation for which Owner may be subject to penalty. Manager further acknowledges that the Premises and the operation thereof must comply in all respects with the HPD Regulatory Agreement and the HFA Regulatory Agreement and shall prepare and file in a timely fashion (after review by Owner

if so requested by Owner) all reports and filings required under the HPD Regulatory Agreement or the HFA Regulatory Agreement.

ARTICLE 5

**Insurance and Indemnification**

5.1    **Liability of Manager**. Except as expressly provided to the contrary herein, the obligations and duties of Manager under this Agreement shall be performed as agent of Owner, but Manager shall be personally liable for its breaches of this Agreement and for damages and costs (including reasonable attorney's fees) resulting from Manager's gross negligence or willful misconduct. All expenses incurred by Manager in accordance with its obligations and duties under this Agreement and consistent with Owner's approved operating budget, except those due to its breaches of this Agreement or gross negligence or willful misconduct and those expressly specified as Manager's expenses herein, shall be for the account of and on behalf of Owner.

5.2    **Insurance**. Manager shall obtain and keep in force such forms and amount of insurance requested by Owner, at Owner's expense, as necessary under the Requirements with insurance companies satisfactory to Owner, including but not limited to insurance against physical damage (fire and extended coverage endorsement, boiler and machinery, etc.) and against liability for loss, damage or injury to property or persons which might arise out of the occupancy, management, operation or maintenance of any part of the Project. Manager shall be named as an additional insured while acting as real estate manager for Owner in all liability insurance maintained with respect to the Project. Manager shall investigate and promptly furnish to Owner full written reports of all accidents, claims and potential claims for damages relating to the Project, and shall cooperate fully with Owner's insurers, regardless of whether the insurance was arranged by Manager or others. Manager shall provide a copy of such insurance policies to Owner and, to the extent required under the Loan Documents, to any lenders. Manager shall not cancel any insurance policy without the prior written consent of Owner. Any failure to obtain such consent shall be a default under this Agreement and Manager shall indemnify Owner for any damages as a result of any such default.

5.3    **Cooperation**. Manager shall furnish whatever readily available information requested by Owner for the purpose of obtaining insurance coverage and shall aid and cooperate in every reasonable way with respect to such insurance and any loss thereunder.

5.4    **Manager's Insurance**. At all times during the term of this Agreement, Manager shall maintain, at its own expense, the following in full force and effect:

      1.    A commercial general liability policy with minimum limits of One Million Dollars ($1,000,000) per occurrence and Two Million Dollars ($2,000,000) in the aggregate, and $5,000,000 umbrella for structures with 1-10 stories or $10,000,000 umbrella for structures with 11 or more stories. A per location aggregate endorsement should be included on an unlimited basis for any policy that has multiple locations.

2. A fidelity bond or employee dishonesty policy in an amount equal to the gross potential income of the Project for three (3) months, in order to protect Owner against misapplication of Project funds by Manager and/or its employees. Owner shall be named as a loss payee.

3. Comprehensive automotive liability insurance for all owned, hired and non-owned vehicles operated by Manager's off-site employees with minimum limits of One Million Dollars ($1,000,000) combined single limits per occurrence for bodily injury and property damage liability.

4. Insurance for statutory workers' compensation and other employee benefits required by all applicable laws with respect to Manager's corporate employees, employer's liability insurance for an amount not less than Two Million Dollars ($2,000,000) covering claims and suits by or on behalf of employees and others, not otherwise covered by statutory workers' compensation insurance.

Manager shall obtain the foregoing from a responsible insurance company reasonably satisfactory to Owner and to Owner's Lenders. Manager shall furnish Owner a certificate of insurance evidencing such coverage and providing thirty (30) days prior written notice of cancellation, non-renewal or any material change in coverage. Owner shall not reimburse Manager for Manager's cost of such insurance, or for any other coverage that Manager obtains to protect its own interests.

5.5 **Subcontractor's Insurance**. Manager shall require that all subcontractors working on the Project maintain, at the subcontractor's expense, worker's compensation insurance, in such amounts as may be required by law from time to time. Manager shall be notified promptly in the event Owner waives any of the requirements in this Section 5.5.

5.6 **Indemnification of Owner**. To the extent permitted by law, Manager agrees to defend, indemnify and save harmless Owner and its partners from all claims, investigations and suits, with respect to (i) any alleged or actual violation of state or federal labor or other laws pertaining to employees, it being expressly agreed and understood that as between Owner and Manager, all persons employed in connection with the premises are employees of Manager, not Owner; or (ii) Manager's breach of this Agreement or its gross negligence or willful misconduct. Manager shall at all times keep its employees and contractors insured for statutory workers' compensation and other employee benefits required by all applicable laws. Owner and its partners shall be protected in all such insurance by specific inclusion of Owner and its partners under an additional insured or alternate employer rider. Manager shall provide Owner and its partners with a certificate of insurance evidencing that workers' compensation and employer's liability insurance is in force and providing not less than ten (10) days' notice to Owner prior to cancellation.

5.7 **Indemnification of Manager**. To the extent permitted by law, Owner agrees to defend, indemnify and save harmless Manager from all claims and suits in connection with the Project provided that such claims and suits are attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property, and such claims and suits arise, or are alleged to arise, in whole or in part out of any negligent act or omission of Owner, its officers,

employees or agents. Any such indemnification shall be recoverable solely from the assets of the Owner, other than any reserve accounts held by Owner. Owner agrees to include Manager as an additional insured in Owner's public liability policy with respect to the Project, but only while Manager is acting as real estate manager for Owner under this Agreement. Owner shall provide Manager with a certificate of insurance evidencing such liability insurance and providing not less than ten (10) days' notices to Manager prior to cancellation.

5.8    **Survival of Indemnity Obligations**. The indemnity obligations contained in this Agreement shall survive the termination of this Agreement.

ARTICLE 6

## Owner's Right to Audit

6.1    **Owner's Right to Audit**. Owner reserves the right to conduct or to appoint others to conduct examinations, at Owner's expense, without notification, of the books and records maintained for Owner by Manager and to perform any and all additional audit tests relating to Manager's activities hereunder.

6.2    **Correction of Discrepancies**. Should Owner's employees or appointees discover either weaknesses in internal control or errors in record keeping, Manager shall correct such discrepancies either upon discovery or within a reasonable period of time. Manager shall inform Owner in writing of the action taken to correct such audit discrepancies.

ARTICLE 7

## Remittance of Funds

7.1    **Deposit of Funds**. Manager shall deposit immediately upon receipt all security deposits in a separate account designated as such by the Manager for Owner (the "***Security Deposit Account***") and shall deposit all rents and other funds collected from the operation of the Project, including any and all advance funds, in a bank approved by Owner, in Owner's account for the Project (the "***Operating Account***").

7.2    **Security Deposits**. Manager shall maintain detailed records of all security deposits and such records shall be open for inspection by Owner's employees or appointees. Manager shall obtain Owner's approval prior to the return of such security deposit to any particular Tenant when the amount of such return, in any single instance, exceeds Five Hundred Dollars ($500), and is not part of an ordinary refund of a security deposit to a Tenant upon a Tenant's vacating a unit in a voluntary move and leaving the unit in satisfactory condition.

7.3    **Expenditures**. Any disbursements made by Manager pursuant to this Agreement shall be made out of the Operating Account. Owner agrees to make necessary operating funds available to Manager. Manager shall not be obligated to make any advance to the Operating Account or to pay any amount except out of funds in the Operating Account, nor shall Manager be obligated to incur any extraordinary liability or obligation unless Owner shall furnish Manager with the necessary funds for the discharge thereof. If Manager shall voluntarily advance any amount of its own funds on behalf of Owner for the payment of any obligation or necessary

expense connected with the maintenance or operation of the Project or otherwise, Owner shall reimburse Manager therefor within a reasonable time after demand.

ARTICLE 8

## Compensation

The Manager will be compensated for its services under this agreement by monthly fees, to be paid out of the Operating Account and treated as Project Expenses. Such fees will be payable on the first day of each month of the Agreement beginning on a date to be mutually agreed upon by the parties hereto. Each such monthly fee will be a sum equal to SIX PERCENT (6.0%) of actual rent collections for the preceding month.

ARTICLE 9

## Termination

9.1 **Sale of Property**. This Agreement shall be terminated automatically and immediately upon destruction, condemnation, sale, exchange, or other disposition (excluding any mortgage or refinancing) of the Project by Owner or, at the option of the Owner, upon the removal of the General Partner of Owner if the General Partner is affiliated with Manager.

9.2 **Other Termination**. This Agreement may be terminated by Owner at any time, with or without cause, by giving thirty (30) days written notice of intent to terminate to the Manager. Manager may terminate this Agreement by giving thirty (30) days written notice if Owner does not make available sufficient funds to maintain the Project in compliance with applicable building codes. Additionally, if the Agency notifies the Owner of reasons for which it is not satisfied with the management of the Project, including but not limited to the failure to maintain the property or books and records of the Project, and such deficiency is not remedied in a reasonable time thereafter, then, at the Agency's request the Agency shall offer the management agent the opportunity to cure such dissatisfaction. If such cure is not accomplished within thirty (30) days and the Agency requests a termination of the managing agent, the owner shall engage a replacement managing agent subject to the Approval by the Agency which shall not be unreasonably withheld or delayed.

This Agreement will also terminate by mutual written consent of Manager and Owner or upon the occurrence of any of the following circumstances which shall be considered a default:

(a) The filing of a voluntary petition of bankruptcy or insolvency or a petition for reorganization under any bankruptcy law by either Owner or Manager;

(b) The consent to an involuntary petition in bankruptcy or the failure by either Owner or Manager to vacate within ninety (90) days from the date of entry thereof any order approving an involuntary petition;

(c) The entering of an order, judgment or decree by any court of competent jurisdiction, on the application of a creditor, adjudicating either Owner or Manager a bankrupt or insolvent or approving a petition seeking reorganization or appointing a receiver, trustee or

liquidator of all or a substantial part of such party's assets, and such order, judgment or decree shall continue unstayed and in effect for a period of one hundred twenty (120) consecutive days;

(d)     The failure of Manager to perform, keep or fulfill any of its duties hereunder or to comply with the covenants, undertakings, obligations or conditions set forth in this Agreement, and the continuance of any such default for a period of thirty (30) days after notice of such failure (except in the event of Manager's fraud, gross negligence, willful misconduct, or violation of law, in which case no notice shall be required).

(e)     The Manager has operated the Project in a manner so as not to qualify as a "qualified low-income housing project" under Section 42(g)(1) of the Code.

(f)     The occurrence of a vacancy rate for the Project in excess of ten percent (10%) for any six (6) consecutive month period.

(g)     Any serious problem or repair requiring immediate action by the Manager which has not been remedied.

(h)     The cancellation of any insurance policy without the consent of Owner as required by Section 5.2 of this Agreement.

(i)     The removal of Owner's General Partner under Section 9.02 of the Partnership Agreement.  Manager acknowledges that the provisions of Section 9.02 of Owner's Partnership Agreement are incorporated into this Agreement.

Upon any such event of default, the non-defaulting party shall, without prejudice to any other recourse at law that it may have, give to the defaulting party notice of its intention to terminate this Agreement and the term of this Agreement shall expire.  The defaulting party shall be liable for all costs and expenses incurred by the other party as a result of the defaults.

Within five (5) days after the termination of this Agreement, Manager shall close all accounts and pay the balances or assign all certificates of deposit regarding the Project to Owner.  Within ten (l0) days after the termination of this Agreement, Manager shall deliver to Owner all plans and surveys of the Project in its possession and all books and records, keys, reports, files, leases, contracts, and all other written material and property concerning the Project.  Within thirty (30) days after the termination of this Agreement, Manager shall submit to Owner all reports required under Section 3.14 hereof to the date of such termination, and Manager and Owner shall account to each other with respect to all matters outstanding as of the date of termination.  Upon Owner's request, Manager shall assign to Owner all contracts requested by Owner concerning the Project, to the extent permitted by such contracts, and shall cooperate (at no expense to Manager) with Owner in connection with the transition to a new manager.

9.3     **Final Accounting**.  Upon termination of this Agreement for any reason, Manager shall deliver to Owner immediately upon termination (or upon Manager's subsequent receipt or acquisition) the following with respect to the Project:

(a)     Any Tenant security deposits or other monies belonging to Owner held by Manager on Owner's behalf; and

     (b)     All records, contracts, leases, receipts for deposits, unpaid bills and other papers or documents relating to the Project.

## ARTICLE 10

## Cooperation

If any claims, demands, suits or other legal proceedings which arise out of any of the matters relating to this Agreement be made or instituted by any person against either Owner or Manager, Owner or Manager shall give to each other all pertinent information and reasonable assistance in the defense or other disposition thereof, at its sole expense.

## ARTICLE 11

## Consent

Whenever in this Agreement the consent or approval of Manager or Owner is required such consent or approval shall not be unreasonably withheld or delayed. Such consent shall be in writing and shall be duly executed by an authorized officer or agent for the party granting such consent or approval; *provided, however*, notwithstanding anything in this Agreement to the contrary, if such consent or approval would be required for Manager to comply with the Requirements, Manager shall not be responsible for a failure to comply with the Requirements as a result of Owner's refusal or unreasonable delay to so consent or approve.

## ARTICLE 12

## Notices

All notices, demands, consents and reports provided for in this Agreement shall be given in writing and shall be deemed received by the addressee on the third day after mailing if mailed by United States certified or registered mail, postage prepaid, or on the day delivered if personally delivered at the following addresses:

     If to Owner:     Crotona Partners L.P.
                     c/o SEBCO Development, Inc.,
                     885 Bruckner Boulevard
                     Bronx, New York 10459

     If to Manager:     Building Management Associates
                     885 Bruckner Blvd.
                     Bronx, NY 10459

The above addresses may be changed by the appropriate party giving written notice of such change to the other parties.

ARTICLE 13

## Miscellaneous

13.1 **Assignment**.  Manager shall not assign its rights under this Agreement without the prior written consent of Owner and any purported assignment without Owner's prior written consent shall be of no effect.

13.2 **Special Power of Attorney**.  Owner authorizes Manager as attorney-in-fact for Owner to enter into and execute Leases and rental agreements with respect to the Project on forms approved by Owner, to collect rents and other funds due Owner in Manager's name on Owner's behalf, and to establish and make deposits into and withdrawals from the Security Deposit Account and the Operating Account in accordance with the terms of this Agreement.

13.3 **Amendments**.  This Agreement constitutes the entire Agreement between Manager and Owner and no amendment, alteration, modification or addition to this Agreement shall be valid or enforceable unless expressed in writing and signed by the party or parties to be bound thereby.

13.4 **Headings**.  All headings herein are inserted only for convenience and ease of reference and are not to be considered in the construction or interpretation of any provisions of this Agreement.

13.5 **No Continuing Waiver**.  None of the parties hereto shall be deemed to have waived any rights hereunder unless such waiver shall be in writing and signed by such party.  The waiver by any party of any breach of this Agreement shall not operate or be construed to be a waiver of any subsequent breach.

13.6 **Illegality**.  If any provision of this Agreement shall prove to be illegal, invalid or unenforceable, the remainder of this Agreement shall not be affected thereby.

13.7 **Relationship**.  Nothing contained in this Agreement shall be construed to create a relationship of employer and employee between Owner and Manager, it being the intent of the parties hereto that the relationship created hereby is that of an independent contractor.  Nothing contained herein shall be deemed to constitute Owner and Manager as partners or joint venturers.

13.8 **Binding Effect**.  This agreement shall be binding upon and inure to the benefit of Owner, its successors and permitted assigns, and shall be binding upon and inure to the benefit of Manager, its successors and its permitted assigns.

13.9 **Governing Law**.  This agreement shall be governed by and interpreted in accordance with the laws of the State of New York.

13.10 **Defined Terms**.  Except as expressly provided herein, terms used in this Agreement with initial capital letters shall have the meanings as set forth in the Partnership Agreement.

13.11 **Enforceability**.  The invalidity of any clause, part or provision of this Agreement shall not affect the validity of the remaining portions thereof.  Owner's remedies under this

Agreement are cumulative, and the exercise of one remedy shall not be deemed an election of remedies nor foreclose the exercise of Owner's other remedies. No waiver by Owner of any breach of this Agreement shall be deemed to be a waiver of any other or subsequent breach. Owner or Manager may apply to any court, state or federal, for specific performance of this Agreement, for an injunction against any violations of this Agreement or for such other relief as may be appropriate, since the injury arising from a default under any of the terms of this Agreement would be irreparable and the amount of damage would be difficult to ascertain.

13.12  **Execution of Counterparts**.  For the convenience of the parties, this Agreement may be executed in multiple counterparts, each of which shall constitute a complete original of this Agreement, which may be introduced in evidence or used for any other purpose without the production of any other counterparts.

13.13  **Successors and Assigns**.  This Agreement shall inure to the benefit of and constitute a binding obligation upon Owner and Manager and their respective successors and assigns; *provided, however*, that Manager shall not assign this Agreement, or any of its duties hereunder, without the prior written consent of Owner. In the event Owner's current general partner or any successor general partner of Owner is removed as general partner in accordance with the Partnership Agreement, any successor general partner selected in accordance with such Partnership Agreement shall have authority to act hereunder on behalf of Owner.

*[ signatures begin on the following page ]*

The parties have executed this Property Management Agreement as of the date first above written.

**CROTONA PARTNERS L.P.** a New York limited partnership
By:    Crotona Avenue Development Corp.
        a New York corporation
        its general partner

By: _____
      Salvatore Gigante, Vice President

Building Management Associates
{Manager}

By: _____
Name: _____
Title: _____

**LEGAL DESCRIPTION**

**<u>Lot 42</u>**

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough and County of Bronx, City and State of New York, Lot 979 on Map of Fairmont Oppel Morrislandia, County of Westchester, State of New York, made by Andrew Findlay, dated Westchester County, June 26, 1850, filed in Office of County of Westchester at White Plains, dated December 11, 1850, as Map #21 said premises, being more particularly bounded and described as follows:

BEGINNING at northwesterly side of Grove Street, 117 feet 8 inches northerly from the northwesterly corner of Grove Street and Woodruff Avenue;

RUNNING THENCE northeasterly along Grove Street, 25 feet;

THENCE northwesterly parallel with Woodruff Avenue, 108 feet 9 inches, be the same more or less to Lot #80 on said map;

THENCE southwesterly along Lot #80, 25 feet;

THENCE southeasterly parallel with Woodruff Avenue, 108 feet 9 inches to the point or place of BEGINNING.

Said premises being more particularly bounded and described as follows:

BEGINNING at a point on the westerly side of Crotona Avenue, said point being distance 117.67 feet northerly from the intersection of the northerly side of East 176th Street with the westerly side of Crotona Avenue;

RUNNING THENCE westerly parallel with East 176th Street 109.17 feet to a point;

THENCE northerly on a line having an interior angle of 95° 02' 00" with the last mentioned course a distance of 25.00 feet to a point;

THENCE easterly parallel with East 176th Street 109.17 feet to the westerly side of Crotona Avenue;

THENCE southerly along the westerly side of Crotona Avenue 25.00 feet to the point or place of BEGINNING.

**Lot 47**

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough and County of the Bronx, City and State of New York, more particularly bounded and described as follows:

BEGINNING at the corner formed by the intersection of the Northerly side of East 176th Street (60' wide) and the Westerly side of Crotona Avenue (80' wide);

RUNNING THENCE Westerly along the Northerly side of East 176th Street; 109.17 feet to a point;

THENCE Northerly along a line forming an interior angle of 95 degrees 02 minutes 00 seconds with the preceding course, 117.67 feet to a point;

THENCE Easterly along a line forming an interior angle of 84 degrees 58 minutes 00 seconds with the preceding course, 109.17 feet to a point on the Westerly side of Crotona Avenue;

THENCE Southerly along the Westerly side of Crotona Avenue, 117.67 feet to the point or place of beginning.

**Exhibit F-II**

**LEASING GUIDELINES**

## A. Screening Process

1. **Application**. Each prospective Tenant must complete and sign a written application for lease, containing detailed personal information, previous residences and landlords for several years, information on employment, income, assets, and credit, proposed occupants (including ages) and pets, and references, and containing such other information and statements as will enable Manager to screen the prospective Tenant or as is otherwise proper and advisable for the management of the Project in accordance with professional standards.

2. **Interview**. Manager shall interview each proposed adult occupant of the housing unit to be leased in order to help determine the character of such persons.

3. **Employment**. Manager shall verify the accuracy of employment information and income information given by the prospective Tenant.

4. **Housekeeping**. If possible, Manager shall check with one or more previous landlords of the proposed Tenant and other occupants with respect to their ability to maintain an apartment in good condition and to abide by building rules. If verbal information is vague or questionable, Manager shall visit the proposed occupants' present residence(s).

5. **Other**. If advisable, Manager shall check other references and perform other screening of the proposed Tenant.

6. **Approval**. Manager shall approve the proposed Tenant's lease application only if, in Manager's best professional judgment, the proposed Tenant is qualified to pay rent when due and all proposed occupants are likely to maintain properly the dwelling unit, abide by reasonable rules, and otherwise be suitable occupants of the Project. Also, without Owner's prior written consent, Manager shall not approve any lease application unless the Tenant and other proposed occupants meet the rental guidelines contained in the Requirements.

## B. Lease

1. **Application**. Prior to leasing any dwelling unit, Manager shall have screened the prospective Tenant and all other proposed occupants in accordance with Section A hereof, and shall have approved the lease application as described above.

2. **Lease Form**. In leasing dwelling units, Manager shall use only the form of lease approved in writing by Owner from time to time, without material changes unless approved in writing by Owner.

3. **Approved Rent**. Manager shall not lease any dwelling unit for a rental amount other than as specified in the rent schedule included as part of Owner's approved operating budget or otherwise approved by Owner in writing.

4.     **Security Deposit**.  Manager shall obtain not less than a One Hundred Dollars ($100) security deposit, and shall require such greater amount as circumstances warrant, but not more than the maximum allowed by law. Manager shall also, if advisable, collect a key deposit, subject to applicable law.

5.     **Named Tenant; Occupants; Pets**.  Each adult occupant of the dwelling unit shall be named as Tenant in the Lease, and shall be jointly and severally liable for rental payments.  The Lease shall specify all other permitted occupants and pets, and it shall be a default if any non-permitted occupant resides in the dwelling units.

6.     **Term**.  Each Lease shall be for a term of at least six (6) months.

7.     **Certain Lease Provisions**.  The form of lease to be approved by Owner shall contain detailed provisions concerning the following matters of practical importance, including, but not limited to:

(a)     *Condition of Unit*.  Acknowledgment of the condition of the dwelling unit as described in a unit inspection report;

(b)     *Default Charges*.  Tenant's liability for the following default charges:  late rent payment charges; returned check charges; lost keys; damage to the dwelling unit or the Project not caused by ordinary wear and tear; missing property, fixtures or equipment; and costs of rent collection and eviction;

(c)     *Security Deposit*.  Procedures concerning deductions from and return of security deposit, with interest to the extent required by law, and any key deposit;

(d)     *Utilities and Other Charges*.  Tenant's responsibilities concerning utility services to the dwelling unit, other services to the dwelling unit, other services provided by Owner or Manager, and any parking or other charges;

(e)     *Maintenance*.  Maintenance duties of Tenant and of Owner, respectively, separately listed;

(f)     *Alterations*.  Requirement of Owner's or Manager's consent to alterations of the dwelling unit, listing examples, and to changes of keys and locks;

(g)     *Use Restrictions*.  Restrictions on Tenant's use of the dwelling units, including hazards, noise, nuisance, etc.;

(h)     *Changes*.  Tenant's obligation to report changes in Tenant's household, employment status or income;

(i)     *Rules*.  Tenant's and all other occupants' obligation to comply with any rules and regulations issued by Owner or Manager.  A copy of any such rules shall be provided to the Tenants or posted on the premises.

(j)     *Other*.   Other provisions customarily included in apartment leases or advisable for the Project, and all provisions necessary to comply with the requirements; and

(k)     *Attachments*.   Acknowledgment of Tenant of any attachments to the Lease.

8.     **Execution**.   Manager shall execute each Lease as agent for Owner.

**ADDENDUM TO PROPERTY MANAGEMENT AGREEMENT**

This Addendum ("*Addendum*") to that certain Property Management Agreement ("*Agreement*") dated as of December 14, 2022, by and between Crotona Partners L.P. ("*Owner*") and Building Management Associates, Inc. ("*Manager*") (collectively the "*Parties*"). This Addendum to Property Management Agreement is dated effective as of December 14, 2022 (the "*Effective Date*").

Capitalized terms used but not defined in this Addendum shall have the same meanings given to them in Owner's First Amended and Restated Agreement of Limited Partnership ("*Partnership Agreement*"). For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereto agree as follows:

1.  Leasing of Premises:

Manager is hereby authorized to execute, deliver and renew leases on behalf of Owner, in such form/s as approved by the Owner, and in accordance with Owner's guidelines, practices, and procedures.

2.  Employment of Personnel:

The Manager shall hire, discharge and supervise any and all labor reasonably required for the operation and maintenance of the Partnership Property. All employees so hired shall be hired by Manager in its own name and shall not be hired as or otherwise deemed employees of Owner. Manager shall deduct from such employees' salaries or wages all taxes that may be payable in connection with unemployment insurance, social security and withholding taxes, as well as any other taxes that may be applicable. Manager shall be solely liable to such employees for the payment of wages and/or other compensation. Whenever the services of independent contractors are used by Manager, Manager shall use its best efforts to secure such services at the best price available, taking into consideration the quality of work to be done by, and the reliability of such independent contractors. If an affiliate or division of the Manager is employed to render such services, the cost to Owner shall not exceed the cost of like services had they been procured in the open market at arms' length nor the cost of like services charged by such affiliate or division to any other owner to whom Manager was then rendering management services.

3.  [reserved]

4.  Insurance:

a.  Owner Insurance Policies. Manager shall obtain and keep in force such forms and amount of insurance requested by Owner, at Owner's expense, as necessary under the Requirements with insurance companies satisfactory to Owner, including but not limited to insurance against physical damage (fire and extended coverage endorsement, boiler and machinery, etc.) and against liability for loss, damage or injury to property or persons which might arise out of the occupancy, management, operation or maintenance of any part of the Project. Manager shall be named as an additional insured while acting as real estate Manager for Owner in

all liability insurance maintained with respect to the Project. Manager shall investigate and promptly furnish to Owner full written reports of all accidents, claims and potential claims for damages relating to the Project, and shall cooperate fully with Owner's insurers, regardless of whether the insurance was arranged by Manager or others. Manager shall provide a copy of such insurance policies to Owner and, to the extent required under the Loan Documents, to any lenders. Manager shall not cancel any insurance policy without the prior written consent of Owner. Any failure to obtain such consent shall be a default under this Agreement and Manager shall indemnify Owner for any damages as a result of any such default.

      b.   <u>Manager's Insurance</u>. At all times during the term of this Agreement, Manager shall maintain, at its own expense, the following in full force and effect:

      a.   A commercial general liability policy with minimum limits of One Million Dollars ($1,000,000) per occurrence and Two Million Dollars ($2,000,000) in the aggregate, and $5,000,000 umbrella for structures with 1-10 stories or $10,000,000 umbrella for structures with 11 or more stories. A per location aggregate endorsement should be included on an unlimited basis for any policy that has multiple locations. Owner shall be named as an additional insured via form CG 2026 or 2027 or carrier's equivalent.

      b.   A fidelity bond or employee dishonesty policy in an amount equal to the gross potential income of the Project for three (3) months, in order to protect Owner against misapplication of Project funds by Manager and/or its employees. Owner shall be named as a loss payee.

      c.   Comprehensive automotive liability insurance for all owned, hired and non-owned vehicles operated by Manager's off-site employees with minimum limits of One Million Dollars ($1,000,000) combined single limits per occurrence for bodily injury and property damage and physical damage (collision and comprehensive) liability.

      d.   Insurance for statutory workers' compensation and other employee benefits required by all applicable laws (in regard to lost wages and medical cost reimbursement) with respect to Manager's corporate employees.

      e.   Employer's liability insurance for an amount not less than Two Million Dollars ($2,000,000) covering claims and suits by or on behalf of employees and others, not otherwise covered by statutory workers' compensation insurance.

Manager shall obtain the foregoing from a responsible insurance company reasonably satisfactory to Owner and to Mortgagees. Manager shall furnish Owner a certificate of insurance evidencing such coverage and providing thirty (30) days prior written notice of cancellation, non-renewal or any material change in coverage, ten (10) days for non-payment of premium.

      c. <u>Subcontractor's Insurance</u>. Manager shall require that all vendors or service providers working on the Project maintain, at the vendor's or service provider's expense, worker's compensation insurance, in such amounts as may be required by law from time to time. Project

Manager shall be notified promptly in the event Owner waives any of the requirements in this Section 4.

5.      [reserved]

6.      [reserved]

7.      [reserved]

8.      Liability of Manager.  Except as expressly provided to the contrary herein, the obligations and duties of Manager under this Agreement shall be performed as agent of Owner, but Manager shall be personally liable for its breaches of this Agreement and for damages and costs (including reasonable attorney's fees) resulting from Manager's gross negligence or willful misconduct.  All expenses incurred by Manager in accordance with its obligations and duties under this Agreement and consistent with Owner's approved Budget, except those due to its breaches of this Agreement or gross negligence or willful misconduct and those expressly specified as Manager's expenses herein, shall be for the account of and on behalf of Owner.

9.      Standard of Conduct.  Manager acknowledges that the Owner Property will generate low income housing tax credits ("*LIHTC*") as provided in Section 42 of the Code and that compliance with the requirements of the Code and the rules and regulations thereunder is required in order to maintain the LIHTC.  Manager represents that it is experienced in professional management of property of a character and nature similar to the Project and Manager agrees to manage the Project and perform its obligations under this Agreement in accordance with the highest professional standards for such property.

10.      HUD Requirements.  In furtherance of Owner's business purposes, Manager shall rent units in the Project only to individuals or families who, at a minimum, qualify under the guidelines established for the State of Utah, by the Secretary of the United States Department of Housing and Urban Development as 'low or moderate income' families.  Manager shall, in renting housing units, obtain such references and perform such background checks as are customary in residential real estate management.

11.      Low Income Housing Tax Credit Requirements.  Manager acknowledges that Owner is required to comply with Section 42(g)(1)(B) of the Internal Revenue Code (as modified by Sections 42(g)(4) and 142(d)(6)).  In addition, Manager acknowledges Owner is required to use its best efforts to lease one hundred percent (100%) of Units to tenants at rent levels that qualify such apartments for inclusion in determining federal low-income housing tax credits (the "*Credits*") for the Project pursuant to Section 42 of the Code, which entails compliance with the following requirements:

1.      118 of the Units comprising the Project to be occupied by Qualifying Tenants with incomes at or below sixty percent (60%) of area median income (which, during the term of the HAP Contract, will be further restricted to fifty percent (50%) of area median income), and 15 of the Units comprising the Project to be occupied by Qualifying Tenants with incomes at or below fifty percent (50%) of area median income, and all such units will be rent-restricted at thirty percent (30%) of the applicable income restriction, as agreed to in the Credit Application, the Loan

Documents and the Regulatory Agreements (unless waived in writing by the applicable governmental agency or Mortgagee).

2. The gross rent (including all utilities) for each unit may not exceed thirty percent (30%) of the qualifying income level for the tenant under Subparagraph (i) above as determined pursuant to Section 42(g)(2)(C) of the Code.

3. Manager further acknowledges that obtaining the Credits will have substantial economic value to Owner and its members. Manager will familiarize itself with the low-income housing tax credit requirements as they relate to Manager's leasing and management duties hereunder and shall use its best efforts to comply with such requirements and to the extent Manager is unable to do so, Manager shall promptly notify Owner of such fact and the reasons therefor. Incident thereto, the following provisions shall apply:

4. Manager shall require each prospective tenant to certify, on the Lease application or Lease, the amount of such tenant's annual family income, family size, and any other information required to enable Owner to obtain the Credits or otherwise reasonably requested by Owner. Manager shall require tenants to certify in writing as to such matters on an annual basis, prior to such time as the information is required for reporting purposes;

5. Manager shall from time to time furnish Owner with a written schedule of maximum rents for the apartments that complies with the Requirements, for Owner's (and any lender's, if required) approval. Without Owner's (or any lender's, if required) express prior written consent, Manager shall not enter into any lease on behalf of Owner at a rental amount exceeding the applicable maximum;

6. Manager shall maintain and preserve all written records of tenant family income and size, and any other information necessary to comply with the Requirements or otherwise reasonably requested by Owner throughout the term of this Agreement, and shall turn all such records over to Owner upon the termination or expiration of this Agreement; and

7. If requested by Owner, Manager shall prepare reports of low-income leasing and occupancy and other matters related to Manager's obligations hereunder and to the operation of the Project in form suitable for submission in connection with the Credits and in compliance with the Requirements.

12. Termination

a. Sale of Partnership Property. This Agreement shall be terminated automatically and immediately upon destruction, condemnation, sale, exchange, or other disposition (excluding any mortgage or refinancing) of the Project by Owner or, at the option of the Owner, upon the removal of the General Partner of Owner if the General Partner is affiliated with Manager.

b. Other Termination. This Agreement may be terminated by Owner at any time, with or without cause, by giving thirty (30) days written notice of intent to terminate to the Manager.

Manager may terminate this Agreement by giving thirty (30) days written notice if Owner does not make available sufficient funds to maintain the Project in compliance with applicable building codes.  This Agreement will also terminate by mutual written consent of Manager and Owner or upon the occurrence of any of the following circumstances which shall be considered a default:

        (i)       The filing of a voluntary petition of bankruptcy or insolvency or a petition for reorganization under any bankruptcy law by either Owner or Manager;

        (ii)      The consent to an involuntary petition in bankruptcy or the failure by either Owner or Manager to vacate within ninety (90) days from the date of entry thereof any order approving an involuntary petition;

        (iii)     The entering of an order, judgment or decree by any court of competent jurisdiction, on the application of a creditor, adjudicating either Owner or Manager a bankrupt or insolvent or approving a petition seeking reorganization or appointing a receiver, trustee or liquidator of all or a substantial part of such party's assets, and such order, judgment or decree shall continue unstayed and in effect for a period of one hundred twenty (120) consecutive days;

        (iv)     The failure of Manager to perform, keep or fulfill any of its duties hereunder or to comply with the covenants, undertakings, obligations or conditions set forth in this Agreement, and the continuance of any such default for a period of thirty (30) days after notice of such failure (except in the event of Manager's fraud, gross negligence, willful misconduct, or violation of law, in which case no notice shall be required).

        (v)      The Manager has operated the Project in a manner so as not to qualify as a "qualified low-income housing project" under Section 42(g)(1) of the Code.

        (vi)     The occurrence of a vacancy rate for the Project in excess of ten percent (10%) for any six (6) consecutive month period.

        (vii)    Any serious problem or repair requiring immediate action by the Manager which has not been remedied.

        (viii)   The cancellation of any insurance policy without the consent of Owner as required by Section 5.2 of this Agreement.

        (ix)     The removal of Owner's General Partner under Section 9.02 of the Partnership Agreement.  Manager acknowledges that the provisions of Section 9.02 of the Partnership Agreement are incorporated into this Agreement.

Upon any such event of default, the non-defaulting party shall, without prejudice to any other recourse at law that it may have, give to the defaulting party notice of its intention to terminate this Agreement and the term of this Agreement shall expire.  The defaulting party shall be liable for all costs and expenses incurred by the other party as a result of the defaults.

Within five (5) days after the termination of this Agreement, Manager shall close all accounts and pay the balances or assign all certificates of deposit regarding the Project to Owner.

Within ten (l0) days after the termination of this Agreement, Manager shall deliver to Owner all plans and surveys of the Project in its possession and all books and records, keys, reports, files, leases, contracts, and all other written material and property concerning the Project. Within thirty (30) days after the termination of this Agreement, Manager shall submit to Owner all reports required under Section 11 and Section 13 hereof to the date of such termination, and Manager and Owner shall account to each other with respect to all matters outstanding as of the date of termination. Upon Owner's request, Manager shall assign to Owner all contracts requested by Owner concerning the Project, to the extent permitted by such contracts, and shall cooperate (at no expense to Manager) with Owner in connection with the transition to a new Manager.

     c.    <u>Final Accounting</u>. Upon termination of this Agreement for any reason, Manager shall deliver to Owner immediately upon termination (or upon Manager's subsequent receipt or acquisition) the following with respect to the Project:

     (i)    Any tenant security deposits or other monies belonging to Owner held by Manager on Owner's behalf; and

     (ii)    All records, contracts, leases, receipts for deposits, unpaid bills and other papers or documents relating to the Project.

     13. <u>Records: Reporting</u>:

     In addition to any requirements specified in this Agreement, Manager shall have the following responsibilities with respect to records and reports:

     a.    Manager shall establish and maintain a system of records, books, and accounts in a manner satisfactory to Owner which is consistent with and for the durations mandated by the Requirements. All records, books, and accounts shall be subject to examination at reasonable hours upon reasonable notice by any authorized representative of Owner;

     b.    Manager shall prepare a monthly report in accordance with the Requirements and in form satisfactory to Owner, and any other reports which are necessary to conform to the Requirements and are consistent with Manager's duties hereunder, containing and including at least the following: (i) a statement of income and expenses and accounts receivable and payable for the preceding month, including an itemized list of all delinquent rents as of the tenth (10th) day of the current month, as well as a report on action taken thereof by Manager; (ii) a rent roll/cash receipts form for the previous month; (iii) a disbursements summary for the previous month; (iv) current bank statements with reconciliation of the Operating and Security Deposit Accounts; and (v) a narrative of any unusual actions taken or emergencies responded to, and a full report of any accidents, claims and potential claims, for the previous month and any other information required by the Requirements. Manager shall submit each such report to Owner on or before the fifteenth (15th) day of each month and shall send all reports that are required to be sent to any lenders to Owner for Owner's prior approval, which approval shall not be unreasonably withheld or delayed; *provided, however*, that Owner shall have two weeks to review such reports prior to submission to any lender;

    i.   Manager shall prepare, execute and file all forms, reports and returns required by law in connection with the employment of personnel, unemployment insurance, workman's compensation insurance, disability benefits, Social Security, and other similar insurance, and all other benefits or taxes now in effect or hereafter imposed;

    ii.   All bookkeeping, data processing services, and management overhead expenses shall be paid for by Manager;

    iii.   Manager shall promptly furnish such additional information (including monthly occupancy reports) as may be requested from time to time by Owner with respect to the renting and financial, physical, or operational condition of the Project; and

    iv.   Manager shall establish tenant files containing copies of Leases, certification forms, notices, and other documentation required by Owner as necessary to conform to the Requirements.

14.   <u>Owner's Right to Audit:</u>

a. Owner's Right to Audit.  Owner reserves the right to conduct or to appoint others to conduct examinations, at Owner's expense, without notification, of the books and records maintained for Owner by Manager and to perform any and all additional audit tests relating to Manager's activities hereunder.

b. Correction of Discrepancies.  Should Owner's employees or appointees discover either weaknesses in internal control or errors in record keeping, Manager shall correct such discrepancies either upon discovery or within a reasonable period of time.  Manager shall inform Owner in writing of the action taken to correct such audit discrepancies.

15.   <u>Resident Services Requests:</u>  The Manager shall systematically and promptly receive and investigate all service requests, and take such action thereon as may be justified, and shall keep records of the same.  Emergency requests shall be responded to as promptly as possible but, in all cases, within twenty-four hours.  Complaints of a serious nature shall be promptly reported to Owner and investigated, and Manager shall keep Owner informed of the investigation's progress and conclusion.

16.   <u>Conflicts</u>.  The provisions of this Addendum supersede and replace any and all conflicting provisions of the Agreement.

17.   <u>Remaining Provisions Unaffected</u>.  Notwithstanding Section 11 hereof, except as expressly modified and amended by this Addendum, the terms and conditions of the Agreement shall remain unaffected and shall remain in full force and effect.

IN WITNESS WHEREOF, the Parties hereto have affixed or caused to be affixed their respective signatures, under seal, as of the Effective Date set forth above.

OWNER:                          CROTONA PARTNERS L.P., a New York limited
                                partnership, by its general partner, Crotona Avenue
                                Development Corp., a New York corporation


                                By: _____
                                     Salvatore Gigante, Vice President


MANAGER:                        BUILDING MANAGEMENT ASSOCIATES, INC.,
                                a New York corporation


                                By: _____
                                     Latoya Allen , Vice President