UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
BUILDING MANAGEMENT ASSICATES, INC.,

        Plaintiff,

  vs.

SALVATORE GIGANTE and LATOYA ALLEN,

        Defendants.
-------------------------------------------------------------------X

Civil Action No.:
1:23-cv-01340-JLR

**DECLARATION OF**
**SALVATORE GIGANTE**

Salvatore Gigante, pursuant to the provisions of 28 U.S.C. § 1746, declares under penalty of perjury that the following is true and correct:

1.     I make this Declaration in opposition to the request of Building Management Associates, Inc. ("BMA") for a Temporary Restraining Order ("TRO")[1] prohibiting me from: (a) interfering with BMA's management of the fifteen properties identified in the TRO ("Properties"); (b) transferring, or seeking to transfer, management of any of the Properties away from BMA to any other individual or entity owned, controlled and/or managed by myself and Latoya Allen ("Allen"); (c) hiring any present or former BMA employees; (d) communicating with current BMA employees for purposes of persuading them to resign from BMA and/or seek employment with my myself or Ms. Allen or any entity under ownership, control and/or management of myself or Ms. Allen; and (e) communicating with any vendors engaged in servicing BMA and/or the Properties, including but not limited to MRI Software LLC and Heat Inc.

---

[1] This response is being submitted pursuant to the Court's Order of February 17, 2023 (ECF No. 18) permitting a response to BMA's application for a TRO. I hereby reserve my rights to formally submit further opposition to BMA's application for and Preliminary Injunction in the event this Court signs the Order To Show Cause.

1

2. I am the former President of BMA, the current Chief Operating Officer of SEBCO, and a member of the SEBCO Board (as defined below). By its terms, the proposed TRO seeks to prevent me from taking future action regarding BMA's business of managing the Properties, including the transfer of properties, employees and vendors away from BMA. However, I was already terminated from BMA as its President back in January 2023. I had no employment agreement or any non-compete, non-solicitation, or non-circumvention agreement. Since then, the SEBCO Board also terminated BMA's management agreement for SEBCO buildings and is moving that function entirely in-house. I have not, nor am not asking, any Property Owner to transfer its management to SEBCO. Nor have I asked, nor will ask any BMA employee to work for SEBCO. Many BMA employees have chosen to resign from BMA and work for SEBCO after I was terminated myself. Last, I have not, nor will I, ask any vendor to stop servicing BMA. There is simply no need for any TRO or injunction.

3. By way of backdrop, the late Father Louis R. Gigante is my great uncle. He founded the South East Bronx Community Organization in 1968 to develop housing Hunts Point Section of the Bronx. The organization was later incorporated as SEBCO Development, Inc. ("SEBCO"), a not-for-profit corporation that has either sponsored and/or developed over 6,000 new or rehabilitated affordable housing units in approximately 450 buildings throughout the South Bronx. They include all of the fifteen (15) Properties set forth in the Plaintiff's motion, which are owned by SEBCO-controlled entities (the "Property Owners"). *See* Declaration of David Samuels dated February 22, 2023 at ¶4.[2]

---

[2] Hereinafter, "Samuels Decl. ¶__."

4.    Father Gigante also held the majority shareholder interest in BMA, a for-profit, building management company. Among others, BMA provided management services to the Property Owners pursuant to written management agreements. However, because of a series of certain events, the SEBCO Board terminated those agreements and is in the process of transitioning building management entirely in-house. *See* Samuels Aff. ¶12. Those events include my termination as BMA President and how Luigino ("Gino") Gigante and Irwin Siegel ("Siegel") replaced me at BMA's offices.

5.    BMA derides my college education in the Complaint (¶31) to justify my being terminated. However, I graduated the University of North Carolina in 2002 as an All-American athlete with an intention to pursue a career aligned with my uncle's vision for SEBCO and the community it serves. I earned a B.A. in Management and Society, "an interdisciplinary major that focuses on the institutional context and inner workings of organizations" that "prepares students for positions in both private or public-sector organizations," such as SEBCO and BMA.[3]

6.    During college, I interned at SEBCO. After obtaining my degree, I began working at BMA in 2004 as a property manager. My duties increased over the years, culminating in managing approximately 1000 units at various SEBCO properties. In 2008, I became Executive Director of BMA. I was promoted to Executive Vice President of BMA in 2010. By 2019, I was the President of BMA.

7.    My professional career has also involved significant executive leadership for SEBCO. I led many of SEBCO's new projects from conception to groundbreaking, including Crotona Belmont (i.e., Crotona Partners, L.P.), a senior affordable housing

---

[3] https://catalog.unc.edu/undergraduate/programs-study/management-society-major-ba (last accessed February 21, 2023)

project with an approximate $60 Million Dollar construction cost. On behalf of SEBCO, I helped obtain New York City Department of Housing Preservation and Development ("HPD") approval for project-based vouchers (in connection with Section 8) to subsidize the cost to each resident. In addition, on behalf of SEBCO, I also helped obtain a grant administered by the State of New York to provide supportive services and staff to residents. For the benefit of SEBCO, I also closed two of the most significant loans issued by HPD in 2010 and 2012 for other SEBCO housing projects as well as spearheaded multiple refinances of several existing SEBCO properties, including a low-income housing tax credit project for two SEBCO projects providing senior housing in 2016.

8. For such these efforts and many others, the SEBCO Board appointed me Chief Operating Officer of SEBCO in 2012. By 2014, I became a member of the SEBCO Board. Over the years, I have worked to establish standards for hiring efficiencies, update physical facilities, and to implement state and federal grant programs as well as private grants by ConEd. During my tenure at SEBCO and in conjunction with all those working at SEBCO, SEBCO added various properties to its real estate portfolio totaling millions of dollars that benefit SEBCO residents. This includes my efforts to strengthen Sentry Security, a wholly owned subsidiary of SEBCO, as its own Chief Operating Officer, to expand video monitoring for SEBCO properties including creating an entire video monitoring station while renegotiating vendor contracts to decrease costs while increasing security services all for the benefit of SEBCO residents. In sum, the once struggling SEBCO became financially and operationally stable during my continued tenure as an officer and board member.

9. Although separate entities, SEBCO and BMA have worked closely together in service of the SEBCO Board's mission of providing affordable housing and community services as outlined above to residents of SEBCO properties including the Property Owners. SEBCO has leased an office located at 885 Bruckner Boulevard, Bronx, New York 10459 (the "Building"). Many SEBCO and BMA employees have worked side by side in the office in the Building on day-to-day SEBCO matters including management of the Properties. Some key employees such as myself, Ms. Allen, and others such as the Comptroller, are jointly employed by both SEBCO and BMA. In effect, both SEBCO and BMA have shared their employees with each other over the years. They would account to each other through charge-backs for their respective cost of utilizing the other's employees. Under this arrangement, many of the management functions that BMA was required to perform for SEBCO and the Property Owners have been handled by individuals employed by SEBCO or jointly employed by both entities.

10. In addition, both SEBCO and BMA had engaged the services of Mr. Siegel as their respective accountant and attorney for many years. He provided legal and accounting services to both entities, including on many of the projects, deals, and initiatives I carried out on behalf of SEBCO and BMA. Through his work with Father Gigante, Mr. Siegel became intimately involved with the finances and operations of both entities including the preparation and approval of their respective financial statements and tax returns. BMA's allegations in the Complaint against me regarding any unauthorized payments whether in the form of car payments, loans, or otherwise (none of which are the subject of the TRO) were reviewed and approved by Mr. Siegel as BMA's accountant. For this and other reasons, those allegations are denied.

11. In or around August 10, 2021, the SEBCO Board accepted Father Gigante's resignation from the SEBCO Board. That same year, Mr. Siegel disclosed for the first time that he allegedly also held a general power of attorney over all of Father Gigante's personal affairs. Essentially, Mr. Siegel asserted that he now effectively stood in the shoes of Father Gigante.

12. Father Gigante's succession plan to ensure the continuation of BMA and the seamless working relationship between BMA and SEBCO was to allow me to purchase Father Gigante's 80% majority shareholder interest pursuant to an option agreement in 2016 in which Mr. Siegel was involved. Unfortunately, due to inadvertence, payments were not made timely. Contrary to BMA's assertion (Complaint ¶34), when I tried to make such payments *prior* to Father Gigante's death, Mr. Siegel rejected them at a time when Father Gigante was no longer capable of making decisions and Mr. Siegel was making decisions for him under a power of attorney. Plaintiff's allegations otherwise are feigned excuses to avoid Father Gigante's plan for self-serving reasons.

13. He also started to insert himself into the business affairs of SEBCO and BMA while still acting as their respective counsel and accountant. This conflict of interest, among other issues with Mr. Siegel, caused the SEBCO Board to decide to terminate SEBCO's professional relationship with Mr. Siegel. As to other matters involving SEBCO, the Court is respectfully referred to the submissions of SEBCO's counsel.

14. Mr. Siegel has taken actions in apparent response. Having thwarted Father Gigante's intention to transfer the majority of shares of BMA to me, Mr. Siegel

maintained control of BMA because he is also the sole trustee of the BMA shares which are being held in trust for Gino. As Trustee of that trust, Mr. Siegel continues to exercise the powers of a majority shareholder.

15. On January 9, 2023, Mr. Siegel and Gino appeared at BMA's offices to summarily terminate my longstanding employment and take over BMA's operations. I was not present at the time due to a pre-planned trip. I was, however, able to observe via video link and to review events with SEBCO employees. Mr. Siegel and Gino entered the office together with three unidentified individuals carrying guns on their waists. Gino brandished my termination letter (from BMA) as if a search warrant to all the employees, and announced that he was now in charge. Yet, many staff present worked for SEBCO, not BMA. They were very confused. One of the armed individuals stood at Ms. Allen's the door and another stood at the entrances to the staircase to the Building the entire time. My office was ransacked. The staff then present were very frightened, visibly upset, and many were in tears. Given the circumstances, I requested that SEBCO's security company respond to SEBCO's offices.

16. Mr. Siegel and presumably Gino were aware of the arrangement between SEBCO and BMA to share the office space in the Building and to utilize each other's staff members pursuant to the charge-back arrangement. Again, Mr. Siegel was the former counsel and accountant for SEBCO. Indeed, Mr. Siegel routinely communicated with me as an officer of SEBCO. Yet, Mr. Siegel's and Gino's behavior on that day was disruptive and disrespectful of the SEBCO employees who worked in the office, including myself, as well as SEBCO's files and information located there, including in my locked office. Both Mr. Siegel and Gino presumably knew I was employed by both

7

BMA and SEBCO and that my desk contained information belonging to BMA and SEBCO. Nevertheless, in violation of SEBCO's rights as a tenant in the Building, they attempted to break into my locked office and, when they were given entry by Ms. Allen, they ransacked my office and boxed up many of my items.

17. Upon my return to the SEBCO office on January 10, 2023, an employee found what appeared to be a gun on the premises. The police had to be called to retrieve the gun and to protect everyone's safety. The staff remained fearful that the armed men would return. Many continued to cry because they had never been physically intimidated like that before. Furthermore, many were also fearful of losing their jobs. I understand that Mr. Siegel threatened many BMA and SEBCO employees that they would be fired if they did not follow his demands. Mr. Siegel and Gino also asked many SEBCO employees to resign from SEBCO and transfer their employment to BMA, including SEBCO's Vice President, Comptroller, payroll clerk, and accounts payable clerk.

18. Contrary to the alleged "poaching" of BMA employees (Complaint ¶97), neither I nor Ms. Allen have engaged in any such activity. Many of the BMA staff only knew me or Ms. Allen as their superiors at BMA. After the events on January 9 and 10, 2023 (as well as afterwards), many of the BMA employees were gravely concerned about Gino. Unlike myself and Ms. Allen, Gino lacks experience in the affordable housing sector. Their first introduction to Gino was also under the threat of armed individuals. I understand that, after these events, many of the individuals who worked for BMA (or who worked for both BMA and SEBCO) decided to resign from BMA. Although I sympathized with those decisions, I did not try to influence them.

19. At the SEBCO Board's request, I relayed my experience regarding the events of January 9 and 10, 2023 to the SEBCO Board, consistent with my obligations as SEBCO's Chief Operating Officer. However, as a SEBCO Board member, I recused myself from the Board's deliberations on the subject. The SEBCO Board determined independently to terminate its contractual relationship with BMA as relates to all of the Properties and to transition their building management functions entirely in-house at SEBCO. Again, the Complaint incorrectly alleges that I and Ms. Allen sought to move building management to "[my] a new company just down the block." (Complaint ¶97). At no time did I or Ms. Allen ever seek to do so. That is false. The SEBCO Board independently determined to transition to self-management under its auspices. Having been terminated from BMA without any written contract or any restrictive covenants, it is my remaining role as SEBCO's COO is to implement the Board's plan.

20. In addition, BMA incorrectly alleges that I improperly communicated with BMA vendors such as MRI Software LLC ("MRI"). This is also false. As alleged, MRI maintains a "database" (Complaint ¶104). However, the Complaint does not explain that the database contains critical data regarding SEBCO properties such as rent ledgers, tenant information, etc. This information belongs to the Property Owners, not to BMA, which is merely a service provider to the Property Owners. SEBCO and the Property Owners are entitled to have access to their own information concerning the Properties. Furthermore, they require this information to now manage the Properties in-house at SEBCO.

21. It is SEBCO, and not BMA, that is being damaged during this transition process set to take in effect on February 25, 2023 (as extended by SEBCO). In the

meantime, BMA's conduct is damaging SEBCO and the Property Owners. BMA is not working with SEBCO to transition management as it should, as required under the Management Agreements. Instead, BMA has actively tried to obstruct the transition, by refusing to comply with requests for information, removing access to the Property Owners' bank accounts, intimidating employees, and – most recently – by seeking to enjoin me. There is no basis to allege any interference or improper communications relating to Properties and BMA staff. Rather, I have always acted in accordance with my role as an officer of SEBCO. Notably, most if not all of the supposed acts of "interference" occurred after I was fired from my position with BMA on January 9, 2023.

22. Since terminating me, it appears that Gino has done virtually nothing to understand BMA's operations, the workflow, the job descriptions, and daily activities necessary to manage the Properties and operate the business. Since SEBCO continues for the time being to share office space with BMA, I observe these issues. Mr. Siegel and Gino's actions have confused SEBCO and BMA staff, decreased morale and have left people questioning the disruptive way Gino is attempting to operate BMA. A TRO against me is not necessary to cure the disruption that he and Mr. Siegel themselves have caused.

23. For the reasons set forth above and in other simultaneous submissions with respect to BMA's application for injunctive relief, I respectfully request that the Court decline to sign the pending Order To Show Cause and/or issue any order directing injunctive relief against me. To do so would unduly impede my ability to perform by role and responsibilities as Chief Operating Officer of SEBCO and, consequently, will prejudice SEBCO by limiting my ability to continue to provide operational leadership to

SEBCO generally and, more specifically, with respect to the necessary transition of the management of the buildings and thousands of occupied units from BMA to SEBCO. Any injunctive relief would, consequently, adversely affect the SEBCO residents most of all, since they depend on effective and efficient building management and security for their well-being. This - above all - was Father Gigante's mission to which I dedicated my education and career.

Executed on February 22, 2023 at Greenwich, Connecticut.

Salvatore Gigante